UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| ITT EDUCATIONAL SERVICES, INC., *et al.*[1] | ) | Case No.  16-07207-JMC-7A |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ———————————————— | ) | |
| | ) | |
| DEBORAH J. CARUSO, the CHAPTER 7 | ) | |
| TRUSTEE for ITT EDUCATIONAL | ) | |
| SERVICES, INC., ESI SERVICE CORP. and | ) | |
| DANIEL WEBSTER COLLEGE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Adversary No. _____ |
| | ) | |
| vs. | ) | |
| | ) | |
| KEVIN MODANY, JOHN E. DEAN, C. DAVID | ) | |
| BROWN II, JOANNA T. LAU, THOMAS I. | ) | |
| MORGAN, JOHN VINCENT WEBER, JOHN F. | ) | |
| COZZI, SAMUEL L. ODLE, and JERRY M. | ) | |
| COHEN, | ) | |
| | ) | |
| Defendants. | ) | |

## ADVERSARY COMPLAINT

Plaintiff Deborah J. Caruso ("Plaintiff" or "Trustee"), as Chapter 7 trustee for ITT

Educational Services, Inc., ESI Service Corp., and Daniel Webster College, Inc. (collectively,

"ITT," "Debtors," or the "Company") brings this action against ITT's former Chief Executive

Officer ("CEO"), Kevin Modany ("Modany"), and the eight individuals who served as members

of ITT's board of directors (the "Board") during all or part of the period beginning on April 20,

2016 and ending with ITT's September 16, 2016 bankruptcy: John E. Dean ("Dean"), C. David

---

[1] The debtors in these cases, along with the last four digits of their respective federal tax identification numbers are ITT Educational Services, Inc. [1311]; ESI Service Corp. [2117]; and Daniel Webster College, Inc. [5980].

Brown II ("Brown"), Joanna T. Lau ("Lau"), Thomas I. Morgan ("Morgan"), John Vincent Weber ("Weber"), John F. Cozzi ("Cozzi"), Samuel L. Odle ("Odle"), and Jerry M. Cohen ("Cohen" and together with Dean, Brown, Lau, Morgan, Weber, Cozzi, and Odle, the "Directors" or, collectively with Modany, "Defendants").

## PRELIMINARY STATEMENT

1.      This case involves claims for breach of fiduciary duty and equitable subordination arising from Defendants' breaches of their fiduciary duties of loyalty, care, and good faith owing to ITT and its stakeholders during the period April 20, 2016 until ITT's September 16, 2016 bankruptcy (the "Crisis Period").

2.      As of March 31, 2016, ITT had reported in its public filings to the U.S. Securities and Exchange Commission (the "SEC") that it held cash and cash equivalents of $108,663,000 and enjoyed total shareholder equity of $162,056,000.

3.      Less than five months later, following demands made by the Department of Education ("ED") and the Accrediting Council for Independent Colleges and Schools ("ACICS"), ITT abruptly shut down without an orderly plan for winding down its operations or even providing for a teach-out of its 40,000 active students; and on September 16, 2016, filed a petition for a liquidation under Chapter 7 of the Bankruptcy Code. ITT's free-fall bankruptcy left it with no shareholder equity and billions of dollars in potential claims.

4.      The resulting tragedy could have been avoided, or, at a minimum, the damages could have been significantly reduced, if Defendants had fulfilled their fiduciary duties to ITT and its stakeholders, including creditors and active students.

5.      The Directors breached their fiduciary duties to ITT by, among other things:

- abdicating crucial decision-making authority to CEO Modany to negotiate with ED, ACICS, and potential transaction partners despite knowing that Modany was conflicted and could not be trusted to place ITT's interests above his own personal interests given, among other things, his desire to retain control of ITT and obvious incentive to maintain the benefits of his substantial compensation package;

- retaining Modany against ITT's best interests and the wishes of ED, ACICS, regulators, state attorneys general, and potential transaction partners;

- chronically failing to exercise reasonable oversight over Modany and other management throughout the Crisis Period;

- failing to independently investigate ITT's financial condition and ability to continue operations and ignoring evidence of ITT's insolvency;

- failing to investigate or secure an orderly merger, sale, or other transaction to maximize ITT's value for its constituents, including a transaction that might not be in Modany's personal interest (*e.g.*, a transaction involving his termination, a reduction in his compensation, and/or settlement of pending claims against ITT in a manner adverse to him); and

- failing to investigate or secure an orderly wind down of ITT's operations either inside or outside of bankruptcy that would have maximized the value of ITT's remaining assets for its shareholders and minimized potential claims against ITT, including ensuring that ITT had in place a program for the teach-out of its current student body, complying with all applicable rules and regulations regarding the disposition of student records, and complying with all applicable employment laws.

6.     As for Modany, in light of the intense and increasing negative publicity, including publicly-disclosed lawsuits relating to him individually, Modany should have diligently pursued the above steps to benefit ITT, and if he was unable or unwilling to do so given the clear conflict of interest between his own interest in protecting his reputation, job and compensation package, and that of the Company, he should have either recused himself from all decisions in which he had a personal conflict or stepped down as CEO and left the Company. By failing to take any of these necessary actions, Modany breached his fiduciary duties to ITT.

## JURISDICTION AND VENUE

7.     On September 16, 2016 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 7 of the Bankruptcy Code in the Bankruptcy Court for the Southern District of Indiana.

8.     This Court has jurisdiction over this action under 28 U.S.C. §§ 157 and 1334(b) and Rule 7001, *et seq*., of the Federal Rules of Bankruptcy Procedure because this adversary proceeding arises in and relates to Case No. 16-07207 pending in the Bankruptcy Court. Under 28 U.S.C. § 157(a), jurisdiction has properly been referred to this Court under S.D. Ind. L.R. 83-8. This action is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), and (O).

9.     Venue is proper in this Court under 28 U.S.C. § 1409(a) because some Defendants reside in this judicial district and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district. In addition, all of the Defendants routinely attended meetings of the Board of Directors in this judicial district.

## PARTIES

10.     The Plaintiff, Deborah J. Caruso, is the Chapter 7 trustee appointed in each of the Affiliated Debtors' Chapter 7 bankruptcy cases, with her principal executive office located at 135 N. Pennsylvania Street, Suite 1400, Indianapolis, IN 46204. The Trustee was appointed interim trustee on the Petition Date, under section 701(a)(1) of the Bankruptcy Code, and thereafter became the case trustee in each of the Affiliated Debtors' bankruptcy cases following the conclusion of the first meeting of creditors on November 1, 2016, under section 702(d) of the Bankruptcy Code.

11.     Defendant Kevin Modany served as ITT's CEO from April 2007 until ITT's September 2016 bankruptcy. In 2014, ITT paid Modany total compensation of $3,194,632. In

4

2015, ITT paid Modany total compensation of $1,379,345. Modany's 2016 annualized base compensation was $824,076. He received other benefits, including use of a company car, a tax return preparation and financial planning allowance, tickets to sporting, theater, and other events, and enhanced disability benefits. Modany is a resident of Carmel, Indiana.

12.     Defendant John E. Dean served as ITT's Executive Chairman of the Board during the Crisis Period. He specialized in higher education law since 1985 and touted his "current and valuable knowledge and insight of the actions of Congress and the U.S. Department of Education . . . related to higher education matters" as qualifying him for ITT's Board. Upon information and belief, Dean is a resident of Washington, D.C. During the Crisis Period, Dean received substantial compensation from ITT in the form of salary, bonuses, and incentive and/or equity-based compensation. For example, Dean received $1,890,920 in total compensation in 2014-2015. As of July 1, 2016, Dean held 130,004 shares in ITT.  Dean routinely attended Board of Directors meetings at ITT's headquarters in Carmel, Indiana.

13.     Defendant C. David Brown II served as a director and the Chairman of the Board during the Crisis Period. He had a 36-year legal career, with service on other public companies' boards, including CVS Health Corporation, Rayonier Advanced Materials Inc., and Orlando Health. Upon information and belief, Brown is a resident of Carmel, California. During the Crisis Period, Brown received substantial compensation from ITT in the form of salary, bonuses, and incentive and/or equity-based compensation. As of July 1, 2016, Brown held 20,367 shares in ITT.  Brown routinely attended Board of Directors meetings at ITT's headquarters in Carmel, Indiana.

14.     Defendant Joanna T. Lau served as a director on the Board during the Crisis Period. Lau has served for over fifteen years on the boards of various companies including Lau

Acquisition Corporation (of which she also the CEO), DSW, Inc. and ESI Group, SA (and was on its Audit Committee when it filed for bankruptcy). She touted her experience "developing and implementing a turnaround and growth strategy" as qualifying her for ITT's board. Upon information and belief, Lau is a resident of Kiawah Island, South Carolina. During the Crisis Period, Lau received substantial compensation from ITT in the form of salary, bonuses, and incentive and/or equity-based compensation. As of July 1, 2016, Lau held 15,148 shares in ITT. Lau routinely attended Board of Directors meetings at ITT's headquarters in Carmel, Indiana.

15.    Defendant Thomas I. Morgan served as a director on the Board during the Crisis Period. Morgan held CEO and other management positions at numerous companies has served for over nineteen years as a director of other public companies, including Baker & Taylor, Inc., Hughes Supply, Inc., Rayonier, Inc., and Waste Management, Inc. He also has relevant bankruptcy experience as a director of US Office Products Company (which filed for bankruptcy shortly after he left its Board) and Value America (which also filed for bankruptcy). Upon information and belief, Morgan is a resident of Bigfork, Montana. During the Crisis Period, Morgan received substantial compensation from ITT in the form of salary, bonuses, and incentive and/or equity-based compensation. As of July 1, 2016, Morgan held 23,965 shares in ITT.  Morgan routinely attended Board of Directors meetings at ITT's headquarters in Carmel, Indiana.

16.    Defendant John Vincent Weber served as a director of the Board during the Crisis Period. He is an accomplished businessman who served for twelve years in the U.S. House of Representatives and was a top advisor on numerous presidential campaigns. He has over 21 years' experience as a director and member of upper management in various public companies, including Mercury Public Affairs LLC, Clark & Weinstock Inc., and the Lenox Group, Inc.

6

Weber's public policy involvement in a variety of highly-regulated areas, including higher education, which allowed him to develop strong knowledge and political insight concerning for-profit colleges. Weber also has relevant bankruptcy experience as a director at Chris-Craft, a manufacturer of luxury boats that went bankrupt twice. Upon information and belief, Weber is a resident of Washington, D.C. During the Crisis Period, Weber received substantial compensation from ITT in the form of salary, bonuses, and incentive and/or equity-based compensation. As of July 1, 2016, Weber held 32,055 shares in ITT.  Weber routinely attended Board of Directors meetings at ITT's headquarters in Carmel, Indiana.

17.     Defendant John F. Cozzi served as a director on the Board during a portion the Crisis Period until May 2016, when he left in the belief that ITT, as mismanaged by Defendants, including himself, would fail in relatively short order and he wished to not be associated with ITT's catastrophic failure. Upon information and belief, Cozzi possessed years of experience in private equity and investment banking. Cozzi is a resident of New York, New York. During the Crisis Period, Cozzi received substantial compensation from ITT in the form of salary, bonuses, and incentive and/or equity-based compensation. As of July 1, 2016, Cozzi held 26,149 shares in ITT. Cozzi routinely attended Board of Directors meetings at ITT's headquarters in Carmel, Indiana.

18.     Defendant Samuel L. Odle served as a director on the Board during the Crisis Period. He held executive positions at numerous organizations in the healthcare industry, which he claims "provided him with the ability to analyze and assess numerous aspects of a complex and highly-regulated organization." Odle has been a senior policy advisor for the Bose Public Affairs Group since October 2012, and served as president and CEO of Methodist Hospital and Indiana University Hospital and executive VP of Indiana University Health since July 2004.

Upon information and belief, Odle is a resident of Indianapolis, Indiana. During the Crisis Period, Odle received substantial compensation from ITT in the form of salary, bonuses, and incentive and/or equity-based compensation. As of July 1, 2016, Odle held 10,414 shares in ITT. Odle routinely attended Board of Directors meetings at ITT's headquarters in Carmel, Indiana.

19.     Defendant Jerry M. Cohen served as a director on the Board during the Crisis Period. Upon information and belief, Cohen joined Deloitte & Touche, LLP in 1973 and had many years of experience as an audit partner there before retiring as a senior partner in June 2014. Upon information and belief, Cohen is a resident of Manhasset, New York. During the Crisis Period, Cohen received substantial compensation from ITT in the form of salary, bonuses, and incentive and/or equity-based compensation. As of July 1, 2016, Cohen held 20,367 shares in ITT. Cohen routinely attended Board of Directors meetings at ITT's headquarters in Carmel, Indiana.

STATEMENT OF RELEVANT FACTS

## I.     ITT's background

20.     ITT was founded in 1946 and became a publicly traded company in 1994. Before the Petition Date, ITT grew to be one of the largest for-profit education companies in the country, employing over 8,000 employees. ITT offered master, bachelor, and associate degree programs to approximately 40,000 students at its 130 campus locations and online programs to students located in at least 38 states and the District of Columbia in a number of subjects, including electronics, drafting and design, criminal justice, business, information technology, health sciences, and nursing.

21.     Like nearly all for-profit education companies, ITT derived the overwhelming majority of its revenues from federal financial aid programs operated under Title IV ("Title IV")

8

of the Higher Education Act of 1965 (the "HEA"). ED, in turn, was responsible for regulating the flow of, among other things, Title IV funds, and ensuring that entities, like ITT that received Title IV funds, maintained certain financial and accreditation requirements. For example, to be eligible for Title IV aid, a for-profit company that owns a school must be accredited by an accrediting agency recognized by ED. 34 C.F.R. § 600.5. In order to maintain its accreditation, ITT was required to meet applicable standards established by accrediting agencies, including ACICS.

22.     Another requirement to obtain and maintain eligibility for Title IV funding is the annual submission of a separate annual compliance or "attestation" audit report to ED. This "attestation" audit includes audited financial statements for the preceding full fiscal year, and a letter from the company's management asserting that the institution is in compliance with the laws and regulations applicable to Title IV programs. A critical purpose of this audit is for the entity receiving federal funds to demonstrate that it is complying with federal law.

23.     For nearly a decade, Modany led ITT's management team. The compensation of ITT's former management, including Modany, was tied directly to ITT's earnings per share, which was correlated to ITT's profit and revenue projections.

## II.    The Crisis Period begins with the ACICS Show-Cause Letter.

24.     On April 20, 2016, ACICS sent ITT a Show-Cause Directive Letter (the "Show-Cause Letter"), a copy of which is attached as Exhibit A, ordering ITT to show cause why its grants of accreditation should not be withdrawn or conditioned, based on information which "call[s] into question the institutions' administrative capacity, organizational integrity, financial viability, and ability to serve students in a manner that complies with ACICS standards." The information cited by the Show-Cause Letter leading to its decision included, *inter alia*:

- the on-going status of ITT's participation in the Title IV program, including the financial implications of Heightened Cash Monitoring conditions applied to the institutions' access to funds;

- the insufficiency of ITT's response to "public and widely-known allegations" regarding the quality of instructional materials; and

- ITT's failure to comply with ACICS' directive to develop and submit a plan that provides for the continuation and completion of all students currently enrolled in the event that the institution elects to curtail or suspend operations.

25.   Defendants knew (or recklessly disregarded the fact) that failing to satisfy ACICS's concerns would likely cause ITT to lose its accreditation, thereby rendering ITT ineligible to continue receiving Title IV funding, which accounted for roughly 90% of ITT's revenue. Loss of accreditation would spell financial ruin for ITT. Indeed, in a follow-up call with ACICS on or about April 23, 2016, ACICS told Modany that it had "run out of patience" with ITT's failure to respond to its teach-out request. (A teach-out is a way to provide a continuation of academic programming in the face of potential closure of a university. This can be done either at the university itself or by partnering with another institution of higher learning.) The ultimate failure to provide a teach-out for ITT's students resulted in the assertion of significant claims in its bankruptcy proceeding.

26.   Defendants also knew (or recklessly disregarded the fact) that ACICS wanted ITT to terminate Modany and that his stepping down would significantly help ITT retain its accreditation. Upon receipt of the ACICS letter, ITT's then Executive Chairman, John Dean, and Director Cohen acknowledged that ACICS saw Modany "as part of the problem." And Modany himself wrote Dean opining that his and Dean's resignations were "a likely necessary action if we are going to respond with a sufficient politically charged reply" because "it's almost a certainty that we need to give these guys a dead body!"

27.     Defendants also knew (or recklessly disregarded the fact) that Modany was a direct impediment to ITT successfully settling the various lawsuits cited in the ACICS Show-Cause Letter. Upon information and belief, each of the federal agencies and state attorneys general (the "AGs") suing ITT had communicated to ITT their desire that ITT terminate Modany, who was responsible for implementing, continuing, participating in and/or cultivating a culture at ITT that encouraged much of the misconduct alleged in the lawsuits. The CFPB and AGs explicitly required Modany's departure as a precondition to settlement. The SEC also made clear its desire for Modany's termination, and stated that it had no interest in settlement unless Modany admitted to fraud.

28.     However, it was not in Modany's own personal interests to either step down or admit to any fraud or other misconduct – even though doing so was clearly in ITT's best interest. Specifically, Modany was eligible for ITT's Senior Executive Severance Plan, which provided Modany with a handsome severance payment if certain conditions were met, one of which was that Modany not be terminated for cause. Modany was also concerned with the damage to his reputation and future employment prospects if he admitted to fraud or was forced to resign as ITT's CEO.

29.     So, rather than stepping down, admitting to fraud, or addressing other issues identified in ACICS's Show-Cause Letter like the need for a comprehensive teach-out agreement, Modany downplayed the risk of de-accreditation and pushed the Board to pursue a sale of the Company or its assets, but only on terms that were beneficial to Modany, personally. The Board held a meeting on April 25, 2016 at which Modany spoke about receipt of the ACICS Show-Cause Letter and said that he did not believe the claims in the letter, but noted that he

believed the letter increased the need to pursue a transaction as soon as possible to avoid any

potential collateral consequences of ITT's receipt of the letter.

30.    But here too, Modany was conflicted due to his severance agreement. ITT's

Senior Executive Severance Plan, approved by the Directors, provided payments only in certain

circumstances as stated in ITT's 2016 Proxy Statement: "The benefits under the Senior

Executive Severance Plan are not payable merely because a change in control transaction occurs

or is imminent. Instead, payment of the severance benefits is only triggered if a change in control

has occurred or is imminent and certain types of termination of employment occur within certain

limited time periods." The 2016 Proxy Statement makes it clear just how lucrative it would be

for Modany if a strategic transaction triggered benefits under ITT's Senior Executive Severance

Plan:

> If benefits are triggered under the Senior Executive Severance Plan, our [CEO]
> would be entitled to payments under the "three times" multiplier and the other
> covered executives would be entitled to payments under the "two times"
> multiplier. Our [CEO] would also be entitled to certain benefits that would not
> be available to the other covered executives, including that our [CEO] would
> receive a tax gross[-]up payment on any excise taxes and that his severance
> benefits would not be limited in the event of the imposition of an excise tax.
> The Compensation Committee believes that our [CEO] should receive the
> higher multiplier and the enhanced benefits given his high level of
> responsibility and the substantial duties that he has with us, as well as the fact
> that it is common market practice for a chief executive officer to receive a
> higher level of severance benefits than other executive officers.

31.    Thus, not only was Modany financially interested in crafting the terms of a

potential sale of ITT in a manner that maximized the benefits to himself even at the expense of

ITT's other constituencies (*e.g.*, its shareholders and creditors), but he also obsessed about

protecting his reputational interest. He did not want to enter a strategic deal in which he would

not survive as CEO because he feared that the market would perceive him as being forced out by the SEC, AGs, the CFBP, ED or the Board.

32.     So, rather than exploring strategies to maximize ITT's remaining value for the benefit of all of its stakeholders, Modany selfishly focused on securing a strategic transaction that would trigger his severance payment and provide him continued employment or some other face-saving exit.

33.     In response to the ACICS Show-Cause Letter, and to prepare for a potential loss of accreditation, it was incumbent upon the Directors, consistent with their fiduciary duties, to immediately take steps to: (a) investigate whether ITT had a viable teach-out plan in place, which it did not; (b) direct management to immediately begin developing a teach-out plan;  (c) supervise or monitor what steps, if any, management was taking to satisfy this requirement (d) retain a restructuring advisor; and (e) terminate Modany and put in place either a permanent or interim CEO who would have been acceptable to ED and other relevant governmental agencies. Unlike ITT's Board, the board of Daniel Webster College, a wholly-owned subsidiary of ITT with a separate board of directors, successfully negotiated a teach-out agreement with Southern New Hampshire University.

34.     Also, given the potentially disastrous consequences that could result from a failure to satisfy the concerns raised in the ACICS Show-Cause Letter, it was also incumbent upon Defendants to seriously and expeditiously explore strategies to maximize ITT's remaining value for the benefit of all of its stakeholders, including exploring potential sales or other transactions that could preserve ITT as a going concern, or at least minimize the loss to ITT's stakeholders. By failing to adequately and promptly investigate and pursue such potential transactions, Defendants breached their fiduciary duties.

13

35.     For example, during an April 24, 2016 Board meeting, ITT's management briefed the Directors on a possible transaction with U.S. Skills LLC ("U.S. Skills") and Thomas H. Lee Partners ("THL"). The Directors were advised that U.S. Skills/THL's advisors insisted on speaking to the SEC to address its pending lawsuit against ITT and Modany before signing a definitive transaction agreement. The Directors were further advised that the SEC had previously made it clear that it had no interest in a settlement, even in the context of a transaction, without both ITT and the individuals (*e.g.*, Modany) admitting to fraud. At this point, given his clear conflict of interest, Modany should have, at a minimum, recused himself from all discussions regarding the proposed U.S. Skills/THL transaction and any similar transactions in which Modany's interests potentially conflicted with those of the Company. Instead, Modany took affirmative efforts to undermine the U.S. Skills/THL offer by claiming that he had become increasingly doubtful about the seriousness of U.S. Skills/THL's offer and encouraged the Directors to cease discussions with U.S. Skills/THL. Indeed, in a subsequent email, Modany stated that: "The sooner we stop talking to these guys and wasting our time, resources and the globe's oxygen supply the better!"

36.     The SEC's position created a clear conflict of interest between Modany's personal interests and those of ITT in terms of moving forward with a transaction with U.S. Skills/THL or any other transaction that contemplated an admission of guilt by Modany. At a minimum, it was incumbent upon the Directors, in furtherance of their fiduciary duties, to explore the propriety of pursuing a deal with U.S. Skills/THL or any other potential acquirer that would similarly require a resolution of the SEC action (among others) as a precondition to a transaction. In fact, given Modany's clear conflict of interest in light of the pending lawsuits against him alleging significant malfeasance in his management of ITT, the Directors should have either terminated

14

Modany or, at a minimum, ensured that non-conflicted members of ITT's management and/or the Directors themselves were intimately involved in all future transactions discussions with all potential deal partners. But the Directors neither terminated Modany nor took steps to preclude his interference in ITT's ability to pursue a deal with U.S. Skills/THL or other similar potential acquirers.

37.     Despite the mortal threat facing ITT, the Directors were unengaged. For example, in an April 29, 2016 email to a colleague, Dean described his role as chairman of the board as quite limited: "I have been on the ITT board since 1994 and stepped in—supposedly temporarily—after the CEO was charged with civil fraud by the SEC. The CEO is still on board, *so my role is quite limited*. I spend most of my time these days in Florida . . . ." This was far from the all-hands-on-deck engagement that ITT's stakeholders could reasonably expect from the Directors during the Crisis Period.

38.     Making matters worse, Modany thereafter became openly hostile to the Directors whenever they sought to engage him regarding potential transactions that could have a negative personal impact on Modany, like the U.S. Skills/THL deal. For example, on or about April 30, 2016, Odle asked Dean, as Chairman of the Board, to set up a conference call with Modany to discuss different transaction options. Dean later replied to Odle that Modany "declined the request," to which Odle responded, "John you are his boss. How does he decline your request?"

39.     Upon information and belief, on or about May 12, 2016, Genki Capital inquired about acquiring ITT via a strategic transaction. ITT officer, Rocco Tarasi, forwarded the inquiry on to Modany, stating, "I'm going to ignore this unless you want otherwise." Modany replied, "I think you know the answer…wild ass fishing!" Thus, by May 2016, it appears that Modany and others in ITT's management were taking active steps to sabotage ITT's ability to secure a

transaction that could have maximized ITT's assets and minimized its liabilities. In breach of their fiduciary duty, the Directors stood idly by and allowed Modany to control the process relating to any potential transaction.

40.      Rather than pursuing potential transactions with U.S. Skills/THL or Genki Capital or other similar transactions, Modany spoke with ED about a proposed deal with Dream Center Foundation ("DCF"), in which DCF would maintain control over ITT but would contract out for various services. Modany chose to pursue this transaction because DCF was willing to negotiate a side-deal with Modany that would have kept Modany involved as part of this transaction. Clearly, Modany was only interested in his own financial well-being, as evidenced by his choice of prospective deal partners for ITT.

41.      While Modany was pursuing the DCF transaction with ED, ED continued to inquire about ITT's teach-out plans. For example, on June 6, 2016, ED asked Modany whether ITT had any teach-out plans and asked him to provide ED with the information provided to ACICS. ED also asked Modany whether there was a contract, memorandum of understanding, or agreement with another institution in the event an ITT program ended for whatever reason. In addition, ED issued its own letter to ITT, on June 6, 2016 (the "First ED Letter"), a copy of which is attached hereto as Exhibit B, in which ED demanded additional financial assurances from ITT due to increased financial risk to ED, Title IV funds, students, and taxpayers as a result of ACICS' action and ITT's shortcomings that gave rise to such action. ED then required ITT to increase its surety with ED by over 50% to $123,646,182.

42.      By this time, Defendants knew (or recklessly disregarded the fact) that because ITT had not secured teach-out agreements for its 40,000 active students, ED would be faced with determining whether to forgive the displaced students' federal loans and seeking their repayment

from ITT. They also knew (or recklessly disregarded the fact) that this liability could far exceed the amount of ITT's surety with ED and that, if ITT failed to secure teach-out agreements with a substantial number of its students in the coming weeks, it would incur massive liabilities. ITT's cessation of operations would require that it perform a comprehensive close-out audit for ED and inform its employees of coming lay-offs and that ITT's failure to do so would expose ITT to claims in staggering, catastrophic amounts. Nonetheless, Defendants failed to take steps to ensure that ITT had a viable teach-out plan to avoid such potentially catastrophic consequences.

43.    Shortly after ITT received the First ED Letter, Defendants knew (or recklessly disregarded the fact) that ITT was not likely to continue as a going concern. For example, on June 11, 2016, Weber told Dean that "[u]nless we get a positive sign from ED, we will have to consider teaching out." In fact, Weber noted that "ED may have concluded we are dead meat. If so, they will reject all alternatives and focus on maximizing recoveries from our remaining assets." Despite the clear understanding that a teach-out needed to be pursued immediately, neither Dean nor Weber nor any of the other Defendants demanded that management do this to limit ITT's exposure.

44.    On June 14, 2016, ITT received a letter of intent for a potential acquisition by Starcore Venture Group at $2.20 per share. But Defendants refused to investigate the potential value of this offer or engage Starcore in negotiations. Instead, wholly uninformed of the potential value of this offer, the Directors deferred to Modany's recommendation to reject the transaction based on Modany's speculation that it would leave insufficient residual value for shareholders. Modany's concern about residual value for shareholders was a farce given that ITT's earnings report for the quarter ended June 30, 2016 *confirmed that ITT was insolvent*. That report showed that ITT had a negative current asset ratio and that ITT's revenue from the first two quarters fell

roughly 17% from the same period in 2015. Similarly, ITT's current cash equivalents for the first two quarters of 2016 fell approximately 40% from the same period in 2015. The report did not disclose that ITT would be unable to continue operating and that its failure to secure teach-out agreements, conduct a final close-out audit, or warn employees of coming lay-offs, all of which exposed ITT to massive liabilities.

45.     Clearly, at this point, Defendants' fiduciary duties required them to maximize ITT's value for the benefit of its stakeholders, including its creditors. They knew (or recklessly disregarded the fact) that an orderly wind-down would require ED's cooperation and take many months and that by not so acting, they would be exposing ITT to otherwise avoidable catastrophic liabilities. An orderly wind-down would have allowed ITT to preserve significant enterprise value that would be lost in a freefall bankruptcy.

46.     But Defendants disregarded their duties to take concrete steps to limit ITT's liabilities. Among other things, Defendants should have immediately performed a solvency analysis to determine the amount and duration of ITT's potential cash flow, and then explored all potential contingencies, including exploring:

- an orderly merger, sale or other transaction in which ITT might be able to continue as a going concern as part of another company's operations;

- an orderly and structured wind-down of ITT's operations outside of bankruptcy that would have included, *inter alia*, teach-out agreements for its tens of thousands of students, orderly compliance with all applicable rules and regulations regarding the disposition of student records, and a plan to lay off employees and close facilities in compliance with all applicable laws; and/or

- a Chapter 11 bankruptcy filing, coupled with a teach-out program, consistent with the model successfully implemented by Corinthian.

47.     The Directors also acquiesced to Modany's refusal to hire a restructuring specialist, whose services would have been vital to the above analyses. On July 5, 2016,

restructuring specialist, FTI Consulting, reached out to Cohen offering to provide advice, but Modany refused to retain FTI or any other restructuring professional. On July 22, 2016, Odle passed on information about restructuring consultants, Alvarez & Marsal ("A&M"), to Dean, who replied that: "We have what I believe are major developments, so I think we are reaching something of a tipping point." Dean then forwarded part of the email, not including the "tipping point" statement, to Modany saying that he had no plans to contact A&M. The Directors should have insisted that management hire FTI, A&M, or another firm capable of helping preserve as much value from ITT as possible. Instead, they again did nothing.

48.    On July 23, 2016, Modany told Dean what was obvious: namely, that "[p]ressure from ED is materially intensifying...they seem to be looking in every nook and cranny for a reason to do something . . . we are weeks away from a material event . . . which I hope is a public announcement of an executed agmt [with a potential acquirer] but could be ED realizing we figured out a way to pay the surety so they now need to come up w/a plan to put the death nail in the coffin...once and for all!" Dean and Modany thus knew that ITT's death spiral was gaining ineluctable momentum.

49.    But rather than pursuing ITT's best interests, Modany was only interested in maximizing his severance. Indeed, the very next day, on July 24, 2016, Modany told Morgan that "we are tracking towards a $0.00 executive bonus. Without settlement of one or more of the legal/regulatory matters, I don't think we have a chance to get much of anything…Pending what happens, these executives may not see any type of 'change of control' payout, which would typically be the case when a transaction is executed. I don't think we would be talking about more than a couple million (probably less)…I can have a conversation with Towers and…potentially put a little more meat on the bone for something to seriously consider."

50.    On August 15, 2016, A&M again contacted Dean, who told A&M to direct all future communications to Modany. Dean told Modany that unless Modany suggested otherwise, he would decline A&M's offer to assist in restructuring. Modany responded by describing Odle's decision to contact A&M as "dysfunctional."

51.    On August 17, 2016, due to ongoing failure to comply with applicable accreditation requirements, ACICS notified ITT that it would remain on "Show-Cause" status. The cited noncompliance included deficiencies with respect to the following standards:

- The "minimal eligibility requirements" for "compliance with all applicable laws and regulations";

- Requirements for student achievement, as measured by retention, placement, and licensure passage rate;

- Institutional integrity, as manifest in the efficiency and effectiveness of its overall administration of the institution;

- Financial stability, including having adequate revenues and assets to meet its responsibilities;

- Administrative capacity, including overall management and record-keeping;

- ACICS admissions and recruitment standards; and

- Federal and state student financial aid administration requirements.

52.    On August 25, 2016, the feared but clearly foreseeable happened: ITT received a final letter from ED, which Modany described it as "the nuclear bomb" (the "Final ED Letter"), a copy of which is attached as Exhibit C. As a result of ITT's continued noncompliance with applicable laws, regulations, and other requirements, the Final ED Letter set forth additional requirements as a condition to ITT's continued participation in Title IV programs, including:

- Increase its surety on file from $94,353,980 to $247,292,364 within 30 days after the date of the letter (*i.e.*, an additional $152,938,654—more than 150%);

- Comply with Title IV's Heightened Cash Monitoring 2 (HCM2) payment method, as described in 34 C.F.R. § 668.162(e);

- Continue to be required to provide certain information to ED no later than 10 days after the occurrence of certain oversight or financial events;

- Not enroll or begin classes for any new students receiving Title IV funds at ITT schools in Indianapolis, IN, and Spokane Valley, WA; and

- Refrain from issuing payments, raises, or retention payments to any of its Management or Directors, nor pay special dividends, nor make any expenditures out of the ordinary course of business and consistent with prior practice, without separate approval from ED.

53.     Only after receiving the Final ED Letter did Defendants even attempt to secure

bankruptcy counsel. And even then, Modany enlisted Dean's help in preventing the other

Directors from "meddling" with ITT's operations. On August 28, 2016, Modany emailed Dean,

seeking his and Brown's help "in avoiding the almost certain distractions from Jerry [Cohen] and

possibly Sam [Odle]" and to "block any suggested efforts that are not necessary or helpful" to

Modany's management. Dean responded:

> I would defer to you on that. . . . I fully agree with you that we can't have
> multiple chefs in the kitchen. Thus, once the board decides to ask you and
> other key, specified executives to stay, the board will need to work in support
> of them rather than second guessing them. . . . I believe our current situation
> suggests that you have increased board awareness—that is why I suggested
> you might want to have one or two directors sit in, as listeners, on some of the
> calls. We are in a changed circumstance and if we have a surprise—say a
> criminal charge against you—we will want to be prepared for that highly
> unlikely event.

54.     Dean then ended the email by reiterating his deference to Modany: "Before you

get unhappy with anything in this email, note again the first sentence. I defer to you." While such

personal fidelity may be admirable in some circumstances, the Directors' repeated and

unquestioned abdication to Modany amounts to serious breaches of their fiduciary duties.

21

55.    While Modany had been supporting the DCF deal when he had the hopes of a side deal with DCF, that all changed when DCF – working with ED – changed the deal terms in a manner that no longer profited Modany. On August 26, 2016, Jahm Najafi called Modany to inform him that "DCF wanted to put in a new CEO." DCF prepared a draft application to ED, which it sent to ITT. In the application, DCF had added certain provisions that, based on its discussions with ED, DCF thought were "needed to get ED to roll back the [sanctions] . . . that threaten the ability of ITT to operate much longer." These provisions included immediately changing ITT's current management, allowing DCF executives to help manage ITT until the transaction closed, prohibiting any dividends, bonuses, raises, or severance or other payments to ITT's management and directors, and accepting the appointment of a monitor. These were all common-sense measures that Defendants should have implemented months earlier. Although it was in ITT's best interests to do whatever it took to appease ED, including changing management, Modany bristled at DCF's recommendation and responded to DCF's counsel by rejecting the proposal out of hand:

> DCF can agree to do whatever they want post acquisition but ITT isn't agreeing to do anything that was suggested in your summary.
>
> -change Management
>
> -give ED authority over our compensation (they don't have it regardless of what they claim)
>
> -accept a monitor
>
> -etc, etc, etc
>
> Of course you can do all of these things and you can commit to doing all of them as the new owners of the company post transaction so I don't think our position in any way impacts your ability to deliver to ED whatever it is you speculate will improve your chances for approval.
>
> The issue is that ITT isn't going to do these things pre acquisition . . . .

56.     Modany later clarified that his email reflected the Board's position and the Directors did not dispute this. While this transaction could have provided value to ITT, the Directors breached their fiduciary duties by allowing Modany to sabotage it based on his self-serving refusal to consider a change in management (*i.e.*, his removal as CEO) and ED controls over compensation to management. The Directors knew that Modany's desire to protect his employment status and compensation was impairing ITT's efforts to close a deal, but they nonetheless refused to intervene, even though they had the authority to replace Modany at any point in time.

57.     In late August 2016, Modany finally capitulated to ITT's retention of bankruptcy counsel. Even then, Modany told Dean that if Cohen (who had questioned Modany's choice of counsel) was going to lead the bankruptcy process, he would consider it his termination. Incredibly, Dean apologized to Modany and let him know that the Board supported Modany and wanted him to stay. Morgan commented to Dean, "I trust him." Modany advised Dean that if the Board consensus is to support this approach of second-guessing management, he would view such a decision as commensurate with a request for a change in leadership. After some discussion, Brown and Morgan offered their support of Modany. Dean went so far as to state that "I would suggest that our sense of urgency precludes director participation in the interviews."

58.     Instead of filing an orderly Chapter 11 liquidation with a teach-out program – similar to what Corinthian had done—on September 16, 2016, ITT simply ceased operations and commenced bankruptcy proceedings by filing voluntary Chapter 7 petitions in the Bankruptcy Court for the Southern District of Indiana, Indianapolis Division.

59.     The manner in which Defendants caused ITT to file for bankruptcy created significant additional and unnecessary liability for ITT. Among other things, Defendants failed to

follow state law requirements to have ITT provide copies of student records to the applicable state agencies, resulting in seven-figure litigation costs to resolve this issue after the fact. In addition, the failure to proceed with an orderly wind down resulted in the Trustee paying millions of dollars in unnecessary rent on property leased by ITT while she had to pack up and store ITT assets remaining in those locations, including copies of vital student records.

60.     In short, Defendants breaches of their fiduciary duties by letting ITT crater in a freefall bankruptcy with claims against the Debtors' estates in the billions.

## First Claim for Relief

### (Breach of Fiduciary Duties of Loyalty, Care, and Good Faith)

61.     Plaintiff realleges and incorporates by reference each of the previous allegations.

62.     By reason of their positions as officers and directors of ITT, each of the Defendants owed ITT and its stakeholders fiduciary duties of loyalty, care, and good faith. Defendants were required to inform themselves fully before making any business decisions and to act in the best interests of ITT and its stakeholders at all times. The Directors were also required, but failed, to exercise reasonable and prudent supervision over ITT's management, policies, practices, and controls of financial affairs, and to use their utmost ability to control and manage ITT in a fair, just, honest, and equitable manner. The Directors' sustained and systemic failure to exercise reasonable oversight over Modany and other management was a breach of their fiduciary duties.

63.     Despite full knowledge of the hostile regulatory environment and the potential dire consequences confronting ITT, from the beginning of the Crisis Period, and at each step along the way, Defendants failed to exercise their duties of loyalty, care, and good faith.

64.     Defendants' actions and inaction not only prevented ITT from satisfying the conditions and concerns raised by ED and ACICS, but predictably and inevitably magnified the eventual losses to all ITT stakeholders when ITT's bankruptcy petition was filed.

65.     Among other things, the Directors breached their fiduciary duties to ITT by:

- abdicating crucial decision-making authority to Modany to negotiate with ED, ACICS, and potential transaction partners despite knowing that Modany was conflicted and could not be trusted to place ITT's interests above his own personal interests given, among other things, his desire to retain control of ITT and obvious incentive to maintain the benefits of his substantial compensation package;

- retaining Modany against ITT's best interests and the wishes of ED, ACICS, regulators, state attorneys general, and potential transaction partners;

- chronically failing to exercise reasonable oversight over Modany and other management throughout the Crisis Period;

- failing to independently investigate ITT's financial condition and ability to continue operations and ignoring evidence of ITT's insolvency;

- intentionally disregarding their responsibilities by knowingly failing to investigate, secure, or make informed decisions regarding an orderly merger, sale, or other transaction to maximize ITT's value for its constituents, including a transaction that might not be in Modany's personal interest (e.g., a transaction involving his termination, a reduction in his compensation, and/or settlement of pending claims against ITT in a manner adverse to him); and

- intentionally disregarding their responsibilities by knowingly failing to investigate, secure, or make informed decisions regarding an orderly wind down of ITT's operations either inside or outside of bankruptcy that would have maximized the value of ITT's remaining assets for its shareholders and minimized potential claims against ITT, including ensuring that ITT had in place a program for the teach-out of its current student body, complying with all applicable rules and regulations regarding the disposition of student records, and complying with all applicable employment laws.

66.     As for Modany, in light of the intense and increasing negative publicity, including publicly-disclosed lawsuits relating to him individually, Modany should have diligently pursued the above steps to benefit ITT, and if he was unable or unwilling to do so given the clear conflict

of interest between his own interest in protecting his reputation, job and compensation package, and that of the Company, he should have either recused himself from all decisions in which he had a personal conflict or stepped down as CEO and left the Company. By failing to take any of these necessary actions, Modany breached his fiduciary duties to ITT.

67.     As a direct and proximate result of the wrongful acts, omissions and breaches of duty alleged herein, ITT has been damaged in amount subject to proof at trial, but in any event no less than $250,000,000. Defendants should also be ordered to disgorge all compensation they received by reason of their roles as Officers and Directors of ITT.

**Second Claim for Relief**
**(Equitable subordination of Kevin Modany's**
**creditor claims under 11 U.S.C. §§ 510(c), and 105(a))**

68.     Plaintiff realleges and incorporates by reference each of the previous allegations.

69.     On November 16, 2016, Modany filed a proof of claim asserting an unsecured creditor claim in ITT's liquidation seeking $5,008,199.00, or alternatively, not less than $3,360,199.00 under his severance plan. *See* Claim No. 846. Modany amended this claim on January 30, 2017 to, among other things, seek indemnification or any other rights Modany is entitled to under ITT's by-laws. *See* Claim No. 2452. Modany's two proofs of claims (the "Claims") are attached as Exhibit D.

70.     Modany is an insider of ITT due to his position as ITT's CEO.

71.     As described in this complaint, Modany engaged in inequitable conduct by willfully breaching his fiduciary duties to ITT. Modany's breaches of fiduciary duty directly injured ITT's creditors in that Modany's breaches of fiduciary duty directly reduced ITT's enterprise value and saddled ITT's bankruptcy estate with unnecessary liabilities.

72.    Equity dictates that, under Sections 510(c) and 105(a) of the Bankruptcy Code, Modany's Claims should be subordinated to the claims of all of ITT's other unsecured creditors.

73.    Subordination of Modany's Claims is not inconsistent with the Bankruptcy Code.

### Prayer for Relief

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against Defendants and in favor of the Plaintiff for the amount of damages sustained by ITT as a result of Defendants' breaches of their fiduciary duties, but in any event no less than $250,000,000.

B.    Requiring Defendants to disgorge all compensation they received by reason of their roles as Officers and Directors of ITT;

C.    Equitably subordinating Defendant Modany's Claims (Nos. 846 and 2452) to the claims of all of ITT's other unsecured creditors.

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

Dated:  May 31, 2018

Respectfully submitted,

*/s/ John C. Hoard*
    John C. Hoard

Ronald J. Schutz (admitted *pro hoc vice*)
Carly A. Kessler (*pro hoc vice* application to be filed)
**ROBINS KAPLAN LLP**
399 Park Avenue, Suite 3600
New York NY 10022
Telephone:  (212) 980-7400
Facsimile:  (212) 980-7499

John C. Hoard (Atty. No. 8024-49)
**RUBIN & LEVIN, P.C.**
135 N. Pennsylvania Street, Suite 1400
Indianapolis, IN 46204
Telephone:  (317) 634-0300
Facsimile:  (317) 263-9411

*Co-counsel to the Trustee*

                -and-

Michael A. Collyard (admitted *pro hoc vice*)
Richard B. Allyn (*pro hoc vice* application to be filed)
Thomas F. Berndt (*pro hoc vice* application to be filed)
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone:  (612) 349-8500
Facsimile:  (612) 339-4181

*Co-counsel to the Trustee*

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury of any and all issues in this action triable by right of jury

Dated:  May 31, 2018

Respectfully submitted,

/s/ John C. Hoard
    John C. Hoard

Ronald J. Schutz (admitted *pro hoc vice*)
Carly A. Kessler (*pro hoc vice* application to be filed)
**ROBINS KAPLAN LLP**
399 Park Avenue, Suite 3600
New York NY 10022
Telephone:  (212) 980-7400
Facsimile:  (212) 980-7499

John C. Hoard (Atty. No. 8024-49)
**RUBIN & LEVIN, P.C.**
135 N. Pennsylvania Street, Suite 1400
Indianapolis, IN 46204
Telephone:  (317) 634-0300
Facsimile:  (317) 263-9411

*Co-counsel to the Trustee*

        -and-

Michael A. Collyard (admitted *pro hoc vice*)
Richard B. Allyn (*pro hoc vice* application to be filed)
Thomas F. Berndt (*pro hoc vice* application to be filed)
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone:  (612) 349-8500
Facsimile:  (612) 339-4181

*Co-counsel to the Trustee*