UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| IN RE: | Case No. 16-07207-JMC-7A |
| ITT EDUCATIONAL SERVICES, INC., ESI SERVICE CORP., and DANIEL WEBSTER COLLEGE, INC. | Jointly Administered |
| Debtors. | |
| DEBORAH J. CARUSO, the Chapter 7 TRUSTEE FOR ITT EDUCATIONAL SERVICES, INC., ESI SERVICE CORP. and DANIEL WEBSTER COLLEGE, INC. | Adversary No. 1:18-AP-50100-JMC |
| Plaintiff, | |
| vs. | |
| KEVIN MODANY, JOHN E. DEAN, C. DAVID BROWN II, JOANNA T. LAU, THOMAS I. MORGAN, JOHN VINCENT WEBER, JOHN F. COZZI, SAMUEL L. ODLE, and JERRY M. COHEN, | |
| Defendants. | |

## BRIEF IN SUPPORT OF FORMER DIRECTORS' MOTION TO DISMISS COMPLAINT

John E. Dean, C. David Brown II, Joanna T. Lau, Thomas I. Morgan, John Vincent Weber, John F. Cozzi, Samuel L. Odle, and Jerry M. Cohen (collectively, "Former Directors"), by counsel, pursuant to Fed.R.Bankr.P. 7012(b) and Fed.R.Civ.P. 12(b)(6), respectfully submit the following brief in support of their Motion to Dismiss Complaint.

### INTRODUCTION

The Complaint fails to plausibly state a breach of fiduciary duty claim against each Former Director and should be dismissed. By asserting a fiduciary duty claim even in the face of an exculpatory clause in the ITT Educational Services, Inc. ("ITT") Restated Certificate of

Incorporation, the Trustee faces some of the most daunting standards in all of Delaware corporate jurisprudence.[1] Despite these onerous standards, the Trustee relies largely on conclusory statements of wrongdoing that conflict with other facts alleged. While the Trustee accuses the Former Directors of "doing nothing" in the face of ITT's financial undoing, the Complaint is peppered with facts showing just the opposite – that the Former Directors were highly engaged. Nowhere does the Trustee plausibly allege that the Former Directors had a callous disregard for their duties, that they intentionally refused to act or knowingly harmed ITT, or that they placed their own personal interests above ITT's. Yet these standards are what Delaware law requires for liability to attach. That the Trustee disagrees with decisions made (even those that she alleges were ruinous to ITT) does not impose liability on the Former Directors. It is settled law that "a bad outcome, without more, does not equate to bad faith." *Rich ex rel. Fuqi Int'l v. Chong*, 66 A.3d 963, 981 (Del. Ch. 2013).

## <u>Factual Background As Alleged</u>

ITT was a large, for-profit education company that offered master, bachelor, and associate degrees to students in a number of disciplines. Compl. ¶ 20. On April 20, 2016, the Accrediting Council for Independent Colleges and Schools ("ACICS") – an accrediting agency responsible for ensuring ITT maintained certain financial and accreditation requirements – sent a

---

[1] Delaware law applies to this case. "To maintain uniform governance in a free market, the law of the state in which a company incorporates governs its internal affairs … The Indiana legislature has expressly provided that the Indiana business corporation law 'does not authorize Indiana to regulate the organization or internal affairs of a foreign corporation authorized to transact business in Indiana.'" *Gulley v. Moravec*, 2008 WL 596002, *4 (S.D. Ind. Feb. 29, 2008) (*quoting* Ind. Code § 23-1-49-5). "[T]he liability of corporate investors and directors for intra-corporate affairs almost invariably depends on the law of the place of incorporation. This is the 'internal affairs doctrine.'" *Nagy v. Riblet Products Corp.*, 79 F.3d 572, 576 (7th Cir. 1996). Indiana recently adopted this doctrine. Ind. Code § 23-0.5-5-1 ("The law of the jurisdiction of formation of an entity governs: (1) the internal affairs of the entity ….").

Show-Cause Directive Letter to ITT questioning ITT's organizational integrity and financial viability due to various lawsuits pending against it. *Id.* at ¶ 24; Exh. A to Compl. A loss of accreditation would be financially devastating to ITT because it would render ITT ineligible to receive Title IV funding, which accounted for approximately 90% of ITT's revenue. *Id.* at ¶ 25.

In the wake of the Show-Cause Directive Letter from ACICS, ITT considered various possible transactions with at least four different companies. *Id.* at ¶¶ 35, 39, 40, 44. Kevin Modany, then Chief Executive Officer of ITT, took the lead in vetting the possible transactions. *Id.* at ¶¶ 35-40, 44. The Trustee alleges that Modany had a conflict of interest because he was only interested in transactions that would benefit him personally and attempted to influence the discussions accordingly. *Id.* at ¶¶ 29-32, 36, 39-40. No transaction partner was ever found. *Id.* at ¶ 58.

On June 6, 2016, the Department of Education issued a letter to ITT demanding additional surety from ITT due to the risk of de-accreditation. *Id.* at ¶ 41; Exh. B to Compl. On August 17, 2016, ACICS notified ITT that it would remain on "show-cause" status due to ITT's inability to meet all demands in the April 20, 2016 letter. *Id.* at ¶ 51. Just over a week later, on August 25, 2016, the Department of Education issued another letter to ITT that increased ITT's surety by over 150% – to $247,292,364. *Id.* at ¶ 52. At that point, ITT had little choice other than to secure bankruptcy counsel. *Id.* at ¶¶ 53, 57. On September 16, 2016, ITT filed a Chapter 7 petition for bankruptcy. *Id.* at ¶ 58.

The Trustee filed suit on May 31, 2018, alleging that the Former Directors breached fiduciary duties owed to ITT by (1) allowing Modany to be the primary negotiator with the Department of Education, ACICS, and potential transaction partners, (2) not terminating Modany, (3) not providing sufficient oversight to Modany, (4) not independently investigating

ITT's financial condition, (5) not maximizing ITT's value prior to bankruptcy, and (6) not implementing a teach-out plan to allow current students to conclude their degree with another institution. *Id.* at ¶ 5. The Trustee accuses the Director Defendants of being "unengaged" and deferring too much to Modany during the critical months leading up to the bankruptcy filing. *Id.* at ¶ 36, 37, 54. As discussed below in more detail, however, the Trustee also alleges that during the five-month "Crisis Period" the Former Directors discussed potential transactions (*id.* at ¶¶ 35, 44, 56-57), struggled with how to satisfy the onerous demands from the Department of Education and ACICS (*id.* at ¶¶ 26, 43, 48), sought out expert advice from bankruptcy counsel and directed restructuring specialists to Modany (*id.* at ¶¶ 47, 50, 57), and consistently supervised and communicated with Modany, to the point that Modany perceived such oversight as meddling and onerous. *Id.* at ¶¶ 38, 50, 53, 57.

### STANDARD OF REVIEW

A motion to dismiss is governed by Federal Rule of Civil Procedure 12(b)(6), and is made applicable in the bankruptcy setting by Federal Rule of Bankruptcy Procedure 7012(b).

A motion to dismiss challenges the viability of the complaint. *Firestone Financial Corp. v. Meyer*, 796 F.3d 822 (7th Cir. 2015). It tests whether a complaint contains sufficient facts, accepted as true, to state a plausible claim for relief. *Id.* (*citing Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In stating the grounds for entitlement to relief, the plaintiff must plead "more than labels and conclusions." *Twombly*, 550 U.S. at 545. Additionally, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *In re Trinsum Group, Inc.*, 466 B.R. 596, 605 (Bankr. S.D.N.Y. 2012) (applying Delaware law) (*quoting Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Likewise, where conclusory allegations are contradicted by facts or exhibits, district courts are free to consider that these might undermine

the plaintiff's claim. *Bogie v. Rosenburg*, 705 F.3d 603, 609 (7th Cir. 2013). "Bare assertions, devoid of further factual enhancement are not sufficient to withstand a motion to dismiss." *Trinsum*, 466 B.R. at 605 (citations omitted) (*citing Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim for relief must be plausible rather than merely conceivable or speculative." *Runnion v. Girl Scouts*, 786 F.3d 510, 526 (7th Cir. 2015).

The fact that the Trustee has for many months had unfettered access to all ITT communications, corporate documents, board meeting minutes, etc. is relevant to how the Court should view the Complaint. Dkt. 1647-1653 (Rule 2004 subpoenas issued to the Former Directors). There is no "'reasonably founded hope' that the discovery process will uncover relevant evidence" that the Trustee does not already possess. *Trinsum*, 466 B.R. at 605 (*citing Twombly*, 550 U.S. at 559, 563 n.8). Even after reviewing millions of pages of documents in search of a scapegoat for ITT's demise, the Complaint fails to state a plausible claim against the Former Directors given the onerous legal standards. Accordingly, the Complaint should be dismissed.

<u>**ARGUMENT**</u>

The Trustee's assorted breach of fiduciary duty allegations against the Former Directors can be grouped under two – and often conflicting – theories.

First, the Trustee accuses the Former Directors of inaction, alleging that the Former Directors sat idly by while ITT was collapsing financially and did not adequately supervise management, in particular CEO Kevin Modany. This is a classic *Caremark* claim. *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996). A *Caremark* claim alleges failures in director oversight (i.e. director inaction), and requires a plaintiff to surmount the incredibly high bar that directors "utterly" and "intentionally" failed to take action or supervise

5

management in a "sustained or systematic" manner. *Stone v. Ritter*, 911 A.2d 362, 370, 372 (Del. 2006). Anything less is merely a breach of the duty of care, which has been expressly foreclosed by an exculpatory clause in ITT's Restated Certificate of Incorporation. A *Caremark* claim is "possibly the most difficult theory in corporation law" to sustain. *Fuqi*, 66 A.3d at 980 (citations omitted).

Secondly, the Trustee takes issue with several affirmative decisions by the Former Directors relating to the strategy to pursue a transaction rather than a wind-down and teach-out, to elect not to terminate Modany, and to permit management to lead the effort to investigate potential transactions. These allegations – that run headlong into the business judgment rule – fall under the fiduciary duty of care. However, ITT insulated its directors from such claims via the exculpatory clause, as permitted by 8 Del. Code Ann. § 102(b)(7). To overcome this exculpatory provision, the Trustee must establish a breach of the duty of loyalty or prove that the Former Directors acted in bad faith.

Pursuant to well-established Delaware jurisprudence, the Trustee has not pled a breach of fiduciary duty claim, and the Complaint must be dismissed in its entirety as to the Former Directors.

**I.    The Trustee Has Not Plausibly Pled a *Caremark* Claim.**

A *Caremark* claim requires that a director, in bad faith, "utterly" and "intentionally" failed to supervise management in a "sustained or systematic" manner. *Stone*, 911 A.2d at 370, 372. No wonder Delaware courts have observed that "[a] *Caremark* claim is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *Fuqi*, 66 A.3d at 980 (citations omitted). The fact that a corporate calamity happened under the directors' watch is not enough. *South v. Baker*, 62 A.3d 1, 14 (Del. Ch. 2012). Moreover, a

decision by directors not to act in a given situation does not given rise to a *Caremark* claim, even if that inaction, in hindsight, was the wrong decision. *Stone*, 911 A.2d at 373 (dismissing a complaint that "[w]ith the benefit of hindsight … seeks to equate a bad outcome with bad faith"). Rather, a *Caremark* claim requires proof that directors **intentionally** refused to act or engaged in no oversight at all: "imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations." *Id.* at 370. A "plaintiff must plead facts establishing a sufficient connection between the corporate trauma and the board." *South*, 62 A.3d at 14. Then, that connection must be a sustained or systemic, utter and intentional failure to oversee management. *Stone*, 911 A.2d at 369.

The Complaint fails to state an adequate *Caremark* claim for at least two reasons. **First**, the Complaint is internally inconsistent. In one breath the Trustee asserts conclusory allegations depicting the Former Directors as idly sitting by while ITT's financial condition worsened to the point of bankruptcy. However, in the next breath the Trustee acknowledges – as she must – that the Former Directors actively supervised and interacted with management, including Modany, even to the point of causing friction (Compl. ¶¶ 38, 50, 53, 57), discussed potential transactions (*id.* at ¶¶ 35, 44, 56-57), wrestled with the demands of regulators and how to satisfy them (*id.* at ¶¶ 26, 43, 48), and sought out expert advice from bankruptcy counsel and others. *Id.* at ¶¶ 47, 50, 57. Conclusory allegations that are elsewhere contradicted by specific facts should be disregarded: "In considering a motion to dismiss under Rule 12(b)(6), district courts are free to consider 'any facts set forth in the complaint that undermine the plaintiff's claim.'" *Bogie*, 705 F.3d at 609. The Trustee's inconsistent allegations cannot support a claim as a matter of law.

**Second**, even if the allegations of inaction are given credence by the Court, they fall far short of the extremely high bar to state a *Caremark* claim under Delaware law. "[O]nly a

7

sustained or systemic failure of the board to exercise oversight – such as an utter failure to attempt to assure a reasonable information and reporting system exists – will establish the lack of good faith that is a necessary condition to liability." *Stone*, 911 A.2d at 364 (*quoting Caremark*, 698 A.2d at 971). A *Caremark* claim requires that "(a) the directors utterly failed to implement any reporting or information systems or controls, *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Id.* at 370 (emphasis in original). Under either scenario a plaintiff must show that "the directors *knew* they were not fulfilling their fiduciary duties." *Fuqi*, 66 A.3d at 981 (emphasis supplied). "The test is rooted in concepts of bad faith; indeed, a showing of bad faith is a *necessary condition* to director oversight liability." *In re Citigroup*, 964 A.2d 106, 123 (Del. Ch. 2009) (emphasis in original). This exceptionally high standard of bad faith is all the more critical where, as here, directors are exculpated from duty of care claims.

In *Citigroup*, shareholders brought a derivative action against the officers and directors for failing to take action to protect the corporation from exposure to the subprime lending market. *Id.* at 112. The Court concluded that the shareholders failed to state a *Caremark* claim:

> [P]laintiffs' theory essentially amounts to a claim that the director defendants should be personally liable to the Company because they failed to fully recognize the risk posed by subprime securities. When one looks past the lofty allegations of duties of oversight and red flags used to dress up these claims, what is left appears to be plaintiff [] attempting to hold the director defendants personally liable for making (or allowing to be made) business decisions that, in hindsight, turned out poorly for the Company. …
>
> Business decision-makers must operate in the real world, with imperfect information, limited resources, and an uncertain future. To impose liability on directors for making a "wrong" business decision would cripple their ability to earn returns for investors by taking business risks. ***Indeed, this kind of judicial second guessing is what the business judgment rule was designed to prevent, and even if a complaint is framed under a Caremark theory, this Court will not abandon such bedrock principles of Delaware fiduciary duty law.***

8

*Id.* at 124, 126 (Emphasis supplied).

The Trustee's *Caremark*-based claim against the Former Directors for allegedly failing to take action to save ITT or properly oversee Modany fails the stringent *Caremark* standard. Indeed, as in *Citigroup*, the Trustee's "theory essentially amounts to a claim that the director defendants should be personally liable to the Company because they failed to fully recognize the risk posed by" the loss of accreditation. *Id.* at 124. But the Trustee has not alleged facts sufficient to show that there was a "sustained or systemic" "utter failure" to oversee ITT or its officers, nor does the Complaint demonstrate that the Former Directors "*consciously* failed to monitor or oversee [ITT's] operations thus disabling themselves from being informed of risks or problems." *Stone*, 911 A.2d at 369 (emphasis supplied). Indeed, the Trustee alleges just the opposite.

The Complaint contains multiple examples of the Former Directors actively seeking information, exercising control, and engaging in oversight of ITT's affairs. In fact, the Complaint depicts the Former Directors as ***increasingly*** active as the crisis period progressed and ITT's financial troubles deepened. For example, after they received the initial Show-Cause letter, the Former Directors met twice the following week. Compl. ¶¶ 35; Ex. A. Only days later, Former Director Odle requested a conference call to discuss transaction options with management. *Id.* at ¶ 38. Throughout April, May and June 2016 as the regulatory noose was tightening, the Former Directors discussed and pursued multiple possible transactions. *Id.* at ¶¶ 35, 39-40, 44. Within days of the August 25, 2016 letter from the Department of Education increasing the required surety by over $150,000,000 (thereby ensuring ITT would not survive), the Former Directors retained bankruptcy counsel and offered to have board members sit in on calls with Modany. *Id.* at ¶¶ 53, 57. Far from being disengaged and unconcerned about the fate of ITT, the Complaint (appropriately) demonstrates that the Former Directors were heavily involved in ITT's

management and affairs. Stated differently, the Former Directors did not "consciously" fail to oversee ITT or "intentionally" abdicate their duties. *Stone*, 911 A.2d at 369. While management is alleged to have made "business decisions that, in hindsight, turned out poorly" for ITT, that alone does not state a *Caremark* claim. *In re Citigroup*, 964 A.2d at 124.

The Trustee's primary claims of director inaction relate to (1) an alleged lack of supervision over Modany, punctuated by the fact that the Former Directors did not replace him as CEO,[2] and (2) the allegation that the Former Directors should have done more to try to preserve the value of ITT through a sale of ITT, pursuing a teach-out, or retaining expert advice sooner. Compl. ¶¶ 26, 27, 33, 34, 42, 43, 45, 47, 53, 58. But these claims are little more than thinly-veiled attacks on the business judgment of the Former Directors. Decisions as to hiring, retaining, or compensation of management are quintessential decisions subject to the business judgment rule. *See, e.g., Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000); *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 762 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006). Decisions of whether to enter into a particular transaction also squarely lie within the Former Directors' business judgment. *In re Orchard Enterprises, Inc. Stockholder Litig.*, 88 A.3d 1, 34 (Del. Ch. 2014). Mere disagreement with the wisdom of such decisions provides no basis for liability: "[W]hether a judge or jury considering the matter after the fact, believes a decision substantively wrong, or degrees of wrong extending through 'stupid' to 'egregious' or 'irrational', provides no ground for director liability." *Caremark*, 698 A.2d at 967. Again, "[T]his kind of judicial second guessing is what the business judgment rule was designed to prevent, and even if a complaint is

---

[2] In this regard, the most the Trustee musters is that a majority of the Former Directors trusted Modany to competently handle executive tasks for ITT, which is not a breach of fiduciary duty. Trusting an executive to do their job and properly overseeing the executive are not mutually exclusive.

framed under a *Caremark* theory, this Court will not abandon such bedrock principles of Delaware fiduciary duty law." *Citigroup*, 964 A.2d at 126.

While the Complaint pays lip service to liability against the Former Directors for their inaction (i.e., a *Caremark* claim), nowhere does the Trustee allege sufficient facts to show the Former Directors were utterly disengaged or intentionally ignored their oversight duties. Indeed, the Complaint is replete with evidence that the Former Directors worked diligently to salvage ITT, but to no avail. That Modany is alleged to have been acting with self-interest throughout the final months of ITT's existence does not, without more, state a *Caremark* claim. The Trustee's Complaint should be dismissed as to the Former Directors.[3]

## II. ITT's Restated Certificate of Incorporation Exculpates the Former Directors for Any Breaches of Fiduciary Duty Stemming from the Duty of Care.

The breach of fiduciary duty claim against the Former Directors fails as a matter of law because it is barred by 8 Del. Code Ann. § 102(b)(7), as incorporated in ITT's Restated Certificate of Incorporation. 8 Del. Code Ann. § 102(b)(7) states in part,

> (b) In addition to the matters required to be set forth in the certificate of incorporation by subsection (a) of this section, the certificate of incorporation may also contain any or all of the following matters:
>
> …
>
> (7) A provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the

---

[3] At times the Complaint reads as though the Trustee is faulting the Former Directors for deepening ITT's insolvency through their alleged inaction. *See, e.g.*, Compl. ¶ 4 (alleging that "damages … could have been significantly reduced, if Defendants had fulfilled their fiduciary duties to ITT"). To the extent the Trustee is pursuing a deepening insolvency theory, it fails as a matter of law. "Deepening insolvency, however, is not a cause of action under Delaware … law." *In re Conex Holdings, LLC*, 514 B.R. 405, 415 (Bankr. D. Del. 2014); *see also Trenwick Am. Lit. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 204 (Del. Ch. 2006) ("Delaware Law Does Not Recognize A Cause Of Action For So-Called 'Deepening Insolvency'"). A *Caremark* claim cannot be based on deepening ITT's insolvency.

> director's duty of loyalty to the corporation or its stockholders; (ii) for acts
> or omissions not in good faith or which involve intentional misconduct or
> a knowing violation of law; (iii) under § 174 of this title; or (iv) for any
> transaction from which the director derived an improper personal benefit.

Section 102(b)(7) allows corporations to exculpate directors from monetary liability for breaches of the duty of care,[4] even where directors have been grossly negligent. *In re Walt Disney Co.*, 906 A.2d 27, 64-65 (Del. 2006). This section "is intended to encourage directors to pursue business strategies that may be risky but that hold the potential for value maximization." *Trinsum*, 466 B.R at 612. Overcoming an exculpatory provision requires "an extreme set of facts." *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009) (citations omitted). "If the directors failed to do all that they should have under the circumstances, they breached their duty of care," for which they are expressly exculpated. *Id.* "[T]here is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties." *Id.* at 243. "Accordingly, to plead a non-exculpated breach of the duty of care claim here, [plaintiff] must plausibly allege bad faith." *Oswald v. Identiv, Inc.*, 2018 WL 1783838, *5 (N.D. Cal. Apr. 13, 2018) (*citing In re Cornerstone Therapeutics, Inc. S'holder Litigation*, 115 A.3d 1173, 1179-80 (Del. 2015)).

ITT's Articles of Incorporation contains an exculpatory provision that closely tracks Section 102(b)(7):

> Section 7. No director shall be liable to the Corporation or its stockholders for
> monetary damages for breach of fiduciary duty as a director; provided, however,
> that to the extent required by the provisions of Section 102(b)(7) of the General
> Corporation Law of the State of Delaware or any successor statute, as the same
> may be interpreted or amended from time to time, or any other laws of the state of
> Delaware, nothing contained in this Section 7 shall eliminate or limit the liability
> of a director (a) for any breach of the director's duty of loyalty to the Corporation

---

[4] The Trustee alleges that the breach of fiduciary duty claim encompasses breach of "loyalty, ***care***, and good faith owing to ITT and its stakeholders." Compl. ¶ 1 (emphasis supplied).

or its stockholders, (b) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (c) under Section 174 of the General Corporation Law of the State of Delaware, (d) for any transaction from which the director derived an improper personal benefit or (e) for any act or omission occurring prior to the date when this provision becomes effective. If the General Corporation Law of the State of Delaware hereafter is amended to authorize the further elimination or limitation of the liability of the directors, then the liability of a director of the Corporation, in addition to the limitation provided herein, shall be limited to the fullest extent permitted.

(the "Exculpatory Provision"). This Court can properly take notice of the existence and authenticity of documents publicly available through the Delaware Secretary of State, including ITT's Restated Certificate of Incorporation. *Malpiede v. Townson*, 780 A.2d 1075, 1090-92 (Del. 2001). Consistent with Federal Rule of Evidence 201, a publicly-traded company's certificate of incorporation is not subject to reasonable dispute, is generally known, and can be accurately and readily determined from a reliable source – the Delaware Secretary of State.

To overcome the Exculpatory Provision, the Complaint must contain particularized allegations of facts showing that one of the five exceptions in Section 102(b)(7)(a)-(e) apply: "Because the director defendants are exculpated from liability for certain conduct, then a serious threat of liability may only be found to exist if the plaintiff pleads a *non-exculpated* claim against the directors based on particularized facts." *Citigroup*, 964 A.2d 124-125 (internal quotations omitted). For the reasons that follow, the Trustee has failed to plead a claim under any of the five exceptions.

## A. The Trustee has not Plausibly Pled the First Exception – Breach of the Duty of Loyalty.

To plausibly plead a breach of the duty of loyalty, the Trustee must have made particularized allegations as to each individual Former Director, showing either a conflict of interest, or that the director knowingly and completely failed to undertake his or her responsibilities. *Raul v. Rynd*, 929 F.Supp.2d 333, 348 (D. Del. 2013) (*citing Lyondell*, 970

A.2d at 243-44); *see also Palmer v. Reali*, 211 F.Supp.3d 655 (D. Del. 2016); *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) *decision modified on reargument*, 636 A.2d 956 (Del. 1994) ("A claim for the breach of the fiduciary duty of loyalty requires a director … to act upon an interest that takes precedence over the best interest of the corporation and its shareholders."). This means each Former Director must have attained an improper personal benefit or knowingly disregarded his or her duties in an attempt to benefit themselves. *Trinsum*, 466 B.R. at 611 (*citing In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 WL 4826104, *12 (Del. Ch. Oct. 12, 2011)).

Traditionally, a breach of the duty of loyalty involves some sort of disloyalty, meaning it "involve[s] either a director appearing on both sides of a transaction or a director receiving a personal benefit from a transaction not received by the shareholders generally." *Id.* at 609 (*citing Cede*, 634 A.2d at 362; *In re Cyan, Inc.*, 2017 WL 1956955, *8 (Del. Ch. May 11, 2017); *Feldman v. Soon-Shiong*, 2018 WL 2124063, *5 (Del. Ch. May 8, 2018). If an individual director appears to have a conflict of interest, "the alleged 'disqualifying self-interest or lack of independence must be material,' that is, 'reasonably likely to affect the decision-making process.'" *Id.* (*citing In re Alloy, Inc.*, 2011 WL 4863716, *7 (Del. Ch. 2011)). In short, a breach of the duty of loyalty requires the Former Directors to have "intentionally act[ed] with a purpose other than that of advancing the best interests of the corporation." *Disney*, 906 A.2d at 67.

The Trustee has alleged none of these things. The Complaint contains no allegation that the Former Directors were on both sides of a transaction or received an improper benefit not available to other shareholders. The Complaint nowhere alleges that the Former Directors had some sort of divided loyalty or self-interest that precluded them from exercising their duties to ITT. And the Complaint contains no suggestion that the Former Directors intentionally pursued a

14

purpose other than advancing ITT's best interest due to a conflict of interest. Simply put, this is not a breach of loyalty case as pled by the Trustee, and thus the first of the five exceptions to Section 102(b)(7) is not satisfied.

### B. The Trustee has Not Plausibly Pled that the Former Directors Acted in Bad Faith.

If a *Caremark* claim is "the most difficult theory in corporation law" to sustain (*Fuqi*, 66 A.3d at 980), proving bad faith is not far behind. Finding bad faith is proper only "where the fiduciary ***intentionally*** acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts ***with the intent*** to violate applicable positive law, or where the fiduciary ***intentionally*** fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." *Disney*, 906 A.2d at 67 (emphasis supplied); *see also In re BMT-NW Acquisition, LLC*, 582 B.R. 846, 863 (D. Del. 2018). "[F]iduciary conduct of this kind, which does not involve disloyalty (as traditionally defined) [] is qualitatively more culpable than gross negligence." *Disney*, 906 A.2d at 66. "Allegations that a director 'should have been aware' may not be sufficient to create an inference that a director had a culpable state of mind." *Raul*, 929 F.Supp.2d at 348 (D. Del. 2013). Bad faith has been described as adopting an affirmative, severe attitude of "we don't care about the risks," such that it amounts to "intentional dereliction of duty, a conscious disregard for one's responsibilities." *Disney*, 906 A.2d at 66.

### i.   Noncompliance with Laws or Regulations

In order for the Former Directors to be found to have "violated applicable positive law," the Complaint must first tie the alleged illegality to the claim pursued in the complaint. *Louisiana Municipal Police Employees' Retirement System v. Pyott*, 46 A.3d 313 (Del. Ch. 2012) (judgment reversed on other grounds). Although the Trustee vaguely alleges that ITT was noncompliant with "applicable laws, regulations, and other requirements" (Compl. ¶ 52), the

Trustee makes no effort to explain this nebulous claim. Vague and conclusory allegations of illegality do not satisfy the plausibility standard. *Cf. Superior Offshore Int'l, Inc. v. Bristow Group, Inc.*, 738 F.Supp.2d 505, 517 (D. De. 2010) ("[A] bare assertion of [illegality] will not suffice."); *see also City of Birmingham Retirement & Relief Sys. v. Good*, 177 A.3d 47, 59-60 (Del. 2017) (stating plaintiffs "must allege in sufficient detail that [the company] illegally colluded with a corrupt regulator. And then, plaintiffs must tie the improper conduct to an intentional oversight failure by the board"); *Citigroup*, 964 A.2d at 124-125 (pleading non-exculpated claims must be particularly pled). Moreover, even accepting as true the vague allegation that ITT was noncompliant with unspecified laws and regulations, the Trustee has not alleged bad faith. There is no suggestion that the Former Directors knowingly and intentionally violated the law (or caused ITT to do so) as required to prove bad faith. *Id.*

In fact, the 2016 Annual Meeting Notice and Proxy Statement (Exhibit D to the Complaint) evinces the Former Directors' intent ***not*** to violate laws or regulations. The top management objective for 2016, as set by the Former Directors, was to "[r]esolve (through settlement or otherwise) outstanding legal and regulatory matters involving the company." Compl. Ex. D, p. 32.[5] A stated priority to "resolve" legal and regulatory matters is the polar opposite of intentionally violating the law. There was no such intent. The Trustee does not allege it and the Proxy Statement refutes it. The Former Directors did not engage in bad faith.

### ii.  Intentional Abdication of Duty

Neither did the Former Directors engage in bad faith by intentionally disregarding their duties. "An allegation that a director breached its fiduciary duty by a conscious disregard of such

---

[5] Conflicting facts contained in exhibits to the Complaint should be given greater weight than the allegations. *Massey v. Merrill Lynch & Co.*, 464 F.3d 642, 645 (7th Cir. 2006) ("In addition [on a motion to dismiss], we will consider the exhibits attached to a complaint, but, where an exhibit conflicts with the allegations of the complaint, the exhibit typically controls.").

duty must be plead with particularity. A director must have knowingly and completely failed to take on his responsibility." *Trinsum*, 466 B.R. at 618. While the Trustee claims that the Former Directors sat idly by while ITT careened toward its end, the Complaint contains a litany of actions taken by the Former Directors as ITT struggled to meet the increasingly onerous demands of the Department of Education. The Court is free to consider that these contradictions undermine the Trustee's claims. *Bogie*, 705 F.3d at 609. Again, as recounted above, the Former Directors were anything but idle and disengaged:

(1) The Former Directors considered at least four different offers between April 20, 2016 and September 16, 2016, from U.S. Skills/THL (Compl. ¶¶ 35-36); Genki Capital (¶ 39); Dream Center Foundation (¶ 40); and Starcore Venture Group (¶ 44);

(2) The Former Directors considered multiple restructuring consultants, including Alvarez & Marsal and FTI Consulting (*id.* at ¶¶ 47, 50);

(3) The Former Directors frequently emailed each other and Modany as they wrestled with the correct approach to ITT's financial crisis (*id.* at ¶¶ 26, 35, 37, 38, 39, 43, 47, 48, 49, 50, 52, 53, 54, 55, 56, 57);

(4) The Former Directors attended board meetings to discuss ITT business and options (*id.* at ¶¶ 12-19, 29, 35) (In the relevant five-month time period at issue in the Complaint, board meetings occurred on April 24, April 25, July 24, and July 25); and

(5) The Former Directors kept themselves apprised of ITT's financial condition and potential transactions, including hiring consultants / experts to assist. (Proxy Statement (Ex. D, p. 3) (hired Deloitte & Touche LLP)); Compl. ¶ 29 (April 25, 2016 Board Meeting in which the need to "pursue a transaction as soon as possible" was discussed); *id.* at ¶ 35 ("[D]uring an April 24, 2016 Board Meeting, ITT's management briefed the Directors on

a possible transaction"); *id.* at ¶ 38 ("April 30 ... Odle asked Dean … to set up a conference call … to discuss different transaction options"); *id.* at ¶ 43 (discussing whether strategy of ITT as a going concern would need to be altered); *id.* at ¶ 44 (rejecting offer because management reported that it would leave insufficient value for shareholders); *id.* at ¶ 47 (Directors Cohen, Odle, and Dean considering the need for restructuring consultants); *id.* at ¶ 53 (Dean communicating need for increased Board awareness, including sitting in on conference calls); and *id.* at ¶¶ 52-53 (hiring bankruptcy counsel in August 2016 to guide the Board).

It is clear from the Complaint that the Trustee disagrees with several of the Former Directors' decisions. Principally, the Trustee disagrees with the decision to pursue a transaction rather than winding down ITT and embracing a teach-out model. The Trustee also disagrees with the Former Directors' decision not to terminate Modany. Finally, she disagrees with the Former Directors' decision to allow management to take the lead in investigating prospective transactions. In making these arguments, the Trustee essentially suggests that the Court should substitute its own judgment (guided by hindsight) for that of the Former Directors' judgment. To do so would eviscerate the business judgment rule.

The business judgment rule is both a procedural guide and a substantive rule of law. A court is required to presume that "in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company." *Disney*, 906 A.2d at 52 (*quoting Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)); *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1162 (Del. 1995). "The rule posits a powerful presumption in favor of actions taken by the directors in that a decision made by a loyal and informed board will not be overturned by the courts unless it cannot be

'attributed to any rational business purpose.'" *Cede*, 634 A.2d at 361. Indeed, it has been said that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task." *In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005).

Accordingly, the business judgment rule applies to each board decision at issue in this matter. *Sinclair Oil Corp.*, 280 A.2d at 720. The Court must presume that the Former Directors acted in good faith when they decided to investigate options for a transaction instead of winding down ITT, when they elected to retain Modany as CEO instead of replacing him, and when they permitted management to take the lead on investigating prospective transactions. The Trustee cannot overcome the presumption of good faith based on the business judgment rule by simply insisting that the Former Directors should have taken different actions, and accusing the Former Directors of abdicating their responsibilities by not doing so. That turns the business judgment rule on its head.

The Trustee's claims are founded on the premise that the Former Directors' decision not to pursue an opportunity equates to a bad faith abdication of duty, but those concepts are very different. The standard for bad faith – "knowingly and completely fail[ing] to take on [their] responsibility" – is not established merely because the Former Directors considered, but ultimately rejected, certain courses of action. *Trinsum*, 466 B.R. at 611. For example, the strategy to pursue a transaction to sell all or part of ITT rather than wind it down naturally excludes a teach-out as an option. That decision (undoubtedly a "business judgment") does not mean the Former Directors "did nothing" (as the Trustee repeatedly claims) to pursue a teach-out. Yet again, the Trustee asks the Court to substitute its own judgment for that of the Directors, which is anathema to Delaware law. *Stone*, 911 A.2d at 373; *Citigroup*, 964 A.2d at 124.

Further, it was not an abdication of duty to allow Modany to take the lead in investigating the prospective transactions. "An informed decision to delegate a task is as much an exercise of business judgment as any other." *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 943 (Del. 1985) (delegating responsibility for merger agreement to an independent appraiser was not improper); *see also Grimes v. Donald*, 673 A.2d 1207, 1214 (Del. 1996) (CEO was assigned the task of coordinating a sale) (overruled on other grounds); *In re NYMEX S'holder Litig.*, 2009 WL 3206051, *7 (Del. Ch. Sept. 30, 2009) ("It is well within the business judgment of the Board to determine how merger negotiations will be conducted, and to delegate the task of negotiating to the Chairman and the Chief Executive Officer."). Although the Trustee obviously believes the Former Directors' investigations into prospective transactions were insufficient, "[r]easonable minds may differ as to what a thorough investigation may involve." *Charal Inv. Co. v. Rockefeller*, 1995 WL 684869, *3 (Del. Ch. Nov. 7, 1995).[6]

Even if allowing Modany to vet prospective transactions is deemed to be error, it is not an intentional and complete abdication of duties, and thus does not constitute bad faith. In *Trinsum*, the board of directors permitted one director to negotiate a sale with an entity that the director partly owned, and then the board approved the sale. 466 B.R. at 596. Even then, the court held that at most, the board of directors was grossly negligent, not that they had engaged in bad faith. *Id.*

*Parnes v. Bally Entertainment Corporation*, 722 A.2d 1243, 1246 (Del. 1999) provides an example of the exceedingly high standard for director abdication. In *Parnes*, an executive

---

[6] The Complaint seems to suggest that Modany was conflicted because he wished to keep his job and salary, and for that reason it was wrong of the Former Directors to allow his input. That too is incorrect. An executive's "efforts to negotiate a future position in the event of a merger does not support a finding that the decision to enter the Agreement was 'based on extraneous considerations or influences' or provided any personal benefit not equally shared by the stockholders." *In re Ultimate Escapes Holdings, LLC*, 55 B.R. 749, 774 (D. Del. 2016).

"demanded that any potential acquirer pay [him] for his approval of the merger," and several prospective acquirers had set up "substantial cash payments and asset transfers" to the executive that lacked any consideration, which were conditioned upon the completion of the merger. 722 A.2d 1243, 1246 (Del. 1999). Other interested purchasers "were discouraged from bidding because they were unwilling to participate in illegal transactions." *Id.* These potential payments and asset transfers were "so egregious" that the board's acquiescence in the executive's behavior and approval of the transaction could not satisfy even the liberal business judgment rule. *Id.* at 1446-47. Modany's alleged conduct was not remotely similar to the appalling conduct of the executive in *Parnes*.

The allegations in the Complaint, even if accepted as true, do not establish that the Former Directors knowingly and completely failed to fulfill their duties. The Trustee has not pled a plausible claim that the Former Directors acted in bad faith.

### C.  The Exception Related to Section 174 Does Not Apply.

The third exception in the Exculpatory Provision – Delaware Code Section 174 – is a statutory carve-out that applies if directors have paid unlawful dividends or have unlawfully purchased or redeemed stock. There is no such allegation in the Complaint, and thus Section 174 has no application here.

### D.  No Former Director Is Alleged to have Received an Improper Personal Benefit from a Transaction.

The fourth exception is equally inapplicable. There is no allegation in the Complaint that there was a "transaction from which the director derived an improper personal benefit." First, there is no merger, acquisition, or other "transaction" that is challenged in the Complaint. Second, there is no suggestion that any Former Director received some sort of improper personal benefit, from a transaction or otherwise.

### E. The Dates of the Alleged Breaches Fall Within the Scope of the Exculpatory Provision.

A final limitation to the Exculpatory Provision is that conduct that occurred prior to the date the Exculpatory Provision was effective is not shielded from liability. This exception does not apply. The alleged breaches of fiduciary duty at issue in the Complaint span approximately five months – from April 20, 2016 through September 16, 2016. Compl. ¶ 1. Section 102(b)(7) of the Delaware Code was first enacted in 1967, and ITT's charter was effective long before April 20, 2016. The alleged breaches of fiduciary duty occurred while the Exculpatory Provision was effective.

In summary, the Exculpatory Provision bars liability for breach of the duty of care unless one of the enumerated exceptions applies. The Trustee alleges no facts to sustain a breach of the duty of loyalty, and the Complaint falls far short of the exceedingly high standard for plausibly pleading that the Former Directors acted in bad faith (i.e., that they took the attitude of "we don't care about the risks," such that it amounts to "intentional dereliction of duty, a conscious disregard for one's responsibilities"). *Disney*, 906 A.2d at 67. The remaining three exceptions to the Exculpatory Provision are inapposite. Because the Exculpatory Provision bars a claim for breach of the duty of care, no breach of loyalty is alleged, and there is no plausible basis to contend the Former Directors acted in bad faith, the fiduciary duty claim should be dismissed.

### III. The Plausibility Standard for Pleading Applies to Each Director Individually.

It is well-settled that a "director of a corporation is ordinarily liable only for those torts which he himself commits," commands, or brings about. *Hitchcock v. Am. Plate Glass Co.*, 259 F. 948, 952-53 (3d Cir. 1919). As the Seventh Circuit Court of Appeals stated, "Liability is personal. … Each defendant is entitled to know what he or she did that is asserted to be wrongful. A complaint based on a theory of collective responsibility must be dismissed." *Bank of*

*Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013). Delaware courts agree: "[L]iability of the directors must be determined on an individual basis because the nature of their breach of duty (if any), and whether they are exculpated from liability for that breach, can vary for each director." *Disney*, 907 A.2d at 748 (*quoting In re Emerging Comms. Inc.*, 2004 WL 1305745, *38 (Del. Ch. June 4, 2004)). The general rule is that "an officer of a corporation who takes no part in the commission of the tort committed by the corporation is not personally liable to third persons for such a tort, nor for the acts of other agents, officers or employees of the corporation in committing it, unless he specifically directed the particular act to be done, or participated, or cooperated therein." *Zubik v. Zubik*, 384 F.2d 267, 273 (3d Cir. 1967) (*quoting* 3 Fletcher Cyc. Corp. § 1137 (p. 782-783) (Perm. Ed. Rev. 1965)).

The Trustee has not plausibly alleged that each individual director breached his or her fiduciary duties. *Cf. Conex*, 514 B.R. at 413. In *Conex*, a trustee pled various fiduciary breaches "by the Directors and Officers" without further specification. *Id.* The Court held that the allegations were conclusory because "the bankruptcy trustee failed to plead sufficient facts that would identify which officers were involved," and that the "allegations regarding the officers [were] vague and lack[ed] sufficient detail about which officers, if any, knowingly participated." *Id.* at 414. Dismissal was required because the *Conex* trustee "***lump[ed] all of the Individual Defendants together as 'Officers and Directors' ... without supplying specific facts as to each defendant's wrongdoing***." *Id.* at 414 (emphasis supplied).[7] Similarly, in *Feldman*, one director enriched himself at the expense of the company, but the other directors were protected by an exculpatory provision, because they, individually, were not alleged to have acted disloyally or in

---

[7]  *Conex* was a Delaware Bankruptcy Court decision that applied Texas law, but relied heavily on Delaware law concepts of pleading specificity for director and officer liability. *See id.* (citing *In re Troll Communications, LLC*, 385 B.R. 110, 120 (Bankr. D. Del. 2008)).

bad faith. *Feldman*, 2018 WL 2124063 at *5. The court dismissed the complaint as to those directors, because the plaintiff did "not allege that [those directors] personally benefitted" or that they as "individuals were intentionally derelict in fulfilling ***their*** fiduciary obligations." *Id.* (emphasis supplied).

Here, just as in *Conex*, the Trustee has lumped all of the Former Directors together and pled blanket, conclusory allegations against them as a group. Compl. ¶¶ 5, 33, 35, 36, 37, 39, 44, 46, 47, 54, 56, 62, 65. In fact, in many cases the Trustee is even more imprecise by generically using the term "The Defendants," which includes Modany. *Id.* at ¶¶ 4, 25, 26, 27, 34, 42, 43, 44, 45, 53, 55, 59, 60, 62, 63, 64, 67. One is left to wonder which Former Director is alleged to have personally participated in the alleged action or inaction of which the Trustee complains. While the Trustee manages to plead particularized allegations against Modany (*id.* at ¶¶ 6, 23, 25, 26, 27, 28, 29, 30, 31, 32, 35, 36, 38, 39, 40, 41, 44, 48, 49, 53, 55, 56, 57), the Former Directors are largely treated as one homogeneous group.

For example, Former Directors Lau and Cozzi are mentioned only once in the entire Complaint in paragraphs 14 and 17, respectively, with the allegations consisting of identifying them as board members, providing their backgrounds, and alleging they "routinely attended Board of Director meetings" (which, incidentally, is quite the opposite of an intentional disregard for duties).[8] Aside from general background allegations, Former Director Weber is referenced only once in the entire Complaint for an email exchange he had with Former Director Dean stating the Board should consider teaching out and noting that the Department of Education will likely insist that ITT maximize its assets. *Id.* at ¶¶ 16, 43. The only specific conduct attributed to

---

[8] Former Director Cozzi only served on the Board until May 2016, meaning he was on the Board only a couple weeks into the "Crisis Period" that allegedly started on April 20, 2016. (*Id.* at ¶ 17.) The Trustee provides no explanation for asserting a claim against Cozzi despite his short stint on the Board during the relevant period.

24

Former Director Brown is that he "offered … support of Modany" in late August 2016 after the Board secured bankruptcy counsel, and that he, too, "routinely attended Board of Director meetings." *Id.* at ¶¶ 13, 57. Former Director Morgan is accused of only three things in the entire Complaint: (1) attending Board meetings, (2) receiving an email from Modany in which Modany discussed executive bonuses, and (3) stating in an email that "I trust him" referring to Modany. *Id.* at ¶¶ 15, 49, 57. Nowhere in the 28-page, 73-paragraph Complaint are there particularized allegations of what any of these Former Directors, themselves, did wrong.

The Trustee expends a little more effort with respect to Former Directors Odle and Cohen, but her allegations belie the claim that the Former Directors did nothing while ITT collapsed. The only allegations directed specifically at Former Director Odle are that he (1) attended Board meetings, (2) challenged Modany's refusal to participate in a conference call to discuss possible transactions, and (3) provided contact information for restructuring consultant, Alvarez & Marsal (which Modany apparently took exception to) – all of which affirmatively demonstrate his engagement in ITT and oversight of Modany. *Id.* at ¶¶ 18, 38, 47. The only other references to Former Director Odle allege that Modany was frustrated with Odle contacting Alvarez & Marsal and that Modany wanted assistance in blocking Odle's "suggested efforts that are not necessary or helpful." *Id.* at ¶¶ 50, 53.

Allegations against Former Director Cohen are similar. He is accused of (1) attending Board meetings, (2) recognizing that the Accrediting Council for Independent Colleges and Schools saw Modany as "part of the problem," and (3) passing along FTI Consulting as an option for a restructuring specialist. *Id.* at ¶¶ 19, 26, 47. Like Former Director Odle, the remaining references to Cohen demonstrate that he was active in managing ITT, at times causing conflict with Modany by "meddling" with ITT's operations and questioning the selection of

bankruptcy counsel. *Id.* at ¶¶ 53, 57. Far from meeting the lofty standard for bad faith, the Trustee's allegations against Former Directors Odle and Cohen demonstrate just the opposite – good faith efforts to provide oversight of executive management (even to the point of conflict).

The Trustee does make particularized allegations against Former Director Dean. However, as explained above, the Trustee has alleged little more than her disagreement with decisions Former Director Dean made (1) to support (rather than terminate) Modany, (2) to allow Modany to play a prominent role in vetting potential transactions, and (3) to pursue a strategy of seeking a sale of ITT rather than winding it down and pursuing a teach-out model. For the reasons stated above, those decisions do not satisfy the rigorous *Caremark* standard, are insulated from attack by the business judgment rule and the Exculpatory Provision, and were not done in bad faith.

Delaware law is clear that liability of directors must be determined on an individual basis – there is no guilt by association. *Zubik*, 384 F.2d at 273; *Disney*, 907 A.2d at 748. A Complaint must state particularized allegations against individual directors to state a claim as to each, and the failure to do so results in dismissal. *Feldman*, 2018 WL 2124063 at *5; *Conex*, 514 B.R. at 413. The Trustee has failed to make individualized allegations that state a plausible claim for breach of fiduciary duty. For this reason, in addition to the arguments above, dismissal of the Complaint is required.

## CONCLUSION

For the foregoing reasons, the Former Directors respectfully request that the Court dismiss the Trustee's Complaint in its entirety.

Respectfully submitted,


*/s/ Paul D. Vink*
Gregory F. Hahn, Attorney No. 10547-49
V. Samuel Laurin, Attorney No. 11607-53
James P. Moloy, Attorney No. 10301-49
Paul D. Vink, Attorney No. 23783-32
BOSE MCKINNEY & EVANS LLP
111 Monument Circle, Suite 2700
Indianapolis, Indiana  46204
(317) 684-5000
(317) 684-5173 (FAX)
ghahn@boselaw.com
slaurin@boselaw.com
jmoloy@boselaw.com
pvink@boselaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 24th day of August, 2018, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties through the Court's Electronic Case Filing System. Parties may access this filing through the Court's system.

Richard Allyn
rallyn@robinskaplan.com

Thomas Berndt
tberndt@robinskaplan.com
jgerboth@robinskaplan.com

John Cannizzaro
john.cannizzaro@icemiller.com
deborah.martin@icemiller.com

Michael Anthony Collyard
mcollyard@robinskaplan.com
rhoule@robinskaplan.com

Elaine Victoria Fenna
elaine.fenna@morganlewis.com

John C. Hoard
johnh@rubin-levin.net
jkrichbaum@rubin-levin.net
atty_jch@trustesolutions.com

Jeffrey A. Hokanson
jeff.hokanson@icemiller.com
kathy.peed@icemiller.com

Carly Kessler
ckessler@robinskaplan.com

Ronald James Schutz
rschutz@robinskaplan.com

U.S. Trustee
ustpregion10.in.ecf@usdoj.gov

Philip A. Whistler
philip.whistler@icemiller.com
carla.persons@icemiller.com

I further certify that on August 24, 2018, a copy of the foregoing was mailed by first-class United States mail, postage prepaid, and properly addressed to the following:

None

*/s/ Paul D. Vink*
Paul D. Vink

3460008_4/27062-3