UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| ITT EDUCATIONAL SERVICES, INC., *et al.*[1] | ) | Case No.  16-07207-JMC-7A |
| | ) | |
| Debtors. | ) | Jointly Administered |
| _____ | ) | |
| | ) | |
| DEBORAH J. CARUSO, the CHAPTER 7 | ) | |
| TRUSTEE for ITT EDUCATIONAL | ) | |
| SERVICES, INC., ESI SERVICE CORP. and | ) | |
| DANIEL WEBSTER COLLEGE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Adversary No. 18-50100 |
| | ) | |
| vs. | ) | |
| | ) | |
| KEVIN MODANY, JOHN E. DEAN, C. DAVID | ) | |
| BROWN II, JOANNA T. LAU, THOMAS I. | ) | |
| MORGAN, JOHN VINCENT WEBER, JOHN F. | ) | |
| COZZI, SAMUEL L. ODLE, and JERRY M. | ) | |
| COHEN, | ) | |
| | ) | |
| Defendants. | ) | |

**TRUSTEE'S BRIEF IN OPPOSITION
TO FORMER DIRECTORS' MOTION TO DISMISS**

---

[1] The debtors in these cases, along with the last four digits of their respective federal tax identification numbers are ITT Educational Services, Inc. [1311]; ESI Service Corp. [2117]; and Daniel Webster College, Inc. [5980].

T<small>ABLE OF</small> C<small>ONTENTS</small>

**Page(s)**

Preliminary Statement.................................................................................................... 1

Summary of Allegations ................................................................................................ 3

I.  During ITT's final five months, the Directors' breaches of their fiduciary duties squandered ITT's remaining value and saddled its estate with avoidable liabilities........ 3

II.  The Directors refused to remove Modany, abdicated all decision-making authority to him, and blindly deferred to his recommendation to reject numerous transactions ............................................................................................................ 4

Argument ....................................................................................................................... 7

I.  The Trustee's Complaint satisfies Rule 8's liberal pleading standard............................ 7

  A.  Fed. R. Civ. P. 8(a)'s plausibility standard controls ............................................. 8

  B.  The Directors misleadingly cite heightened pleading standards applicable in derivative cases and Delaware state court—but not here .................................. 8

II.  The Trustee's breach-of-fiduciary-duty claims are sufficiently pled ............................ 10

  A.  The Directors breached their duties of loyalty and good faith by abdicating all decision-making authority to Modany and intentionally disregarding their duty to make informed decisions, maximize ITT's value, and avoid unnecessary liabilities .......................................................................................... 10

  B.  The Directors further breached their duties of loyalty and good faith by chronically failing to exercise reasonable oversight over Modany .................... 15

  C.  The Directors breached their duty of care by making uninformed decisions and failing to implement any rational decision-making process ........................ 18

III.  Neither the business judgment rule nor the exculpatory provision in ITT's Certificate of Incorporation provide a basis to dismiss .................................................. 21

  A.  The business judgment rule cannot support the Directors' motion to dismiss.................................................................................................................. 21

  B.  Similarly, the exculpatory provision cannot warrant dismissal .......................... 24

IV.  The Directors ignore black letter law that reasonable inferences must be drawn in the Trustee's favor .................................................................................................... 25

V.  The Trustee sufficiently alleges facts relating to each individual Director .................... 27

Conclusion ...................................................................................................................... 30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ad Hoc Comm. Of Equity Holders of Tectonic Network, Inc. v. Wolford*,
554 F. Supp. 2d 538 (D. Del. 2008)........................................................................10, 22

*Alberts v. Tuft (In re Greater Se. Cmty. Hosp. Corp. I)*,
353 B.R. 324 (Bankr. D.D.C. 2006) ...............................................................................11

*Aronson v. Lewis*,
473 A.2d 805 (Del. 1983) ...............................................................................................23

*ATR-Kim Eng. Fin. Corp. v. Araneta*,
2006 Del. Ch. LEXIS 215 (Del. Ch. Dec. 21, 2006) ................................................10, 18

*Bell Atl. Corp. v. Twombly*,
127 S.Ct. 1955 (2007)........................................................................................................8

*Boles v. Filipowski (In re Enivid, Inc.)*,
345 B.R. 426 (Bankr. Mass. 2006) ......................................................................18, 19, 29

*Brehm v. Eisner*,
746 A.2d 244 (Del. Feb. 9, 2000) .............................................................................14, 23

*Bridgeport Holdings Inc. Liquidating Trust v. Boyer ("Bridgeport")*,
388 B.R. 548 (Bankr. D. Del. 2008) ......................................................................11, 14, 24

*Buckley v. O'Hanlon*,
2007 U.S. Dist. LEXIS 22211 (D. Del. Mar. 28, 2007) ...............................................29

*Cede & Co. v. Technicolor*,
634 A.2d 345 (Del. 1993) ...............................................................................................23

*Cinerama, Inc. v. Technicolor*,
663 A.2d 1156 (Del. 1995) .............................................................................................23

*Clingman & Hanger Mgmt. Assocs., LLC v. Knobel (In re Regents Educ., Inc.)*,
No. 16-cv-62028, 2018 U.S. Dist. LEXIS 122455 (S.D. Fla. Jan. 9, 2018)...........................17

*FDIC v. Baldini*,
983 F. Supp. 2d 772 (S.D. W. Va. 2013)........................................................................22

*Friedman v. Beningson*,
1995 Del. Ch. LEXIS 154 (Del. Ch. 1995)......................................................................20

*Gulley v. Moravec*,
   2008 U.S. Dist. LEXIS 15841 (S.D. Ind. Feb. 29, 2008) ..................................................10

*In re Citigroup Inc. S'holder Deriv. Litig.*,
   964 A.2d 106 (Del. Ch. 2009)...............................................................8, 9, 16, 23

*In re OODC, LLC*,
   321 B.R. 128 (Bankr. D. Del. 2005) .................................................................7

*In re Orchard Enters., Inc.*,
   88 A.3d 1 (Del. Ch. 2014).................................................................................23

*In re Walt Disney Co. Derivative Litig.*,
   907 A.2d 693 (Del. Ch. 2005)...........................................................................23

*Maio v. Aetna, Inc.*,
   221 F.3d 472 (3d Cir. 2000)...............................................................................8

*McMullin v. Beran*,
   765 A.2d 910 (Del. 2000) .........................................................................10, 15

*Ormond v. Anthem, Inc.*,
   2009 U.S. Dist. LEXIS 90837 (S.D. Ind. Sept. 29, 2009) ....................................10

*Parnes v. Bally Entertainment Corp.*,
   722 A.2d 1243 (Del. 1999) ...............................................................................23

*Raul v. Rynd*,
   929 F. Supp. 2d 333 (D. Del. 2013)....................................................................9

*Shamrock Holdings v. Arenson*,
   456 F. Supp. 2d 599 (D. Del. 2006)...................................................................22

*Sinclair Oil Corp. v. Levien*,
   280 A.2d 717 (Del. 1971) .................................................................................23

*Smith v. Van Gorkom*,
   488 A.2d 858 (Del. 1985) .................................................................................18

*South v. Baker*,
   62 A.3d 1 (Del. Ch. 2012)................................................................................16

*Stanziale v. Nactomi (In re Tower Air, Inc.)*,
   416 F.3d 229 (3d Cir. 2005)................................................................8, 9, 18, 21, 23

*Stanziale v. Versa Capital Mgmt., LLC (In re Simplexity)*,
   Case No. 14-10569(KG), Adv. Pro. No. 16-50212(KG), 2017 Bankr. LEXIS
   37 (D. Del. Jan. 5, 2017) ..........................................................................22, 24

*Stone v. Ritter*,
    911 A.2d 362 (Del. 2006) ...........................................................................10, 11, 16

*Wahoski v. Classic Packaging Co. (In re Pillowtex Corp.)*,
    427 B.R. 301 (Bankr. D. Del. April 14, 2010)..........................................................7

**Statutes**

Delaware General Corporation Law section 102(b)(7) ...............................................24

Indiana Code § 23-0.5-5-1 .......................................................................................10

**Rules**

Delaware Chancery Court Rule 23.1 ...............................................................2, 9, 18

Federal Rule of Bankruptcy Procedure 7012(b) ........................................................7

Federal Rule of Civil Procedure 8 ..........................................................................7, 9

Federal Rule of Civil Procedure 8(a) ...................................1, 2, 8, 9, 10, 11, 16, 29

Federal Rule of Civil Procedure 9(b) .........................................................................9

Federal Rule of Civil Procedure 12(b)(6) ...........................................................7, 8, 21

Federal Rule of Civil Procedure 23.1 ...............................................2, 9, 10, 15, 16, 23

Plaintiff Deborah J. Caruso ("Plaintiff" or "Trustee"), as Chapter 7 trustee for ITT Educational Services, Inc., ESI Service Corp., and Daniel Webster College, Inc. (collectively, "ITT," "Debtors," or the "Company") submits this memorandum of law in opposition to the Former Directors' (collectively, the "Directors") Motion to Dismiss.

## Preliminary Statement

The Directors will have a chance to argue the merits of their defenses. But doing so at the pleading stage—before this case has even started—is premature and inappropriate. The Trustee's Complaint is flush with specific facts, citing letters from regulators, minutes from ITT board meetings, financial reports, and the Directors' own emails showing that they knew of the perilous risks ITT faced during its final five months (the "Crisis Period") and knew the actions their fiduciary duties required—removing the self-interested CEO, Kevin Modany; independently investigating potential transactions or an orderly wind down; and taking steps to minimize ITT's liabilities. Yet despite such knowledge, the Directors not only refused to remove Modany, against the express wishes of state and federal regulators, but abdicated all decision-making authority to him. They rejected numerous transactions with no diligence, acquiesced to Modany's repeated refusals to secure restructuring or bankruptcy counsel, and disregarded regulators' repeated demands to secure a comprehensive teach-out to allow ITT's 40,000 students to complete their education elsewhere. These facts make it more than plausible that the Directors breached their fiduciary duties.

Throughout their brief, the Directors espouse incorrect pleading standards that, conveniently, are more stringent than Federal Rule of Civil Procedure 8(a)'s plausibility standard, which controls here. Citing shareholder derivative suits, the Directors repeatedly argue that the Complaint must contain "particularized allegations." But the derivative cases the

1

Directors cite apply a heightened pleading standard under Delaware Chancery Court Rule 23.1 (or Federal Rule of Civil Procedure 23.1), which explicitly requires "particularity" in pleadings. The Directors elsewhere cite Delaware state-court cases applying Delaware Chancery Rule 8, which Delaware courts interpret to require more specificity than Fed. R. Civ. P. 8(a)'s plausibility standard. Although inapplicable, the derivative cases the Directors cite only demonstrate that the Trustee's allegations are sufficiently particularized to satisfy even these stringent pleading standards, let alone Rule 8(a)'s comparatively lenient plausibility standard.

The Directors' primary basis for seeking dismissal is their argument that the business judgment rule and an exculpatory provision in ITT's certificate of incorporation shield them from liability. But overwhelming authority holds that neither of these fact-intensive affirmative defenses are appropriate to consider on a motion to dismiss where, as here, they are nowhere mentioned on the face of the Complaint. Yet even at trial, the Directors cannot avail themselves of the business judgment rule because their breaches consist of a failure to make informed decisions—in other words, failing to exercise *any* business judgment. And the exculpatory provision, by its own terms, cannot shield the Directors from liability for breaching their duties of loyalty and good faith.

The Directors also ask the Court to ignore black-letter law requiring it, on a motion to dismiss, to view facts in the light most favorable to and draw all reasonable inferences in favor of the non-movant (the Trustee). Indeed, the purported "contradictions" the Directors point to in the Complaint require the Court to make dubious inferences in *their* favor. For example, the Directors claim that "the Complaint is peppered with facts showing . . . the Former Directors were highly engaged." But the portions of the Complaint the Directors cite for this proposition show just the opposite: that the Directors were well aware of ITT's inability to continue

operations and the massive liabilities it faced if it did not secure a transaction or wind down in an orderly manner, and yet remained unengaged, abdicated all decision-making authority to Modany, failed to investigate potentially life-saving transactions, and disregarded their duty to secure a teach-out for ITT's 40,000 students. Viewed in the light most favorable to the Trustee, these allegations, at a minimum, state plausible claims sufficient to withstand the Directors' motion to dismiss.

### Summary of Allegations

**I.      During ITT's final five months, the Directors' breaches of their fiduciary duties squandered ITT's remaining value and saddled its estate with avoidable liabilities.**

The Trustee's Complaint (the "Complaint") alleges claims against the Directors for breaching their fiduciary duties of loyalty, good faith, and care. Between April 20, 2016 and September 16, 2016 (the "Crisis Period"),[2] the Directors were presented with numerous opportunities to preserve ITT's remaining assets and avoid unnecessary liabilities. But instead of acting for ITT's benefit, the Directors engaged in systematic breaches of fiduciary duty resulting in ITT's free-fall bankruptcy on September 16, 2016.

As of March 31, 2016, ITT had reported in its public SEC filings that it held cash and cash equivalents of $108,663,000 and enjoyed total shareholder equity of $162,056,000. (*Complaint ("Compl.")* at ¶ 2.) But less than five months later, following demands made by ED and ACICS, and a rapid decline in financial stability, the Directors abandoned ITT and made the decision to file for bankruptcy on September 16, 2016, creating hundreds of millions of dollars in foreseeable and avoidable liabilities. (*Id.* at ¶ 3.)

---

[2] Capitalized terms have the meaning as set forth in the Complaint.

II.    **The Directors refused to remove Modany, abdicated all decision-making authority to him, and blindly deferred to his recommendation to reject numerous transactions.**

The Crisis Period began on April 20, 2016, when ACICS sent ITT a Show-Cause Directive Letter (*see Id.*, Ex. A) ordering ITT to show cause why its grants of accreditation should not be withdrawn or conditioned, based on information which "call[s] into question the institutions' administrative capacity, organizational integrity, financial viability, and ability to serve students in a manner that complies with ACICS standards." (*Id.* at ¶ 24.) Among other things, ACICS's letter demanded that ITT develop and submit a teach-out plan that would allow ITT's students to complete their program of study in the event that ITT precipitously closed. (*Id.*) Defendants knew that, if they failed to satisfy ACICS's concerns, ITT would lose its accreditation, and in turn, be ineligible to continue receiving Title IV funding, roughly 90% of ITT's revenue. (*Id.* at ¶ 25.) Loss of accreditation would equal financial doom for ITT. (*Id.*)

ITT's failure to resolve the deficiencies cited in the ACICS letter spurred the U.S. Department of Education ("ED") to send ITT a June 6, 2016 letter citing the risk to students if ITT were to close precipitously and requiring ITT to increase its surety with ED from $79,707,879 to $123,646,182. (*Id.* at ¶ 41.) ITT did not have the money to pay the additional $44 million surety, and if forced to, would be unable to continue operations. (*Id.* at ¶ 43.) As ITT had not secured teach-out agreements for its 40,000 active students, Defendants also knew that ED would be forced to forgive displaced students' federal loans and seek repayment of these loans from ITT and that this liability would vastly exceed the amount of ITT's current $79 million surety. (*Id.* at ¶ 42.) In short, Defendants knew that, if ITT failed to immediately secure teach-out agreements with a substantial number of its students, ITT would incur massive liabilities to ED and others. (*Id.*) But despite this knowledge, Defendants consciously disregarded their duty to

take steps to ensure that ITT had a viable teach-out plan to avoid such potentially catastrophic consequences. (*Id.*)

ITT was also facing a crisis of leadership. By the beginning of the Crisis Period, ITT's longtime CEO, Kevin Modany, was being sued by the SEC for securities fraud and his conduct was the subject of numerous investigations and lawsuits by state and federal regulators. (*Id.* at ¶ 27, Ex. A.) The CFPB and a group of state attorneys general suing ITT explicitly required Modany's departure as a precondition to settlement. (*Id.*) In emails, Directors Dean and Cohen acknowledged that ACICS saw Modany "as part of the problem." (*Id.* at ¶ 26.) And Modany himself wrote Dean opining that his and Dean's resignations were "a likely necessary action if we are going to respond with a sufficient politically charged reply" because "it's almost a certainty that we need to give these guys a dead body!" (*Id.*) Dean's emails reveal he feared a "criminal charge" against Modany. (*Id.* at ¶ 53.) Yet despite their own awareness that removing Modany was in ITT's best interests, and in disregard of the express wishes of state and federal regulators (*Id.* at ¶¶ 26-27), the Directors not only refused to remove Modany, but instead, abdicated all decision-making authority to him. (*Id.* at ¶ 5.)

For example, the Directors either rubber-stamped Modany's recommendations to reject or failed to consider numerous potentially life-saving offers from third parties to purchase or accept transfer of ITT's assets. (*Id.* at ¶¶ 35-36 (U.S. Skill's/THL transaction), ¶ 39 (Genki Capital transaction), ¶ 44 (StarCore transaction), ¶¶ 55-56 (DCF transaction).) No Director conducted or authorized independent investigations of the potential value of these transactions and all Directors knew (or should have known) that Modany's recommendations were based on his own personal interest to retain control of ITT, secure future employment, and maximize his severance compensation. (*Id.* at ¶ 65.) In these instances, the Directors consciously disregarded their duties

5

to make informed decisions on these transactions and instead abdicated their decision-making authority to Modany despite his clear conflicts. (*See id.* at ¶¶ 34-36 (Directors knew Modany's recommendation to reject U.S. Skills/THL offer was self-interested, yet deferred to it anyway), ¶ 44 (Directors deferred to Modany's recommendation to reject StarCore transaction), ¶¶ 53-54 (Modany told Dean and Brown to "block any suggested efforts" not in line with his agenda).)

Then, on August 25, 2016, the feared but clearly foreseeable happened: ITT received a final letter from ED increasing its surety on file from $94,353980 to $274,292364 and requiring payment of this additional $180 million within 30 days. It was not until this point that Modany even attempted to secure bankruptcy counsel – but by then, it was too late. (*Id.* at ¶ 53.)

On September 16, 2016, ITT abruptly ceased operations and commenced bankruptcy proceedings by filing voluntary Chapter 7 petitions in the Bankruptcy Court for the Southern District of Indiana, Indianapolis Division. (*Id.* at ¶ 58.) Because of the rushed nature of its bankruptcy filing, ITT faced significant additional and unnecessary liability. (*Id.* at ¶ 59.) For example, it failed to follow state law requirements to have ITT provide copies of student records to the applicable state agencies, which resulted in seven-figure litigation costs to resolve. (*Id.*) The Trustee was also forced to pay millions of dollars in rent on property leased by ITT while she had to pack up and store ITT assets remaining in those locations, including copies of vital student records. (*Id.*). This could have easily been avoided had ITT filed an orderly Chapter 11 liquidation. (*Id.*).

The Complaint alleges that the Directors breached their fiduciary duties to ITT by, among other things:

- abdicating crucial decision-making authority to Modany to negotiate with ED, ACICS, and potential transaction partners despite knowing that Modany was

conflicted and could not be trusted to place ITT's interests above his own personal interests given, among other things, his desire to retain control of ITT and obvious incentive to maintain the benefits of his substantial compensation package;

- retaining Modany against ITT's best interests and the wishes of ED, ACICS, regulators, state attorneys general, and potential transaction partners;

- chronically failing to exercise reasonable oversight over Modany and other management throughout the Crisis Period;

- failing to independently investigate ITT's financial condition and ability to continue operations and ignoring evidence of ITT's insolvency;

- intentionally disregarding their responsibilities by knowingly failing to investigate, secure, or make informed decisions regarding an orderly merger, sale, or other transaction to maximize ITT's value for its constituents, including a transaction that might not be in Modany's personal interest (e.g., a transaction involving his termination, a reduction in his compensation, and/or settlement of pending claims against ITT in a manner adverse to him); and

- intentionally disregarding their responsibilities by knowingly failing to investigate, secure, or make informed decisions regarding an orderly wind down of ITT's operations either inside or outside of bankruptcy that would have maximized the value of ITT's remaining assets for its shareholders and minimized potential claims against ITT, including ensuring that ITT had in place a program for the teach-out of its current student body, complying with all applicable rules and regulations regarding the disposition of student records, and complying with all applicable employment laws.

(*Id*. at ¶ 65.)

## Argument

### I.    The Trustee's Complaint satisfies Rule 8's liberal pleading standard.

"Fed.R.Civ.P. 12(b)(6), made applicable by Fed.R.Bankr.P. 7012(b), governs a motion to dismiss for failing to state a claim upon which relief can be granted." *Wahoski v. Classic Packaging Co. (In re Pillowtex Corp.)*, 427 B.R. 301, 310 (Bankr. D. Del. April 14, 2010). The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of a case. *Id*. (quoting *Paul v. Intel Corp. (In re Intel Corp.*

*Microprocessor Antitrust Litig.)*, 496 F. Supp. 2d 404, 407 (D. Del. 2007)); *Maio v. Aetna, Inc.,* 221 F.3d 472, 482 (3d Cir. 2000); *In re OODC, LLC,* 321 B.R. 128, 134 (Bankr. D. Del. 2005) ("Granting a motion to dismiss is a 'disfavored' practice . . . .").

### A.    Fed. R. Civ. P. 8(a)'s plausibility standard controls.

The pleading standard applicable to the Trustee's breach-of-fiduciary-duty claims is Fed. R. Civ. P. 8(a)'s plausibility standard. On this motion, the Directors bear the burden of showing that the Trustee has not alleged facts sufficient "to raise [her] right to relief above the speculative level… assum[ing] that all of the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007). An action under Delaware law for breach of fiduciary duty may "not be thrown out of court on a Rule 12(b)(6) motion for lack of detailed facts." *Stanziale v. Nactomi (In re Tower Air, Inc.)*, 416 F.3d 229, 237 (3d Cir. 2005). Indeed, all that Rule 8(a) requires is a "simple and brief statement of claims or irrationality or inattention and gives the directors and officers fair notice of the grounds of those claims." *Id*. at 239.

### B.    The Directors misleadingly cite heightened pleading standards applicable in derivative cases and Delaware state court—but not here.

Throughout their brief, the Directors attempt to apply heightened pleading standards applicable only in pleading demand futility in derivative cases. For example, the Directors quote *In re Citigroup Inc. S'holder Deriv. Litig*., 964 A.2d 106, 124-25 (Del. Ch. 2009) for the proposition that "[t]o overcome the Exculpatory Provision, the Complaint must contain *particularized allegations* of facts." (Brief in Support of Former Directors' Motion to Dismiss Complaint ("Brief") at 13 (emphasis added)). But *Citigroup*, like virtually all fiduciary duty cases the Directors cite, is a derivative action requiring the plaintiff to properly plead the futility

of first making a demand on the board. 964 A.2d at 125. Under Delaware Chancery Court Rule 23.1, a plaintiff must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors . . . and the reasons for the plaintiff's failure." The *Citigroup* court acknowledges that Rule 23.1 imposes "stringent requirements of factual particularity" and that "pleadings . . . are held to a higher standard under Rule 23.1 than under the permissive notice pleading standard under [Rule] 8a." *Citigroup*, 964 A.2d at 120.

The Directors later cite *Raul v. Rynd*, 929 F. Supp. 2d 333, 348 (D. Del. 2013) for the proposition that "[t]o plausibly plead a breach of the duty of loyalty, the Trustee must have made *particularized allegations* as to each individual Former Director." Brief at 13 (emphasis added). But like *Citigroup*, *Raul* is inapplicable here because: (1) it is a derivative case in which the court applies Federal Rule Civ. P. 23.1's heightened pleading standard requiring the plaintiff to "state with particularity" its demand futility allegations, [3] and (2) the *Raul* plaintiffs also asserted a securities fraud claim, to which the court applied the heightened pleading standard for fraud under Fed. Rule Civ. P. 9(b). *Id*. at 340, 342. *Raul's* requirement for "particularized allegations" has no bearing here, where the Trustee asserts neither derivative nor securities fraud claims.

And to the extent Delaware state-court cases cited by the Directors base dismissal on Del. Ch. Ct. R. 8(a), those cases are inapplicable because Delaware courts interpret Del. Ch. Ct. R. 8(a) to impose a more stringent pleading standard than its federal analog, Fed. R. Civ. P. 8(a), which applies here. *In re Tower Air*, 416 F.3d at 236 (noting that "Delaware courts interpret Chancery Rule 8 to require pleading facts with specificity. That is not the federal notice pleading

---

[3] Like Delaware Ch. Ct. R. 23.1 analyzed in *Citigroup,* Fed. R. Civ. P. 23.1 explicitly requires demand futility to be pled with "particularity."

standard."); *Ad Hoc Comm. Of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp. 2d 538, 556 (D. Del. 2008) (same).

The Directors' attempt to incorrectly impose heightened pleading standards applicable to derivative cases, securities fraud claims, or Delaware state court cases must be rejected. The Trustee has pled sufficient factual allegations to make her claim for relief plausible and, therefore, meets the applicable standard under Fed. R. Civ. P. 8(a).

## II.    The Trustee's breach-of-fiduciary-duty claims are sufficiently pled.

Delaware law provides that corporate directors owe the corporation a triad of fiduciary duties: loyalty, good faith, and due care. *McMullin v. Beran,* 765 A.2d 910, 917 (Del. 2000).[4] Here, the Trustee's Complaint sufficiently alleges the Directors breached each of these duties.

### A.    The Directors breached their duties of loyalty and good faith by abdicating all decision-making authority to Modany and intentionally disregarding their duty to make informed decisions, maximize ITT's value, and avoid unnecessary liabilities.

The fiduciary duty of loyalty "is not limited to cases involving a financial or other cognizable fiduciary conflict of interest," but "also encompasses cases where the fiduciary fails to act in good faith." *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006);[5] *see also ATR-Kim Eng. Fin.*

---

[4] Delaware law controls the Trustee's breach-of-fiduciary-duty claims. Under the internal affairs doctrine, the law of the state of incorporation governs "matters peculiar to the relationship among or between the corporation and its current officers, directors and shareholders." *Ormond v. Anthem, Inc.,* 2009 U.S. Dist. LEXIS 90837, *29 (S.D. Ind. Sept. 29, 2009) (internal citations omitted). The internal-affairs doctrine, which Indiana recently codified, recognizes that only one state should have the authority to regulate a corporation's internal affairs in furtherance of maintaining uniform governance in a free market. *Gulley v. Moravec*, 2008 U.S. Dist. LEXIS 15841, *13-17 (S.D. Ind. Feb. 29, 2008) (stating that Indiana's public policy, as expressed by the legislature is to not interfere with foreign corporations' internal affairs); *see* Indiana Code § 23-0.5-5-1 ("The law of the jurisdiction of formation of an entity governs … the internal affairs of the entity."). As ITT is incorporated in Delaware, Delaware law controls the Trustee's breach-of-fiduciary-duty claims.

[5] *Stone* was a shareholder derivative action asserting breach-of-fiduciary-duty claims against the company's directors. As a derivative case, Fed. R. Civ. P. 23.1's stringent pleading standard applied.

*Corp. v. Araneta*, 2006 Del. Ch. LEXIS 215, *71 (Del. Ch. Dec. 21, 2006) ("Under Delaware law, it is fundamental that a director cannot act loyally towards the corporation unless she tries— i.e., makes a genuine, good faith effort—to do her job as a director."). Fiduciaries breach their duties of loyalty and good faith, for example, "where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation" or "where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." *Stone*, 911 A.2d at 362; *see also Bridgeport Holdings Inc. Liquidating Trust v. Boyer ("Bridgeport")*, 388 B.R. 548, 564 (Bankr. D. Del. 2008). Fiduciaries also breach their duties of loyalty and good faith through "abdication of their directorial duties" or by "any action that demonstrates a faithlessness or lack of true devotion to the interests of the corporation and its shareholders." *Bridgeport*, 388 B.R. at 564; *Alberts v. Tuft (In re Greater Se. Cmty. Hosp. Corp. I)*, 353 B.R. 324, 344 (Bankr. D.D.C. 2006) ("[M]aking a decision that is not in the corporation's best interests—abdicating one's directorial duties—is a breach of the fiduciary duty to act in good faith, . . . which is just another permutation of the fiduciary's duty of loyalty.").

Here, the Trustee has alleged the Directors breached their duties of loyalty and good faith by, among other things:

- Abdicating crucial decision-making authority to Modany to negotiate with ED, ACICS, and potential transaction partners despite knowing that Modany was conflicted and could not be trusted to place ITT's interests above his own personal interests . . .;

- Retaining Modany against ITT's best interests and the wishes of ED, ACICS, regulators, state attorneys general, and potential transaction partners;

  [. . .]

---

While the *Stone* court ultimately affirmed dismissal of the shareholders' breach-of-fiduciary-duty claims, that decision is distinguishable from this case in which Fed. R. Civ. P. 8(a)'s pleading standard applies.

- Failing to independently investigate ITT's financial condition and ability to continue operations and ignoring evidence of ITT's insolvency;

- Intentionally disregarding their responsibilities by knowingly failing to investigate, secure, or make informed decisions regarding an orderly merger, sale, or other transaction to maximize ITT's value for its constituents, . . . and

- Intentionally disregarding their responsibilities by knowingly failing to investigate, secure, or make informed decisions regarding an orderly wind down of ITT's operations either inside or outside of bankruptcy that would have maximized the value of ITT's remaining assets . . . and minimized potential claims against ITT....

(Compl. at ¶ 65.)

The Complaint contains detailed allegations, citing letters from regulators, Board minutes, and internal ITT emails laying a detailed factual basis for these allegations. For example, the Complaint recounts various investigations and lawsuits exposing Modany's misconduct, including the SEC's securities fraud suit against him, and demands for his removal from state and federal regulators. (Compl. at ¶ 27.) The Complaint even quotes emails from Directors Dean and Cohen acknowledging that ITT's accreditor saw Modany "as part of the problem" and an email from Modany to Dean recognizing that his and Dean's resignations were "a likely necessary action" because "it's almost a certainty that we need to give these guys a dead body!" (*Id.* at ¶ 10.) The Complaint also details Modany's ongoing conflicts of interest, including a generous severance plan, and quotes contemporaneous emails showing Modany's entrenchment efforts and dominance over Dean and other Directors. (*Id.* at ¶ 35 (Modany encouraged Directors to reject U.S. Skills/THL transaction when it conflicted with Modany's personal interest), ¶ 37 (Chairman Dean writing "The CEO is still on board, so my role is quite limited."), ¶ 38 (Dean accepting Modany's refusal to discuss U.S. Skills/THL transaction), ¶ 50 (Dean deferring to Modany's refusal to contact restructuring counsel), ¶ 53 (in response to

12

August 28, 2016 ED letter, Dean reiterating multiple times that "I defer to you").) These allegations make it more than plausible that the Directors acted against ITT's best interests in retaining Modany and abdicating their directorial duties to him.

As another example, the Complaint cites ACICS's April 20, 2016 letter threatening to withdraw ITT's accreditation and requiring ITT to submit a comprehensive teach-out plan. (*Id.* at ¶ 24.) After receiving ED's subsequent June 6 letter requiring ITT to increase its surety by $44 million, which ITT did not have, Weber acknowledged the need to teach out in an email to Dean. (*Id.* at ¶ 43 ("[u]nless we get a positive sign from ED, we will have to consider teaching out").) ITT did not have the funds to pay the increased surety and ITT's Q2 earnings report confirmed ITT's inability to continue operations in light of the surety increase. (*Id.* at ¶ 44.) At this point, the Directors had no excuse for failing to immediately develop a teach-out plan to allow ITT's 40,000 students to complete their education elsewhere. They were well aware that their failure to secure a teach out would result in ED forgiving hundreds of millions of dollars in federal loans to ITT's students and ED seeking to recover these funds from ITT.[6] (*Id.* at ¶ 42.) Indeed, ED has filed such a claim in ITT's bankruptcy seeking hundreds of millions of dollars. Even to this day, the Directors have not offered any excuse or explanation for their failure to secure a teach-out. There is none. Even the Directors' Brief, which argues the merits of this case at every turn, fails to offer any explanation of this complete failure. Viewed in the light most favorable to the Trustee, these facts, at a minimum, plausibly allege that the Directors consciously disregarded their duty to, among other things, secure a teach-out.

---

[6] The Directors knew of ED regulations providing displaced students a "borrower defense" to loan repayment and giving ED the ability to recover such forgiven loans from the failed institution.

Other federal courts have held that similar allegations stated claims for breach of the duties of loyalty and good faith. For example, in *Bridgeport*, the plaintiff liquidating trust sued the debtor Bridgeport's former directors and officers for breaching their duties of loyalty and good faith by approving a sale of substantially of all of the debtors' assets for inadequate consideration. 388 B.R. at 558. The *Bridgeport* trustee alleged that, while the company faced significant financial distress, the directors gave the company's COO unfettered supervisory discretion. *Id*. at 558-59. Unimpeded, the COO, in turn, executed a rushed asset sale without conducting adequate due diligence and without soliciting competing bids. *Id*.

The *Bridgeport* court denied the defendants' motion to dismiss, holding that the complaint "alleged sufficient facts to support the claim that the D&O Defendants breached their duty of loyalty and acted in bad faith by consciously disregarding, i.e., abdicating, their duties to the Company." *Id.* at 564. The court found that "the allegations support the claim that the D&O Defendants breached their fiduciary duty of loyalty and failed to act in good faith by abdicating crucial decision-making authority to [the COO] . . . resulting in an abbreviated and uninformed sale process." *Id.*

Almost identical to the allegations made in *Bridgeport*, the Trustee here alleges that the Directors breached their duties of loyalty and good faith by "abdicating crucial decision-making authority" to Modany, for example, to reject numerous transactions and disregard regulators' demands to secure a teach out. Like the *Bridgeport* directors, the Directors rubber-stamped Modany's recommendations on potential transactions and dealings with regulators with no independent investigation or meaningful discussion. As the *Bridgeport* court held, such allegations state claims against the Directors' for breaching their fiduciary duties of loyalty and

14

good faith by "intentionally disregard[ing] their responsibilities" and by "knowingly failing to make decisions… on an informed basis." *Id.* at 565.

Similarly, in *McMullin*, the Delaware Supreme Court held that a plaintiff shareholder stated a claim against the company's directors for breaching their fiduciary duties of loyalty and good faith by alleging that the defendant directors abdicated their duties to the company's majority shareholder to approve a potential merger and failed to investigate or make a recommendation to shareholders on the proposed merger. 765 A.2d at 921-26. The court held the plaintiff minority shareholder stated a claim for breach of fiduciary duty because, under Delaware law, the directors were obligated "to act in an informed and deliberate manner in determining whether to approve an agreement of merger before submitting the proposal to the stockholders." *Id*. at 919. The court explained that "the board cannot abdicate [their fiduciary] duty by leaving it to the shareholders alone to approve or disapprove the merger agreement." *Id*.

Like *McMullin*, the Trustee's Complaint asserts that the Directors breached their fiduciary duties by acting in an uninformed manner, abdicating their directorial duties to Modany, and leaving it to him alone to approve or disapprove potentially life-saving transactions. Like the *McMullin* court found, the Directors' inaction cannot shield them from liability.

**B.     The Directors further breached their duties of loyalty and good faith by chronically failing to exercise reasonable oversight over Modany.**

Defendants spend a majority of their brief arguing that the Trustee failed to plausibly plead a *Caremark* claim, emphasizing that this claim "is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." (Brief at 6.) Indeed, this claim is often difficult because it is usually alleged in a shareholder derivative suit where a plaintiff must comply with Rule 23.1's stringent pleading requirements. Most of the cases the

Directors cite to support their argument that the Trustee has not stated a *Caremark* claim are derivative cases subject to dismissal under Del. Ch. Ct. R. 23.1. *See e.g., Brehm v. Eisner*, 746 A.2d 244 (Del. Feb. 9, 2000); *Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996); *In re Citigroup*, 964 A.2d 106, 123 (Del. Ch. 2009), *South v. Baker*, 62 A.3d 1, 14 (Del. Ch. 2012); *Stone*, 911 A.2d at 367. But again, this case is not subject to Rule 23.1's heightened pleading standard and is instead subject to Rule 8(a)'s more lenient plausibility standard.

The Directors also characterize nearly all of the Trustee's allegations as stating a *Caremark* claim. But as the Delaware Supreme Court made clear in *Stone*, bad faith can be shown in numerous ways—*Caremark* oversight failure is merely one such example. *Stone*, 911 A.2d at 369. More generally, bad faith can be shown "where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation" or "irrationally failing to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." *Id*. Here, *Caremark* oversight failure does not subsume all of the Trustee's allegations of bad faith such as the Directors' blind acquiescence to Modany's recommendations or their failure to inform themselves of potential transactions, which are not examples of oversight failure.

The Trustee nonetheless states a *Caremark* claim by alleging that the Directors breached their duties of loyalty and good faith by failing to properly "monitor or oversee" employee misconduct or violations of law. *Stone*, 911 A.2d at 370. *Caremark* liability can be imposed where: (a) the directors utterly failed to implement any reporting or information system or controls, or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention. *Id*.

16

Here, the Trustee has alleged that the Directors breached their fiduciary duties of loyalty and good faith by "chronically failing to exercise reasonable oversight over Modany and other management throughout the Crisis Period." (Compl. at ¶ 65.) For example, the Trustee alleges that the Directors failed to "supervise or monitor what steps, if any, management was taking to satisfy [ACICS] requirement[s]" including its requirement to submit a comprehensive teach-out plan. (Compl. at ¶ 33.) The Trustee also alleges that the Directors failed to supervise or monitor Modany's negotiations with potential deal partners. (Compl. at ¶ 36 ("the Directors should have . . . ensured that non-conflicted members of ITT's management and/or the Directors themselves were intimately involved in all future transactions discussions with all potential deal partners").)

In *Clingman & Hanger Mgmt. Assocs., LLC v. Knobel (In re Regents Educ., Inc.),* No. 16-cv-62028, 2018 U.S. Dist. LEXIS 122455, *4 (S.D. Fla. Jan. 9, 2018), the bankruptcy trustee for FCC Holdings, Inc., which owned and operated 41 for-profit post-secondary education schools—including Florida Career College and Anthem Education schools—alleged the company's former officers breached their fiduciary duties by failing to monitor employees who were illegally withdrawing excessive funds from ED's electronic payment system. The *Clingman* court held that the trustee sufficiently alleged a *Caremark* claim by pointing to internal emails showing the officers were aware, among other things: (1) of the withdrawals, (2) that excessive withdrawals could create liability for the company, and (3) that the company lacked any checks and balances to ensure the withdrawals were not excessive.

As in *Clingman*, the Trustee's Complaint alleges that the Directors both knowingly violated the law by failing to comply with ED regulations and other applicable laws and regulations and failed to monitor Modany. Like the officers in *Clingman*, the Directors were aware of, but had no system or checks and balances in place to ensure compliance with, ED

17

regulations, employment laws, and state law requiring ITT to provide copies of student records to state agencies.

Similarly, in *ATR-Kim*, the Delaware Chancery Court found that defendant directors breached their fiduciary duties because "[a]lthough it was [the company's chairman] who ran amok by emptying the [company] of its major assets, the other directors did nothing to make themselves aware of this blatant misconduct or to stop it." 2006 Del. Ch. LEXIS 215 at *76. The court explained that "[o]ne of the most important duties of a corporate director is to monitor the potential that others within the organization will violate their duties." *Id*. at *71-72. Like *ATR-Kim Eng. Fin. Corp.*, the Directors here breached their fiduciary duties of loyalty and good faith by failing to prevent Modany's self-dealing. These facts state a plausible *Caremark* claim.

**C.    The Directors breached their duty of care by making uninformed decisions and failing to implement any rational decision-making process.**

The Directors are also charged with the duty of care, which requires that they "use that amount of care which ordinarily careful and prudent men would use in similar circumstances" and "consider all material information reasonably available in making business decisions." *Boles v. Filipowski (In re Enivid, Inc.)*, 345 B.R. 426, 450 (Bankr. Mass. 2006) (internal citations omitted). A "good faith effort to be informed and exercise judgment is the core duty of care inquiry." *In re Tower Air*, *Inc*. 416 F.3d at 240. Lack of due care can also be shown through an irrational decision-making process. *Id*. at 241. The Directors were obligated to assess information regarding important corporate decisions with a "critical eye." *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985).

The Trustee has sufficiently pled causes of action for breach of the duty of care by alleging that, among other things, the Directors failed to independently investigate ITT's financial

condition and ability to continue operations and failed to make informed decisions regarding potential transactions or an orderly wind-down. (Compl. at ¶ 65.) In rejecting potential transactions, the Directors not only failed to employ due process, they employed *no* process: they rejected potential transactions with no diligence, deliberation, or valuation. They do not appear to have made any decision—much less an informed decision—regarding whether to pursue an orderly wind-down or secure a comprehensive teach-out.

Paralleling the facts here, the court upheld duty-of-care claims against defendant directors and officers in *In re Enivid*, *Inc*., where it was alleged that the CEO "dominated the other Defendants," who relented and remained "silent regarding the truly crucial issues facing the Company." 345 B.R. at 451-52. The court likened the defendants' governance style to a "'we don't care about the risks' attitude concerning a material corporate decision," which the court held breached their duty of care. *Id*. Here, the Directors rejected the U.S. Skills/THL and Starcore transactions based solely on Modany's recommendation without conducting any independent investigation. (Compl. at ¶ 35 (Modany encouraged Directors to reject U.S. Skills/THL transaction when it conflicted with Modany's personal interest), ¶ 44 ("Directors deferred to Modany's recommendation to reject the transaction based on Modany's speculation that it would leave insufficient residual value for shareholders").) Like the *In re Enivid* defendants, the Directors breached their duties of care by allowing Modany to dominate them and by remaining silent regarding the truly crucial issues facing the company.

Indicative of the Directors' irrational decision-making, Modany's sole justification for recommending the Directors reject the transaction was that it would provide insufficient value to shareholders. (*Id*. at ¶ 44.) But the Trustee alleges that ITT was insolvent at the time meaning

that, by definition, there was no residual value for shareholders and that the Directors obligations were to maximize ITT's remaining value for its creditors. (*Id*.)

And the Board does not appear to have even voted on two other transactions, apparently deferring entirely to Modany. (*Id*. ¶ 39 (Modany and officer Rocco Tarasi rejecting Genki offer without discussing with Directors), ¶¶ 55-56 (Modany immediately rejecting DCF transaction once DCF requested Modany's removal and freeze of executive compensation, a decision he later stated reflected the Board's position, though there is no evidence of a vote).) While Odle requested that Dean arrange a conference call with Modany to discuss one such transaction, both relented when Modany refused. (*Id*. ¶ 38.)

The Directors similarly employed no discernable process to consider or secure an orderly wind down, and instead remained beholden to Modany and his strategy.[7] This alone, "may sometimes raise a reasonable doubt that directors in such a situation could exercise judgment on behalf of the corporation concerning the transaction involving such dominant or influential party." *Friedman*, 1995 Del. Ch. LEXIS at *12. While Odle and Cohen referred Modany to restructuring counsel, they did nothing when Modany refused to contact restructuring counsel until shortly before ITT's bankruptcy. (*Id*. at ¶¶ 47, 50.) The ultimate bankruptcy filing was so rushed, that Defendants took no steps to ensure ITT had a program in place for the teach-out of its current student body or to ensure compliance with ED regulations, employment laws, or state law requiring ITT to provide copies of student records to state agencies. The Directors' failures saddled ITT's estate with hundreds of millions of dollars in unnecessary liabilities. (*Id*. at ¶¶ 59, 60.)

---

[7] *Friedman v. Beningson*, 1995 Del. Ch. LEXIS 154, *12 (Del. Ch. 1995) (stating that a director may be considered "beholden to or under the control, domination or strong influence of a party with a material financial interest in the transaction under attack, which interest is adverse to that of the corporation").

The Trustee's allegations evidence that the Directors failed to follow any process in rejecting strategic transactions, failed to conduct any investigation and failed to meaningfully discuss the viability of these offers. Instead, they accepted Modany's assertions wholesale and remained beholden to him, all while knowing that his demands were contrary to the best interests of ITT.

### III.    Neither the business judgment rule nor the exculpatory provision in ITT's Certificate of Incorporation provide a basis to dismiss.

The bulk of the Directors' brief argues for dismissal based on the business judgment rule or an exculpatory provision in ITT's Certificate of Incorporation. But both the business judgment rule and the exculpatory provision are affirmative defenses that are nowhere referenced in the Trustee's Complaint and are, therefore, inappropriate to consider on this motion.

#### A.    The business judgment rule cannot support the Directors' motion to dismiss.

The Directors spend a large portion of their brief arguing that the business judgment rule warrants dismissal. But the business judgment rule is a fact-intensive affirmative defense that is inappropriate to consider on a motion to dismiss. On the merits, an officer or director can defend his or her actions by stating that he or she affirmatively analyzed the transaction and exercised his or her reasonable judgment to make an informed decision, thereby entitling him or her to the benefits of the business judgment rule. But as such facts are rarely, if ever, gleaned from the face of a complaint, this defense cannot entitle the Directors to dismissal at the pleading stage.

In analyzing the business judgment rule under Delaware law, the Third Circuit stated in *In re Tower Air, Inc.*, that "[g]enerally speaking, we will not rely on an affirmative defense such as the business judgment rule to trigger dismissal of a complaint under Rule 12(b)(6)." 416 F.3d at 238. The exception the court recognized is when the affirmative defense appears "on the face"

of the complaint. *Id*. In that case, the court found the exception applied because, rather than waiting for the business judgment rule to be raised as an affirmative defense, the trustee's complaint placed the rule directly at issue by affirmatively alleging that "the business judgment rule does not vitiate any of [the trustee's] claims." *Id*. But in this case, where the Trustee's complaint does not mention the business judgment rule, it is inappropriate to consider at this stage of the proceedings.

An overwhelming majority of courts refuse to consider the business judgment rule on a motion to dismiss. *FDIC v. Baldini*, 983 F. Supp. 2d 772, 783 (S.D. W. Va. 2013) (collecting cases from across country and observing that "there is overwhelming authority to support the [Plaintiff's] position that the business judgment rule is highly fact dependent and, therefore, inappropriate for consideration on a motion to dismiss"); *Ad Hoc Comm. Of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp. 2d 538, 557 (D. Del. 2008) (rejecting argument that business judgment rule is appropriate to consider on a motion to dismiss where "implicitly raised" by the complaint and holding under Delaware law that "defendants are not required to plead around the business judgment rule at this stage in the proceedings"); *Shamrock Holdings v. Arenson*, 456 F. Supp. 2d 599, 609 (D. Del. 2006) (applying Delaware law and holding that claimant, who "did not make any allegations about the business judgment rule" in complaint, was "not required to plead around the business judgment rule at this stage in the proceedings"); *Stanziale v. Versa Capital Mgmt., LLC (In re Simplexity)*, Case No. 14-10569(KG), Adv. Pro. No. 16-50212(KG), 2017 Bankr. LEXIS 37, *22-23 (D. Del. Jan. 5, 2017) (applying Delaware law and refusing to consider the business judgment rule on a motion to dismiss where "there is no question that the Trustee did not raise the business judgment rule in his Complaint, and thereby did not give the Defendants any opening to raise the affirmative defense").

22

All ten of the cases the Directors cite to support their business judgment defense demonstrate why it is inapplicable here. (Brief at 8-10, 18-21.) Four of the cases are derivative cases in which the court analyzes the business judgment rule under Chancery Rule 23.1, which requires that allegations of demand futility include particularized facts that "create a reasonable doubt that the directors' action was entitled to the protections of the business judgment rule."[8] But again, Rule 23.1 is inapplicable here, along with its requirement that plaintiffs plead around the business judgment rule. Five cases are appeals following either judgment or summary judgment, where the court considered the business judgment rule on the merits.[9] And the final case the Directors cite to support their business judgment argument is *In re Tower Air, Inc.*, 416 F.3d at 238, discussed above, where the Third Circuit only analyzed the business judgment rule because it was explicitly referenced on the face of the complaint. Far from supporting the Directors' argument, these cases demonstrate why the business judgment rule is inapplicable on this motion.

But even on the merits, which are premature to consider, the Directors cannot avail themselves of the business judgment rule's protections because it neither shields a director from liability for abdicating duties nor protects actions taken without reasonable inquiry. In other words, to obtain the protection of the business judgment rule, one has to actually exercise business judgment. *In re Tower Air, Inc.*, 416 F.3d at 238 n.13 ("successfully alleging inattention

---

[8] Those three cases are *Aronson v. Lewis*, 473 A.2d 805, 808 (Del. 1983) (derivative case establishing standard that, under Rule 23.1, "demand can only be excused where facts are alleged with particularity which create a reasonable doubt that the directors' action was entitled to the protections of the business judgment rule"); *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 1999) (derivative case analyzing business judgment rule under *Aronson* and Rule 23.1); *In re Citigroup Inc. S'holder Deriv. Litig*., 964 A.2d 106, 119 (Del. Ch. 2009) (same); *Parnes v. Bally Entertainment Corp*., 722 A.2d 1243, 1247 (Del. 1999) (derivative case applying *Aronson* standard on motion for judgment on pleadings).

[9] Those five cases are *Cinerama, Inc. v. Technicolor*, 663 A.2d 1156, 1156 (Del. 1995) (appeal following trial); *Cede & Co. v. Technicolor*, 634 A.2d 345, 345 (Del. 1993) (same); *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971) (derivative case appealing order to account for excessive dividends); *In re Orchard Enters., Inc*., 88 A.3d 1, 1 (Del. Ch. 2014) (derivative case on appeal from summary judgment); *In re Walt Disney Co. Derivative Litig*., 907 A.2d 693, 697 (Del. Ch. 2005) (derivative case on appeal following trial).

circumvents the business judgment rule"); *Smith*, 488 A.2d at 889 (by failing to keep informed of the corporation's affairs, a director loses the protection of the business judgment rule, because the director's judgment must be an informed judgment). By failing to take action, without a business justification, an officer or director does not receive the benefits of the business judgment rule. As the Trustee has alleged here that the Directors abdicated their duties and failed to make informed decisions regarding potential transactions, an orderly wind-down, or otherwise maximizing ITT's value, the business judgment rule does not entitle Defendants to dismissal.

### B.    Similarly, the exculpatory provision cannot warrant dismissal.

The Directors argue that an exculpatory clause in ITT's certificate of incorporation, which is based on section 102(b)(7) of the Delaware General Corporation Law, bars the claims against the Directors other than claims "for any breach of the director's duty of loyalty" or "for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law." (Brief at 11-12.) Such exculpatory provisions generally shield directors from liability for breaching their duty of care, but not their duties of loyalty and good faith.

But under Delaware law, "[a]n exculpatory clause is considered an affirmative defense and will not provide the basis for dismissal." *In re Simplexity*, 2017 Bankr. LEXIS 37 at *18. As the exculpatory provision is an affirmative defense and the Complaint nowhere references the exculpatory provision, it cannot form the basis for dismissal. *Id*.

Moreover, "[w]hen a duty of care breach is not the exclusive claim, a court may not dismiss the duty of care claim based upon an exculpatory provision." *Bridgeport*, 388 B.R. at 568 (Bankr. D. Del. 2008) (quoting *Alidina v. Internet.com Corp*., No. 17235, 2002 Del. Ch. LEXIS 156, 2002 WL 31584292, at *8 (Del. Ch. Nov. 6, 2002)) (emphasis in original). Here,

because the Trustee has sufficiently pled breach of the duties of loyalty and good faith, the exculpatory provision cannot operate to insulate the Directors from a duty-of-care claim.

**IV.    The Directors ignore black letter law that reasonable inferences must be drawn in the Trustee's favor.**

Beyond citing several incorrect pleading standards, the Directors ignore black-letter law that a court must view the facts in the light most favorable to and draw all reasonable inferences in favor of the non-movant (here, the Trustee) on a motion to dismiss. The alleged contradictions the Directors cite are based on dubious inferences the Directors ask the Court to make in *their* favor.

Several sections of the Directors' brief point to allegations they claim demonstrate their "active engagement." (Brief at 7, 9, 17.) In each reprise, the Directors point to the same basic allegations, none of which "contradict" the Trustee's claims:

- The Directors "attended board meetings" and "frequently emailed each other and Modany." (Brief at 17.)
- The Directors rejected four potential transactions based on Modany's recommendation and with no investigation. (Compl. at ¶¶ 35-36, 39, 44, 55-56.)
- Modany rejected Odle's request for a conference call to discuss one such transaction. (*Id*. ¶ 38.)
- Cohen and Odle referred Modany to restructuring counsel, which upset Modany. (*Id*. at ¶¶ 47, 50.)
- Modany recruited Dean and Brown's help in blocking "meddling" or "second-guessing" by Odle or Cohen. (*Id*. at ¶¶ 53, 57.)

The Directors claim these allegations show they "attended board meetings to discuss ITT business and options," "considered at least four different offers," "considered multiple restructuring consultants," and "actively supervised and interacted with . . . Modany, even to the

point of causing friction."[10] (Brief at 7, 17.) If mundane activities like frequent emailing, attending board meetings, or voting on transactions shielded directors from liability, it would be nearly impossible for directors to breach their fiduciary duties. Never mind the Complaint's other allegations that the Directors conducted no investigation before rejecting these transactions—in fact, there is no evidence that the Board even voted on the Genki and DCF transactions—and that the Directors relented to Modany's refusal to retain restructuring or bankruptcy counsel until too late. It would require the Court to make unreasonable inferences *against* the Trustee to infer active engagement from these allegations.

Elsewhere, the Directors argue Paragraphs 26, 43, and 48 of the Complaint are "inconsistent" with the Trustee's claims because they show the Directors "wrestled with the demands of regulators and how to satisfy them." But these paragraphs allege nothing of the sort:

> Paragraph 26 alleges Dean wrote Cohen acknowledging that ACICS saw Modany "as part of the problem" and that Modany told Dean that his and Dean's resignations were "a likely necessary action" because "it's almost a certainty that we need to give these guys a dead body!" ¶ 26.

> Paragraph 43 alleges Weber told Dean that "[u]nless we get a positive sign from ED, we will have to consider teaching out." ¶ 43.

> Paragraph 48 alleges Modany telling Dean that "[p]ressure from ED is materially intensifying…they seem to be looking in every nook and cranny for a reason to do something…we are weeks away from a material event…which…could be ED realizing we figured out a way to pay the surety so they now need to come up w/a plan to put the death nail in the coffin…once and for all!" ¶ 48.

Even if viewed in the light most favorable to the *Directors*, these allegations do not show that the Directors "wrestled" with "how to satisfy" regulators. Instead, they merely show the

---

[10] The Directors also claim that "the Trustee acknowledges—as she must—that the Former Directors actively supervised and interacted with management, including Modany, even to the point of causing friction." (Brief at 7.) But nowhere in the Complaint does the Trustee "acknowledge" that the Directors "actively supervised" Modany. And the fact that they "interacted" with him hardly rebuts the Trustee's allegations.

Directors were aware that Modany was a problem, that they needed to secure a teach-out, and that ITT was facing increasing pressure from ED. Viewed in the light most favorable to the Trustee, as they must be on a motion to dismiss, these allegations are not "inconsistent with" but actually support the Trustee's claims that the Directors knew what steps to take—*e.g.*,. fire Modany and pursue a transaction or secure a teach-out – but consciously disregarded their duties, ensuring the foreshadowed "death nail in the coffin."

Lastly, the Directors argue that ITT's Annual Meeting Notice and Proxy Statement "evinces the Directors' intent not to violate laws or regulations" based solely on the fact that one of the listed "Management Objectives*"* is to "resolve . . . outstanding legal and regulatory matters." (Brief at 16.) In other words, the Directors ask the Court to infer the Directors' subjective intent to comply with applicable law and regulations from an annual statement saying that *management* intends to *resolve pending litigation*. This is more than a modest inferential leap. This and the other alleged "contradictions" the Directors cite rely on strained inferences that fail under their own weight, let alone when viewing the facts in the light most favorable to the Trustee.

**V.    The Trustee sufficiently alleges facts relating to each individual Director.**

The Directors argue that the Trustee has not plausibly alleged that each individual director breached his or her fiduciary duties citing *Bank of Am., N.A. v. Knight*, 725 F.2D 815 (7th Cir. 2013). But this case merely found that a complaint against accountants for violating an Illinois statute failed to state a claim by failing to allege "who did what." *Id.* at 818. Here, the Trustee's Complaint describes each Director's role and cites the Directors' own emails showing their individual misconduct. Perhaps more importantly, the Complaint alleges what the Directors did *not* do, collectively or individually – none sought to have potential life-saving transactions

27

independently reviewed, none sought to consider or implement teach out procedures, and none

sought to have Modany removed despite regulators' and potential investors' insistence.

The Complaint further contains particularly detailed allegations regarding Chairman

Dean's complicity with and complete abdication to Modany:

- Upon receiving the April 20, 2016 ACICS Show-Cause Directive Letter, Dean acknowledged that ACICS saw Modany "as part of the problem." Modany also wrote Dean opining that his and Dean's resignations were "a likely necessary action if we are going to respond with a sufficient politically charged reply" because "it's almost a certainty that we need to give these guys a dead body!" (Compl. at ¶ 26.)

- In an April 29, 2016 email exchange to a colleague, Dean acknowledged his lack of engagement to ITT, describing his role as chairman of the board as quite limited: "I have been on the ITT board since 1994 and stepped in—supposedly temporarily—after the CEO was charged with civil fraud by the SEC. The CEO is still on board, *so my role is quite limited*. I spend most of my time these days in Florida . . . ." (*Id*. at ¶ 37.)

- On or about April 30, 2016, Defendant Odle asked Dean, as Chairman of the Board, to schedule a conference call with Modany to discuss transaction options. Dean replied to Odle that Modany "declined the request." Dean failed to pushback on Modany, despite being his supervisor. (*Id*. at ¶ 38.)

- On July 22, 2016, Odle passed on information about restructuring consultants, Alvarez & Marsal ("A&M"), to Dean, who forwarded the email to Modany saying he had no plans to contact A&M. (*Id*. at ¶ 47.)

- After A&M contacted Dean on August 15, 2016, Dean told Modany that he would decline A&M's offer to assist in restructuring. (*Id*. at ¶ 50.)

- On August 28, 2016, Modany emailed Dean, seeking his and Brown's help "in avoiding the almost certain distractions" from other Directors and to "block any suggested efforts" not in line with Modany's agenda. Dean responded that he would "defer" to Modany and that he "fully agee[d]" with Modany that "we can't have multiple chefs in the kitchen. Dean ended the mail saying, "Before you get unhappy with anything in this email, note against the first sentence. I defer to you." (*Id*. ¶¶ 53-54.)

- In late August 2016, after Modany wrote Dean threatening to resign if other Directors questioned his choice of bankruptcy counsel, Dean backed Modany's wish to preclude Director participation by stating "our sense of

urgency precludes director participation in the [bankruptcy counsel] interviews." (*Id.* at ¶ 57.)

The Trustee similarly cites emails from other Directors:

- On June 11, 2016, Weber told Dean that "[u]nless we get a positive sign from ED, we will have to consider teaching out." In fact, Weber noted that "ED may have concluded we are dead meat. If so, they will reject all alternatives and focus on maximizing recoveries from our remaining assets," corroborating the Trustee's allegations that Defendants, despite appreciating that a teach-out was crucial, failed to take the necessary steps to implement one. (*Id.* at ¶ 43.)

- In late August 2016, during a communication regarding the bankruptcy process and a change in leadership, Morgan, referring to Modany, said to Dean, "I trust him." Brown and Morgan also offered their support of Modany, utterly ignoring the criminal allegations he faced. (*Id.* at ¶ 57.)

Such allegations satisfy Rule 8(a)'s pleading standard by giving the Directors notice of their alleged misconduct. In *In re Enivid, Inc.*, the court rejected a similar group-pleading argument finding that "[a]lthough there are fewer references to [one defendant] than the other Defendants in the Complaint, the overall theme is the same: the [the CEO] so dominated the [defendants] that each failed to exercise his business judgment before the Board by keeping their misgivings secret." *Id.* at 449-50. And in *Buckley v. O'Hanlon*, 2007 U.S. Dist. LEXIS 22211, *14-15 (D. Del. Mar. 28, 2007), the court rejected a group-pleading argument where the complaint "use[d] the categories of officers and directors merely as substitutes for listing names, rather than using them as sweeping terms to avoid having to associate specific parties to particularized conduct." The court reasoned that "[w]herein much of the alleged conduct involved collective action and decision making, [the plaintiff] has sufficiently identified the small groups within DVI and their roles in approving or participating in each alleged bad-faith practice." *Id.*

Here, the Trustee's Complaint similarly alleges the same overall theme of collective inaction against each Director—abdicating decision-making authority to Modany, failing to investigate or make informed decisions regarding potential transactions, and disregarding their duty to avoid known liabilities like those resulting from a failure to secure teach-out agreements for ITT's students. Such allegations state claims against the individual Directors.

**Conclusion**

For the foregoing reasons, the Former Directors' Motion to Dismiss should be denied.

October 5, 2018

*/s/ Ronald J. Schutz*

Ronald J. Schutz (admitted *pro hac vice*)
Carly A. Kessler (admitted *pro hac vice*)
**ROBINS KAPLAN LLP**
399 Park Avenue, Suite 3600
New York NY 10022
Telephone: (212) 980-7400
Facsimile: (212) 980-7499

-and-

Michael A. Collyard (admitted *pro hac vice*)
Richard B. Allyn (admitted *pro hac vice*)
Thomas F. Berndt (admitted *pro hac vice*)
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone: (612) 349-8500
Facsimile: (612) 339-4181

*Co-counsel to the Trustee*

Respectfully submitted,

*/s/ John C. Hoard*
John C. Hoard

John C. Hoard (Atty. No. 8024-49)
**RUBIN & LEVIN, P.C.**
135 N. Pennsylvania Street, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 634-0300
Facsimile: (317) 263-9411

*Co-counsel to the Trustee*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 5, 2018, a copy of the foregoing *Trustee's Brief in Opposition to Former Directors' Motion to Dismiss* was filed electronically. Notice of this filing will be sent to the following party/parties through the Court's Electronic Filing System.

Party/parties may access this filing through the Court's system.

Richard Allyn     rallyn@robinskaplan.com
Thomas Berndt     tberndt@robinskaplan.com, jgerboth@robinskaplan.com
John Cannizzaro     john.cannizzaro@icemiller.com, Deborah.Martin@icemiller.com
Michael Anthony Collyard     mcollyard@robinskaplan.com, rhoule@robinskaplan.com
Elaine Victoria Fenna     elaine.fenna@morganlewis.com
John C Goodchild     john.goodchild@morganlewis.com
Gregory Forrest Hahn     ghahn@boselaw.com, jmcneeley@boselaw.com
John C. Hoard     johnh@rubin-levin.net, jkrichbaum@rubin-
levin.net;atty_jch@trustesolutions.com;sturpin@rubin-levin.net
Jeffrey A Hokanson     jeff.hokanson@icemiller.com, Kathy.peed@icemiller.com
Carly Kessler     ckessler@robinskaplan.com
Vilda Samuel Laurin     slaurin@boselaw.com
Rachel Jaffe Mauceri     rachel.mauceri@morganlewis.com
James P Moloy     jmoloy@boselaw.com,
dlingenfelter@boselaw.com;mwakefield@boselaw.com
Ronald James Schutz     rschutz@robinskaplan.com
U.S. Trustee     ustpregion10.in.ecf@usdoj.gov
Paul D. Vink     pvink@boselaw.com, clindsey@boselaw.com
Philip A. Whistler     philip.whistler@icemiller.com, carla.persons@icemiller.com

I further certify that on the October 5, 2018, a copy of the foregoing *Trustee's Brief in Opposition to Former Directors' Motion to Dismiss* was mailed by first-class United States mail, postage prepaid, and properly addressed to the following:

None.

/s/ John C. Hoard
John C. Hoard