UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| ITT EDUCATIONAL SERVICES, INC., *et al.*[1] | ) | Case No. 16-07207-JMC-7A |
| | ) | |
| Debtors. | ) | Jointly Administered |
| _____ | ) | |
| | ) | |
| DEBORAH J. CARUSO, the CHAPTER 7 | ) | |
| TRUSTEE for ITT EDUCATIONAL | ) | |
| SERVICES, INC., ESI SERVICE CORP. and | ) | |
| DANIEL WEBSTER COLLEGE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Adversary No. 18-50100 |
| | ) | |
| v. | ) | |
| | ) | |
| KEVIN MODANY, JOHN E. DEAN, C. DAVID | ) | |
| BROWN II, JOANNA T. LAU, THOMAS I. | ) | |
| MORGAN, JOHN VINCENT WEBER, JOHN F. | ) | |
| COZZI, SAMUEL L. ODLE, and JERRY M. | ) | |
| COHEN, | ) | |
| | ) | |
| Defendants. | ) | |

**TRUSTEE'S BRIEF IN OPPOSITION
TO KEVIN MODANY'S MOTION TO DISMISS**

_____

[1] The debtors in these cases, along with the last four digits of their respective federal tax identification numbers are ITT Educational Services, Inc. [1311]; ESI Service Corp. [2117]; and Daniel Webster College, Inc. [5980].

## **TABLE OF CONTENTS**

**Page**

Preliminary Statement.................................................................................................... 1

Summary of Allegations ................................................................................................ 2

I.     Background ......................................................................................................... 3

II.    The Crisis Period and Modany's conscious disregard of his duties. ................. 3

Argument ........................................................................................................................ 8

I.     The Trustee's Complaint satisfies Rule 8(a)'s liberal pleading standard. ......... 8

II.    The Trustee's breach-of-fiduciary-duty claims are sufficiently pled. .............. 9

       A.     Modany breached his duties of loyalty and good faith by placing ITT's
              best interests secondary to his own ego, greed, and obsession with
              retaining control of ITT. ...................................................................... 10

       B.     Modany breached his duties of loyalty and good faith by refusing to resign
              and rejecting any transaction that would not provide him continued control
              or a face-saving exit. ............................................................................ 14

       C.     Modany breached his duties of loyalty and good faith by consciously
              disregarding his duty to consult restructuring or bankruptcy counsel,
              consider an orderly wind-down, or minimize ITT's liabilities. .......... 15

       D.     Modany's irrational decision-making process breached his duty of care. ........... 16

III.   The business judgment rule does not entitle Modany to dismissal................... 17

IV.    The Trustee has far surpassed the minimal pleading standards for an equitable
       subordination claim against an insider like Modany. ...................................... 19

Conclusion ................................................................................................................... 22

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ad Hoc Comm. Of Equity Holders of Tectonic Network, Inc. v. Wolford,*
554 F. Supp. 2d 538 (D. Del. 2008).......................................................................18

*Bell Atl. Corp. v. Twombly,*
127 S. Ct. 1955 (2007)............................................................................................8

*Benjamin v. Diamond (In re Mobile Steel Co.),*
563 F.2d 692 (5th Cir. 1977) ................................................................................20

*Boles v. Filipowski (In re Enivid, Inc.),*
345 B.R. 426 (Bankr. Mass. 2006) ..................................................................11, 16

*Enron Corp. v. Ave. Special Situations Fund II, LP (In re Enron Corp.),*
333 B.R. 205 (Bankr. S.D.N.Y. 2005) ..................................................................22

*FDIC v. Baldini,*
983 F. Supp. 2d 772 (S.D. W. Va. 2013) ..............................................................18

*Freedman v. Adams,*
No. CIV.A. 4199-VCN, 2012 WL 1345638 (Del. Ch. Mar. 30, 2012) .............9, 12

*Grobow v. Perot,*
539 A.2d 180 (Del. 1987) ................................................................................12, 13

*Gulley v. Moravec,*
2008 U.S. Dist. LEXIS 15841 (S.D. Ind. Feb. 29, 2008) ........................................9

*In re Aéropostale, Inc.,*
555 B.R. 369 (Bankr. S.D.N.Y. 2016) ..................................................................22

*In re Aida's Paradise, LLC,*
485 B.R. 806 (Bankr. M.D. Fl. 2013) ..............................................................20, 21

*In re Arvinyl Metal Finishing Group, LLC,*
2009 Bankr. LEXIS 3618 (Bankr. S.D. Ind. Oct. 29, 2009)..............................19, 20

*In re Cilek,*
115 B.R. 974 (Bankr. W.D. Wisc. 1990) ..............................................................20

*In re Fedders N. Am. Inc.,*
405 B.R. 527 (Bankr. D. Del. 2009) ......................................................................10

*In re Kreisler*,
    546 F.3d 863 (7th Cir. 2008) ...................................................19

*In Re Mid-American Waste Sys.*,
    284 B.R. 53 (Bankr. D. Del. 2002) ............................................20

*In re OODC, LLC*,
    321 B.R. 128 (Bankr. D. Del. 2005) ............................................8

*Law v. Siegel*,
    571 U.S. 415 (2014) ...................................................................22

*Maio v. Aetna, Inc.*,
    221 F.3d 472 (3d Cir. 2000) .......................................................8

*McMullin v. Beran*,
    765 A.2d 910 (Del. 2000) ............................................................9

*Mills Acquisition Co. v. MacMillan, Inc.*,
    559 A.2d 1261 (Del. 1989) ........................................................10

*Official Comm. of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs., Inc.)*,
    299 B.R. 732 (Bankr. D. Del. 2003) ..........................................20

*Official Unsecured Creditors' Comm. of Broadstripe, LLC v. Highland Capital Mgmt., L.P. (In re Broadstripe, LLC)*,
    444 B.R. 51 (Bankr. Del. 2010) .............................................20, 21

*Ormond v. Anthem, Inc.*,
    2009 U.S. Dist. LEXIS 90837 (S.D. Ind. Sept. 29, 2009) ...........9

*Paul v. Intel Corp. (In re Intel Corp. Microprocessor Antitrust Litig.)*,
    496 F. Supp. 2d 404 (D. Del. 2007) ............................................8

*Shamrock Holdings v. Arenson*,
    456 F. Supp. 2d 599 (D. Del. 2006) ..........................................18

*Smith v. Van Gorkom*,
    488 A.2d 858 (Del. 1985) ..........................................................16

*Stanziale v. Nachtomi (In re Tower Air, Inc.)*,
    416 F.3d 229 (3d Cir. 2005) ..........................................9, 16, 18, 19

*Stanziale v. Versa Capital Mgmt., LLC (In re Simplexity)*,
    Case No. 14-10569(KG), Adv. Pro. No. 16-50212(KG), 2017 Bankr. LEXIS 37 (D. Del. Jan. 5, 2017) ..........................................18

*Stone v. Ritter*,
   911 A.2d 362 (Del. 2006) ...........................................................................................10

*Wahoski v. Classic Packaging Co. (In re Pillowtex Corp.)*,
   427 B.R. 301 (Bankr. D. Del. April 14, 2010).........................................................8

**Statutes**

11 U. S. C. § 105(a) ....................................................................................................3, 21, 22

Bankruptcy Code Section 510(c) ...............................................................................3, 19, 22

Indiana Code § 23-0.5-5-1 ................................................................................................10

**Rules**

Delaware Chancery Court Rule 23.1 ..............................................................................9, 12, 13

Fed. R. Bankr. P. 7012(b) ....................................................................................................8

Fed. R. Civ. P. 8(a) .................................................................................................1, 8, 9, 10

Fed. R. Civ. P. 12(b)(6)........................................................................................................8, 9

Plaintiff Deborah J. Caruso ("Plaintiff" or "Trustee"), as Chapter 7 trustee for ITT Educational Services, Inc., ESI Service Corp., and Daniel Webster College, Inc. (collectively, "ITT," "Debtors," or the "Company") submits this memorandum of law in opposition to former Chief Executive Officer, Kevin Modany's ("Modany"), Motion to Dismiss.[2] The Trustee incorporates by reference all arguments set forth in her Brief in Opposition to the Former Directors' Motion to Dismiss.[3]

## Preliminary Statement

During ITT's final months, its former CEO, Kevin Modany, breached his fiduciary duties to the company by allowing his greed and refusal to admit defeat sever numerous potential lifelines and lead ITT into a rushed bankruptcy filing. Besides leaving thousands of students without degrees or the means to complete their programs of study, Modany's self-interested refusal to relinquish control, uninformed rejection of potential transactions, and disregard of the U.S. Department of Education's ("ED") demand for a comprehensive teach-out plan squandered ITT's remaining resources and saddled its estate with hundreds of millions of dollars of preventable liabilities.[4]

Modany now asks this Court to dismiss the Trustee's Complaint for lack of "particularized facts"—a standard he has lifted from derivative cases and which is inapplicable here. In this case, Rule 8(a)'s pleading standard controls and the Trustee has pled more than enough facts to make her breach of fiduciary duty and equitable subordination claims plausible.

---

[2] Capitalized terms have the meaning as set forth in the Complaint.
[3] *See* Dkt. 73.
[4] A teach-out is a way to provide the continuation of academic programming in the face of potential closure of a university. This can be done either at the university itself or by partnering with another institution of high learning. (Compl. at ¶ 25.)

When ITT's accreditor threatened to withdraw the school's accreditation in April 2016, placing ITT in an existential crisis, Modany acknowledged that his resignation "was a likely necessary action." Numerous federal and state regulators—including the SEC, who was suing him for securities fraud—explicitly called for Modany's removal. Yet rather than relinquishing control, Modany enlisted Chairman John Dean's help in blocking any "meddling" or "second-guessing" by ITT's Board and took sole control of negotiations with regulators and potential suitors.

Modany acknowledged the need for ITT to secure a transaction. Yet on two different occasions, when it became apparent that a transaction would require his removal and, consequently, damage to his reputation, he not only failed to recuse himself, but actively sabotaged the potential transactions. Modany rejected two other offers with no investigation or valuation. Even after knowing that ITT would be unable to continue its operations, he repeatedly refused to consider an orderly wind-down or retain restructuring or bankruptcy counsel, and disregarded ACICS's and ED's repeated demands for a comprehensive teach-out that would allow ITT's 40,000 students to complete their programs of study elsewhere. Until the end, Modany dominated ITT's Board and led the company into a rushed liquidation with no care given to minimizing foreseeable liabilities. Even more brazenly, Modany now seeks millions of dollars in severance payment from ITT's estate. But the Trustee has alleged more than enough facts to plausibly state claims against Modany for breach of fiduciary duty and equitable subordination and is entitled to have this case decided on the merits.

**Summary of Allegations**

2

## I.   Background

The Trustee's Complaint alleges claims against Modany for breaching his fiduciary duties of loyalty, good faith, and care and seeks to equitably subordinate Modany's claim against ITT's bankruptcy estate under Section 510(c) and 105(a) of the Bankruptcy Code. Between April 20, 2016 and September 16, 2016 (the "Crisis Period"), ITT faced an existential threat. But instead of acting for ITT's benefit, Modany engaged in systematic breaches of fiduciary duty resulting in ITT's free-fall bankruptcy on September 16, 2017.

As of March 31, 2016, ITT's former management reported in its public filings to the SEC that it held cash and cash equivalents of $108,663,000 and enjoyed total shareholder equity of $162,056,000. (*Complaint ("Compl.")* at ¶2.) But less than five months later, following demands made by ED and ACICS, and a rapid decline in financial stability, ITT was forced into a freefall bankruptcy on September 16, 2016 and now faces hundreds of millions of dollars in what were foreseeable and avoidable liabilities.

### A.   The Crisis Period and Modany's conscious disregard of his duties.

The Crisis Period began on April 20, 2016, when ACICS sent ITT a Show-Cause Directive Letter (Compl., Ex. A), ordering ITT to show cause why its grants of accreditation should not be withdrawn or conditioned, based on information which "call[s] into question the institutions' administrative capacity, organizational integrity, financial viability, and ability to serve students in a manner that complies with ACICS standards." (*Id*. at ¶24.) Modany was well-aware that if ITT failed to satisfy ACICS's concerns, ITT would lose its accreditation, and in turn, be ineligible to continue receiving Title IV funding, roughly 90% of ITT's revenue. (*Id*. at ¶25.) Loss of accreditation would equal financial doom for ITT. (*Id.*)

One of ACICS's concerns was Modany himself, who was the subject of numerous investigations and lawsuits by state and federal regulators, including one by the SEC. (*Id*. at ¶¶ 25-27, Ex. A.) The CFPB and a group of state attorneys general ("AGs") suing ITT explicitly required Modany's departure as a precondition to settlement. (*Id.* at ¶ 27.) The SEC also made clear its desire for Modany's termination, and stated that it had no interest in settling its pending suit against ITT and Modany unless Modany admitted to fraud. (*Id.*) As a result of the foregoing, ACICS made it clear that it wanted ITT to terminate Modany and that his removal would significantly help ITT retain its accreditation. (*Id*. at ¶ 26.) For example, upon receipt of ACICS's show cause letter, Modany emailed Director John Dean acknowledging that his and Dean's resignations were "a likely necessary action if we are going to respond with a sufficient politically charged reply" because "it's almost a certainty that we need to give these guys a dead body!" (*Id.*)

But being removed was not in Modany's self-interest. He was eligible for ITT's Senior Executive Severance Plan, which provided Modany with a seven-figure severance payment if certain conditions were met, one of which was that Modany not be terminated for cause. (*Id*. at ¶¶ 28, 30, Ex. D.) He also obsessed about his reputation and feared that the market would perceive him as being forced out by the SEC, AGs, the CFBP, ED, or the Board. (*Id*. at ¶¶ 28, 31.)

Consistent therewith, Modany was only interested in a potential merger, stock, or asset sale of ITT that would maximize the benefits to himself even at the expense of ITT's other constituencies (e.g., its shareholders and creditors). For example, during the Crisis Period, Modany rejected at least four potentially life-saving offers from third parties to purchase or accept transfer of ITT's assets. (*Id*. at ¶¶ 35-36 (U.S. Skill's/THL transaction), ¶ 39 (Genki

4

Capital transaction), ¶ 44 (StarCore transaction), ¶¶ 55-56 (DCF transaction).) Modany rejected

two of these offers—the Genki and StarCore offers—with no investigation or diligence. (*Id*. at ¶

39 (Tarasi telling Modany with regard to Genki offer "I'm going to ignore this unless you want

otherwise" and Modany replying "I think you know the answer…wild ass fishing!"); ¶ 56

(rejection of StarCore offer with no investigation.)

And despite being conflicted as to the other two transactions, he rejected both with little

or no input from the Directors. U.S. Skill's/THL's requirement that ITT settle its pending case

with the SEC and the SEC's refusal to settle without Modany admitting to fraud presented

Modany with a debilitating conflict of interest. But rather than recusing himself, he took

affirmative efforts to undermine the U.S. Skills/THL offer and encouraged the Directors to cease

discussions with U.S. Skills/THL, writing in an email that: "The sooner we stop talking to these

guys and wasting our time, resources and the globe's oxygen supply the better!" (*Id*. at ¶¶ 35-36.)

Modany then refused Director Sam Odle's request for a conference call to discuss this

transaction. (*Id*. ¶ 38.) The Directors, also in breach, acceded to Modany's wishes.

Later, in August 2016, Modany rejected a transaction with DCF, one that he had

previously championed, after DCF requested Modany's immediate removal and freeze of

executive compensation. (*Id*. at ¶¶ 55-56 (when DCF informed Modany that "DCF wanted to put

in a new CEO" as a condition for moving forward with a deal, Modany bristled at the request

and outright rejected it, stating, "DCF can agree to do whatever they want post acquisition but

ITT isn't agreeing to do anything that was suggested in your summary").) DCF's request again

presented Modany with a clear conflict of interest. But again, instead of recusing himself, he

immediately rejected the request, which effectively killed the deal. (*Id*. at ¶¶ 55-56.) Only later

did Modany seek to paper-over his conflict of interest and breach of duty by contending that the

decision not to go forward with DCF was supposedly the Board's position—even though it does not appear that the Board even voted on the transaction. (*Id*.)

ITT's failure to resolve the deficiencies cited in the ACICS's show cause letter spurred ED to send ITT a June 6, 2016 letter citing the risk to students if ITT were to close precipitously and requiring ITT to increase its surety with ED from $79,707,879 to $123,646,182. (*Id*. at ¶ 41.) ITT did not have the money to pay the increased surety, and if forced to pay the additional $44 million demanded by ED, it would be unable to continue operations. (*Id*. at ¶ 43.) As ITT had not secured teach-out agreements for its 40,000 active students, Modany knew that ED would be forced to forgive displaced students' federal loans and seek repayment of these loans from ITT and that this liability would vastly exceed the amount of ITT's current $79 million surety. (*Id*. at ¶ 42.) In short, Modany knew that, if ITT failed to immediately secure teach-out agreements for a substantial number of its students, ITT would incur massive liabilities to ED and others. (*Id*.) But despite this knowledge, Modany consciously disregarded his duty to take steps to ensure that ITT had a viable teach-out plan to avoid such potentially catastrophic consequences. (*Id.*) Again, the Board ignored its fiduciary duties allowing Modany to act solely in his own self-interest, and disastrous results ensued.

Even at this point, Modany refused to hire restructuring counsel. On July 5, 2016, restructuring specialist FTI Consulting ("FTI") reached out to ITT through Director Jerry Cohen, but Modany refused to retain FTI. (*Id*. at ¶ 42.) Then, on July 22, 2016, Director Sam Odle passed on information about restructuring consultants, Alvarez & Marsal ("A&M"), to Dean, who passed it on to Modany. But Modany again refused to contact A&M. (*Id*.) On August 15, 2016, A&M again contacted Dean, who told A&M to direct all future communications to Modany. Dean told Modany that unless Modany suggested otherwise, he would decline A&M's

offer to assist in restructuring. (*Id*. at ¶ 50.) Modany responded by describing Odle's decision to contact A&M as "dysfunctional." (*Id*.)

Then, on August 25, 2016, the feared but clearly foreseeable happened: ITT received a final letter from ED. (*Id.* at ¶ 52.) Modany referred to this letter as "the nuclear bomb," presumably because it set forth additional requirements as a condition to ITT's continued participation in Title IV programs, including, increasing its surety from $94,353980 to $274,292364 within 30 days after the letter was sent. (*Id.*)

Even at this point, Modany enlisted Dean's help in preventing the other Directors from "meddling" with ITT's operations or "second-guessing" him. (*Id*. ¶ at 53.) On August 28, 2016, Modany emailed Dean, seeking his and Brown's help "in avoiding the almost certain distractions from Jerry [Cohen] and possibly Sam [Odle]" and to "block any suggested efforts that are not necessary or helpful" to Modany's management. (*Id*.) It was not until this time, in late August 2016, that Modany finally capitulated to ITT's retention of bankruptcy counsel. (*Id.* at ¶ 57.) Even then, Modany told Dean that, if Cohen (who had questioned Modany's choice of counsel) was going to lead the bankruptcy process, he would consider it his termination. (*Id*.)

On September 16, 2016, ITT abruptly ceased operations and commenced bankruptcy proceedings by filing voluntary Chapter 7 petitions in the Bankruptcy Court for the Southern District of Indiana, Indianapolis Division. (*Id.* at ¶ 58.) Because of the rushed nature of its bankruptcy filing, ITT faced significant additional and unnecessary liability. (*Id.* at ¶ 59.) For one, it failed to follow state law requirements to have ITT provide copies of student records to the applicable state agencies, which resulted in seven-figure litigation costs to resolve. (*Id.*) The Trustee was also forced to pay millions of dollars in rent on property leased by ITT while she had to pack up and store ITT assets remaining in those locations, including copies of vital student

records. This could have easily been avoided had ITT filed an orderly Chapter 11 liquidation. (*Id.*)

On November 16, 2016, Modany filed a proof of claim asserting an unsecured creditor claim in ITT's liquidation seeking $5,008,199.00, or alternatively, not less than $3,360,199.00 under his severance plan. (*Id.* at ¶ 69, Ex. D.) Modany amended this claim on January 30, 2017 to, among other things, seek indemnification or any other rights Modany is entitled to under ITT's by-laws. (*Id.*)

## Argument

### I.    The Trustee's Complaint satisfies Rule 8(a)'s liberal pleading standard.

"Fed. R. Civ. P. 12(b)(6), made applicable by Fed. R. Bankr. P. 7012(b), governs a motion to dismiss for failing to state a claim upon which relief can be granted." *Wahoski v. Classic Packaging Co. (In re Pillowtex Corp.)*, 427 B.R. 301, 310 (Bankr. D. Del. April 14, 2010). The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of a case. *Id.* (quoting *Paul v. Intel Corp. (In re Intel Corp. Microprocessor Antitrust Litig.)*, 496 F. Supp. 2d 404, 407 (D. Del. 2007)); *Maio v. Aetna, Inc.,* 221 F.3d 472, 482 (3d Cir. 2000); *In re OODC, LLC,* 321 B.R. 128, 134 (Bankr. D. Del. 2005) ("Granting a motion to dismiss is a disfavored practice . . . .") (citations omitted).

The pleading standard applicable to the Trustee's breach-of-fiduciary-duty claims is Fed. R. Civ. P. 8(a)'s plausibility standard. On this motion, Modany bears the burden of showing that the Trustee has not alleged facts sufficient "to raise [her] right to relief above the speculative level… assum[ing] that all of the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007). An action under Delaware law for breach of fiduciary duty may "not be thrown out of court on a Rule 12(b)(6) motion for lack of

8

detailed facts." *Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 237 (3d Cir. 2005). Indeed, all that is required is a complaint that includes a "simple and brief statement of claims or irrationality or inattention and gives the directors and officers fair notice of the grounds of those claims." *Id*. at 239.

Like the Directors, Modany cites several cases applying heightened pleading standards, which are applicable only in derivative cases. For example, Modany's brief cites *Freedman v. Adams*, No. CIV.A. 4199-VCN, 2012 WL 1345638, at *6 (Del. Ch. Mar. 30, 2012) for the proposition that "the alleged amount of compensation and employment benefits are not particularized facts of self-interest." (Brief. at 13.) But *Freedman*, like other cases Modany cites, is a derivative action in which Delaware Chancery Court Rule 23.1 requires the plaintiff to "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors . . . and the reasons for the plaintiff's failure." Because the Trustee has not asserted a derivative claim, Rule 23.1's requirement for particularized pleading has no application here. The Trustee has pled sufficient factual allegations to make her claim for relief plausible and, therefore, meets the applicable standard under Fed. R. Civ. P. 8(a).

## II.   The Trustee's breach-of-fiduciary-duty claims are sufficiently pled.

Delaware law holds corporate officers responsible for a triad of fiduciary duties: loyalty, good faith, and due care. *McMullin v. Beran,* 765 A.2d 910, 917 (Del. 2000).[5] These duties are

---

[5] Delaware law controls the Trustee's breach-of-fiduciary-duty claims. Under the internal-affairs doctrine, the law of the state of incorporation governs "matters peculiar to the relationship among or between the corporation and its current officers, directors and shareholders." *Ormond v. Anthem, Inc.*, 2009 U.S. Dist. LEXIS 90837, *29 (S.D. Ind. Sept. 29, 2009) (internal citations omitted). The internal-affairs doctrine, which Indiana recently codified, recognizes that only one state should have the authority to regulate a corporation's internal affairs in furtherance of maintaining uniform governance in a free market. *Gulley v. Moravec*, 2008 U.S. Dist. LEXIS 15841, *13-17 (S.D. Ind. Feb. 29, 2008) (stating that Indiana's public policy, as expressed by the legislature is to not interfere with foreign corporations' internal affairs); s*ee* Indiana Code § 23-0.5-5-1 ("The law of the jurisdiction of formation of an entity governs . . . the internal affairs of the entity."). As ITT is incorporated in Delaware, Delaware law controls the Trustee's breach-of-fiduciary-duty claims.

"immutable" and "demand that corporate fiduciaries absolutely refrain from any act which breaches the trust reposed in them." *Mills Acquisition Co. v. MacMillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989). Here, the Trustee's Complaint sufficiently alleges Modany breached each of these duties.

### B. Modany breached his duties of loyalty and good faith by placing ITT's best interests secondary to his own ego, greed, and obsession with retaining control of ITT.

Modany attempts to force the Trustee's duty-of-loyalty claim into an artificially narrow mold. For example, Modany cites *In re Fedders N. Am. Inc.*, 405 B.R. 527, 540 (Bankr. D. Del. 2009) for the proposition that "[t]o state a legally sufficient claim for breach of the duty of loyalty, plaintiffs must allege facts showing that a self-interested transaction occurred, and that the transaction was unfair to the plaintiffs." (Brief at 11.)

But the Delaware Supreme Court has explicitly rejected this proposition, stating that "the fiduciary duty of loyalty is not limited to cases involving a financial or other cognizable fiduciary conflict of interest," but "also encompasses cases where the fiduciary fails to act in good faith." *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).[6] And a failure to act in good faith may be shown, for instance, "where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation . . . or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." *Id.* The Trustee here alleges that Modany breached his duties of loyalty and good faith by intentionally acting with the purpose of enhancing his wealth and maintaining control of ITT and

---

[6] *Stone* was a shareholder derivative action asserting breach-of-fiduciary-duty claims against the company's directors. As a derivative case, Fed. R. Civ. P. 23.1's stringent pleading standard applied. While the *Stone* court ultimately affirmed dismissal of the shareholders' breach-of-fiduciary-duty claims, that decision is distinguishable from this case in which Fed. R. Civ. P. 8(a)'s plausibility pleading standard applies.

consciously disregarding his duties to maximize ITT's value and minimize unnecessary liabilities.

This type of entrenchment motive is a form of self-interest that can support a duty-of-loyalty claim. For example, in *Boles v. Filipowski (In re Enivid, Inc.)*, an e-commerce "incubator" company, whose founder planned to acquire tech companies to take public, failed after several ill-advised acquisitions. 345 B.R. 426, 435-39 (Bankr. Mass. 2006). A liquidation trust for the debtor sued the company's former CEO and directors alleging that, as the company's financial condition worsened and it became apparent that the CEO's acquisition strategy was failing, the CEO painted a misleadingly rosy picture of the company's finances, dominated board members, and refused to relinquish power or consider alternative strategies. *Id*. at 444. In finding that these allegations sufficiently pled a duty-of-loyalty claim, the court explained that "allegations concerning a CEO's employment, stock position and perquisites, which constituted material benefits to him, coupled with his unwavering personal adherence to the acquisition strategy in the face of mounting operational and financial problems and warnings . . . permitted a reasonable inference of the self-interest of entrenchment." *Id*. at 445. The court described the CEO's strategy as a "damn the torpedoes" approach, being that his "principal motivation in the performance of his duties was his desire to maintain his acquisition strategy by maintaining his position and office as the Company's chief executive officer." *Id*.

Like the CEO in *In re Enivid*, Modany sought to entrench himself. Despite ITT's worsening financial condition, Modany refused to relinquish control and rejected any alternatives that did not fit his plan: he refused to speak with restructuring counsel and sabotaged transactions that were not in his self-interest. (Compl. at ¶¶ 35, 53.) He dominated board members, used Chairman Dean to fend-off Director interference, and stubbornly refused to secure a teach-out.

11

Modany attempts to disprove his self-interest by viewing the Trustee's allegations in isolation and arguing that no single allegation—such as compensation or continued employment—by itself, is sufficient to show self-interest. (Brief at 14-15.) But the cases Modany cites to support this argument are inapposite in that they are shareholder suits applying heightened pleading standards under Rule 23.1 and *Aronson v. Lewis,* 473 A.2d 805 (Del. 1984), which require a shareholder to allege *particularized* facts that a majority of the board was interested or lacked independence.[7] Again, Modany's quotation of *Freedman* shows, on its face, that the court was applying Rule 23.1's particularity requirement. (Brief at 14 (quoting *Freedman,* 2012 WL 1345638 at *6 for proposition that "[t]he Plaintiff *did not allege sufficient particularized facts* in the Complaint to show or to allow the Court reasonably to infer that the [defendants]' compensation" presented a material conflict).)

Modany also cites *Grobow v. Perot*, 539 A.2d 180, 188 (Del. 1987) for the proposition that "the mere allegation that a defendant is compensated by the debtor for his or her work for the debtor is, in and of itself, insufficient to establish an interest in conflict with that of the debtor." (Brief at 14.) But *Grobow* too was a derivative case under which Rule 23.1 required the plaintiff to "plead particularized facts demonstrating either a financial interest or entrenchment on the part of the [defendant] directors." *Grobow*, 539 A.2d at 188.[8] *Grobow* is inapposite here where Rule 23.1's heightened pleading standard does not apply.

---

[7] *Aronson* was a shareholder derivative suit establishing standard that, under Chancery Rule 23.1, "demand can only be excused where facts are alleged with particularity which create a reasonable doubt that the directors' action was entitled to the protections of the business judgment rule." 473 A.2d at 808. *Aronson* is inapposite here, where the Trustee's claims are not derivative claims subject to Rule 23.1's stringent pleading requirements.

[8] Even *Grobow* recognized that, had there been "a struggle for corporate control," it would have raised "the inherent presumption of director self-interest associated with such a contest." *Grobow*, 539 A.2d at 188. Here, the Trustee's allegations that Modany sought to retain control by sabotaging potential change-of-control transactions is an additional way that *Grobow* is distinguishable.

Citing *Orman v. Cullman,* 794 A.2d 5, 28-29 (Del. Ch. 2002), Modany further argues "the assertion of continued employment on the part of Modany and attendant receipt of compensation is not a sufficient assertion of interest." (Brief at 16.) But *Orman* was also a shareholder suit applying *Aronson's* requirement for *particularized* facts that a majority of the board was interested or lacked independence.[9] *Id*. at 23-24. The court held that the plaintiff insufficiently alleged one director's interest where the sole allegation of that director's interest was that he would become a director of the surviving company. *Id*. at 28. Yet even there, the court acknowledged that the result "might be different" if the fees the director would earn "were shown to exceed materially what is commonly understood and accepted to be a usual and customary director's fee." *Id*. at 28 n.62. *Orman* is of no use to Modany as the Trustee's claims are not subject to *Aronson*'s heightened pleading requirements and, in any event, because Modany was a highly compensated CEO whose severance or continued employment were worth many multiples of a customary director's fee.

And even more fundamentally, these cases are distinguishable because each analyzes whether an allegation of nominal compensation or continued employment *by itself* can support an inference of self-interest. None of the cases hold that compensation or continued employment can *never* create self-interest, especially where, as here, the alleged benefit is worth millions of dollars and is but one of several alleged bases of self-interest. In addition to the promise of a multi-million dollar severance or position with a surviving entity, Modany was further motivated by his refusal to relinquish control and reputational interest in avoiding the appearance of being forced out by state or federal regulators who had publicly accused him of fraud. Read as a whole

---

[9] *Aronson* was a shareholder derivative suit establishing standard that, under Chancery Rule 23.1, "demand can only be excused where facts are alleged with particularity which create a reasonable doubt that the directors' action was entitled to the protections of the business judgment rule." 473 A.2d at 808. Aronson is inapposite here, where the Trustee's claims are not derivative claims subject to Rule 23.1's stringent pleading requirements.

13

and viewed in the light most favorable to the Trustee, the Complaint's allegations of this multitude of material public and private influences weighing on Modany more than adequately allege his self-interest.

### C. Modany breached his duties of loyalty and good faith by refusing to resign and rejecting any transaction that would not provide him continued control or a face-saving exit.

In his own words, Modany acknowledged that his resignation was "a likely necessary action" and that "it's almost a certainty that we need to give [ACICS] a dead body!" Also, because the CFPB, SEC, and state AGs had accused him of fraud and called for his removal, he knew that that if he remained as CEO, it would materially obstruct ITT's ability to resolve pending lawsuits and regulatory matters. He also knew that his removal was an express condition of several potential suitors. Yet, he not only failed to step down, but insisted he control negotiations with regulators and suitors alike.

At the April 25, 2016 board meeting, Modany acknowledged "the need to pursue a transaction as soon as possible." (*Id*. at ¶ 29.) Yet Modany refused to enter any transaction that would threaten his position as CEO or create the appearance of him being forced out by the SEC, AGs, CFBP, ED, or ITT's Board. (*Id*. at ¶¶ 28, 30, 31.) For example, when he learned that ITT could not execute the U.S. Skills/THL transaction without his admitting to fraud, he not only failed to recuse himself, but actively campaigned against the transaction. (*Id*. at ¶¶ 35-36.) Modany repeatedly argues that refusing to plead guilty to fraud does not breach his fiduciary duties. (Brief at 12, 17-18.) The Complaint, however, does not allege that Modany had a duty to admit to fraud, but merely to recuse himself from considering the transaction and, at a minimum, not affirmatively recommend the Board reject it.

Later, after ITT had sunk even deeper into insolvency, Modany rejected offers from Genki Capital and StarCore Venture Group without conducting any investigation or valuation. (Compl. at ¶¶ 39, 40, 44.) The Complaint alleges that he did this because, by this time, he was negotiating a deal with DCF that would allow him to remain in involved after the transaction. (*Id*. at ¶ 40.) The prospect of continued employment and control appealed to Modany's self-interest, which again trumped ITT's interests.

Not coincidentally, Modany soured on the DCF transaction when, on August 26, 2016, Jahm Najafi called Modany to inform him that "DCF wanted to put in a new CEO." *Id*. DCF proposed that, based on its discussions with ED and in an effort to get ED approval for the transaction, Modany be removed immediately and his executive compensation be frozen. (*Id*. at ¶ 55.) Modany bristled at this recommendation, declaring "DCF can do whatever they want post acquisition but ITT isn't agreeing to do anything that was suggested in your summary" – including "change Management." (*Id*.) As predicted, without these terms, ED rejected the transaction. Another deal sabotaged. Modany's refusal to step down and his rejection of these potential transactions breached his duties of loyalty and good faith.

### D. Modany breached his duties of loyalty and good faith by consciously disregarding his duty to consult restructuring or bankruptcy counsel, consider an orderly wind-down, or minimize ITT's liabilities.

In addition to frustrating potentially lucrative transactions, Modany also refused to retain restructuring or bankruptcy counsel until it was too late. (*Id*. at ¶ 50.) Modany also refused to create a comprehensive teach-out plan for the 40,000 students he knew would be left on the street if he failed to fulfill his fiduciary obligations. (*Id*. at ¶ 3, 5, 25, 29, 33, 41, 42, 43, 44, 46, 58, 65.) Even Modany's brief offers no explanation for this inexplicable failure. There was none other than Modany's refusal to let ED win. And as a result of his stubbornness, a teach-out plan

15

was never implemented to ITT's significant detriment. (*Id.*) Taken together, these allegations more than plausibly allege that Modany breached his duties of loyalty and good faith.

### E. Modany's irrational decision-making process breached his duty of care.

The duty of care requires that Modany "use that amount of care which ordinarily careful and prudent men would use in similar circumstances" and "consider all material information reasonably available in making business decisions." *Boles v. Filipowski (In re Enivid, Inc.)*, 345 B.R. 426, 450 (Bankr. Mass. 2006) (internal citations omitted). A "good faith effort to be informed and exercise judgment is the core duty of care inquiry." *In re Tower Air*, *Inc.* 416 F.3d at 240. Lack of due care can also be shown through an irrational decision-making process. *Id.* at 241. Modany was obligated to assess information regarding important corporate decisions with a "critical eye." *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985).

Far from a rational decision-making process, Modany employed *no* process. In May 2016, while ITT was facing an existential threat, he rejected the Genki offer with no investigation, diligence, discussion with ITT's Board, professional advice, or valuation. Nothing. (Compl. at ¶¶ 39, 40, 44.) Modany does not dispute this, but merely argues that the Complaint "does not allege facts sufficient to infer that Modany determined not to pursue the offer because it did not benefit him personally." The Trustee disagrees with this contention, but there can be no dispute that the Trustee's allegations allege, at a minimum, that Modany's decision-making process (or lack thereof) was irrational and breached his duty of care.

Later, after ITT had sunk even further into insolvency, Modany rejected a letter of intent for a potential acquisition by StarCore for $2.20 per share, again with no investigation, diligence, or valuation. (*Id.* at ¶ 44.) Incredibly, Modany does not dispute that he failed to investigate this offer, but instead argues flippantly that officers are not required to investigate "every single

16

potential offer or transaction in order to uphold his or her duty of care." (Brief at 10.) Even if this were true during normal operations, it strains credulity to argue that he did not have a duty to investigate this potentially valuable offer at a time when ITT was insolvent, unable to continue operations, and desperately needed to secure a transaction or be forced into bankruptcy. And Modany's rejecting the transaction based on his speculation that it would leave insufficient residual value for shareholders was a farce given that ITT's earnings report for the quarter ended June 30, 2016 *confirmed that ITT was insolvent*. (Compl. at ¶ 44.) Construed in the light most favorable to the Trustee, Modany's failure to investigate StarCore's offer to purchase ITT for $2.20/share, at a time when ITT was insolvent and unable to continue operations, plausibly alleges a lack of due care and an irrational decision-making process.

Modany's inexplicable failure to secure a teach-out was also the result of an irrational decision-making process. There was no justification for refusing ACICS's and ED's demands— even Modany's brief does not offer one. Such a complete failure to make informed decisions on crucial issues are textbook breaches of the duty of care.

## III.    The business judgment rule does not entitle Modany to dismissal.

As the Trustee argues in her Brief in Opposition to the Former Directors' Motion to Dismiss, the business judgment rule is a fact intensive affirmative defense that is inappropriate to consider on a motion to dismiss.[10] *See, e.g.*, *In re Tower Air, Inc.*, 416 F.3d at 238 (business judgment rule inappropriate to consider on motion to dismiss unless explicitly referenced on face of complaint); *FDIC v. Baldini*, 983 F. Supp. 2d 772, 783 (S.D. W. Va. 2013) (collecting cases from across country and observing that "there is overwhelming authority to support the

---

[10] The Trustee incorporates that argument by reference here.

[Plaintiff's] position that the business judgment rule is highly fact dependent and, therefore, inappropriate for consideration on a motion to dismiss"); *Ad Hoc Comm. Of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp. 2d 538, 557 (D. Del. 2008) (rejecting argument that business judgment rule is appropriate to consider on motion to dismiss where "implicitly raised" by the complaint and holding under Delaware law that "defendants are not required to plead around the business judgment rule at this stage in the proceedings"); *Shamrock Holdings v. Arenson*, 456 F. Supp. 2d 599, 609 (D. Del. 2006) (applying Delaware law and holding claimant who "did not make any allegations about the business judgment rule" in complaint "not required to plead around the business judgment rule at this stage in the proceedings"); *Stanziale v. Versa Capital Mgmt., LLC (In re Simplexity)*, Case No. 14-10569(KG), Adv. Pro. No. 16-50212(KG), 2017 Bankr. LEXIS 37, *22-23 (D. Del. Jan. 5, 2017) (applying Delaware law and refusing to consider the business judgment rule on a motion to dismiss where "there is no question that the Trustee did not raise the business judgment rule in his Complaint, and thereby did not give the Defendants any opening to raise the affirmative defense"). Here, where the Trustee's Complaint does not mention the business judgment rule, it is inappropriate to consider at this stage of the proceedings.

In any event, Modany cannot avail himself of its protections because the business judgment rule does not protect actions taken without reasonable inquiry. By failing to keep informed of the corporation's affairs, an officer loses the protection of the business judgment rule, because the officer's judgment must be an informed judgment. *In re Tower Air, Inc.*, 416 F.3d at 238 n.13 ("successfully alleging inattention circumvents the business judgment rule"); *Smith*, 488 A.2d at 889 (by failing to keep informed of the corporation's affairs, a director loses the protection of the business judgment rule, because the director's judgment must be an

18

informed judgment). Here, the Trustee has alleged Modany made uninformed decisions, for example, by rejecting the Genki and StarCore transactions with no investigation. Thus, even on the merits, which are premature to consider at this stage, Modany's inattention precludes him from the business judgement rule's limited protections.

## IV.    The Trustee has far surpassed the minimal pleading standards for an equitable subordination claim against an insider like Modany.

Section 510(c) of the Bankruptcy Code allows a court to "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest." *In re Arvinyl Metal Finishing Group, LLC*, 2009 Bankr. LEXIS 3618, *7 (Bankr. S.D. Ind. Oct. 29, 2009).

The Complaint seeks equitable subordination of Modany's approximately $3-5 million creditor claim, which is based on the very severance plan that Modany valued more than ITT's welfare. (Compl. at ¶ 68-73.)

Equitable subordination is appropriate when the following three conditions are present: (1) the creditor engaged in some type of inequitable conduct; (2) the misconduct resulted in injury to other creditors or conferred an unfair advantage on the creditor; and (3) equitable subordination is not inconsistent with the Bankruptcy Code. *In re Kreisler*, 546 F.3d 863, 866 (7th Cir. 2008) (citing *Benjamin v. Diamond (In re Mobile Steel Co.*), 563 F.2d 692, 700 (5th Cir. 1977); *In re Arvinyl Metal Finishing Group, LLC*, 2009 Bankr. at *8. Such a remedy is most frequently imposed when the claimant has exercised an undue amount of control or influence over the debtor—like here, where, as CEO, Modany outright controlled and influenced all aspects of ITT. *In re Cilek*, 115 B.R. 974, 999 (Bankr. W.D. Wisc. 1990) (stating that courts have

19

applied the doctrine of equitable subordination when the creditor controls the debtor's affairs); *In re Aida's Paradise, LLC*, 485 B.R. 806, 813 (Bankr. M.D. Fl. 2013) ("A creditor who exerts so much control over the decision-making processes of a debtor such that it dominates the free will of the debtor may be held accountable as a fiduciary."). Indeed "[t]he most important factor in determining if a claimant has engaged in inequitable conduct for the purposes of equitable subordination is whether the claimant was an insider or outsider in relation to the debtor at the time of the act." *Official Unsecured Creditors' Comm. of Broadstripe, LLC v. Highland Capital Mgmt., L.P. (In re Broadstripe, LLC)*, 444 B.R. 51, 79 (Bankr. Del. 2010); *Official Comm. of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs., Inc.)*, 299 B.R. 732, 744 (Bankr. D. Del. 2003) ("When the defendant is an insider, the standard for finding inequitable conduct is less exacting."). An insider's conduct is "rigorously scrutinized." *In re Broadstripe, LLC*, 444 B.R. at 70.

Here, all three conditions of equitable subordination are met. The Trustee's allegations against Modany are rife with examples of "inequitable conduct" from which the Court can infer that Modany used his power to "control the debtor…to [his] own advantage or to the other creditors' detriment." *In Re Mid-American Waste Sys.*, 284 B.R. 53, 70 (Bankr. D. Del. 2002). These instances of misconduct directly injured ITT by reducing ITT's enterprise value and saddling ITT's bankruptcy estate with unnecessary liabilities. Equitable subordination is not inconsistent with the Bankruptcy Code. Just the opposite—equitably subordinating the claim of an insider like Modany who is alleged to have caused the company to lose enterprise value by acting in his own self-interest furthers the Bankruptcy Code's equitable policies.

Modany argues that the Trustee's only basis for equitable subordination of his claim are the Trustee's claims that he "willful[ly] breache[d] [his] fiduciary duty." (Brief at 28.) All the

20

Trustee is required to show is that Modany's conduct was "inequitable." *Id.*; *see also In re Aida's Paradise, LLC*, 485 B.R. at 813 ("A debtor's lower burden of proof in achieving equitable subordination over a fiduciary is the price an over-controlling creditor pays for meddling too deeply into a debtor's affairs."). Even if the Court were to find, despite the depth of evidence, that Modany did not willfully breach his fiduciary duties, the Trustee has asserted more than enough evidence to allege his conduct was inequitable. Inequitable conduct is properly shown by "material evidence of unfair conduct." *In re Broadstripe, LLC*, 444 B.R. at 79. Modany's actions were indisputably "unfair" – he failed to investigate acquisition offers, blocked "any suggested efforts" not in line with his agenda, and failed to resign as CEO despite the pending lawsuits against him, failed to cause ITT to implement a teach-out plan for its 40,000 students, among many other things. In addition, the Trustee's Complaint alleges that Modany's inequitable conduct harmed ITT and its creditors by reducing the assets available to pay ITT's obligations after the company filed for bankruptcy. (Compl. at ¶¶ 68-73.) Taking the Complaint's allegations as true for purposes of the motion to dismiss, these allegations more than adequately set forth a cause of action for equitable subordination against Modany.

Finally, Modany argues that the Trustee's claim under Section 105(a) does not permit a court to substitute its judgment where another section of the Bankruptcy Code explicitly applies. Modany purports to argue that his claims should not be equitably subordinated under Section 510(c) but infers that this "section of the Bankruptcy Code explicitly applies." (Brief at 28.) "A bankruptcy court has statutory authority to 'issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of' the Bankruptcy Code." *Law v. Siegel*, 571 U.S. 415, 421 (2014) (quoting 11 U. S. C. § 105(a)). Bankruptcy courts have "broad equitable powers and the ability to invoke equitable principles to achieve fairness and justice in the

21

reorganization process." *In re Aéropostale, Inc.*, 555 B.R. 369, 397 (Bankr. S.D.N.Y. 2016). Equitable subordination, codified in Section 510(c) "is one such example of a bankruptcy court's equitable powers." *Id.*; *Enron Corp. v. Ave. Special Situations Fund II, LP* (*In re Enron Corp.*), 333 B.R. 205, 221-22 (Bankr. S.D.N.Y. 2005) (stating that bankruptcy courts may equitably subordinate a claim in order to "promote a just and equitable distribution of the bankruptcy estate"). If the court were to find that Modany's claims cannot be equitably subordinated under Section 510(c), then, alternatively, the Court may equitably subordinate his claims under Section 105(a).

## Conclusion

For the foregoing reasons, Defendant Kevin Modany's Motion to Dismiss should be denied.

October 5, 2018

*/s/ Ronald J. Schutz*

Ronald J. Schutz (admitted *pro hac vice*)
Carly A. Kessler (admitted *pro hac vice*)
**ROBINS KAPLAN LLP**
399 Park Avenue, Suite 3600
New York NY 10022
Telephone: (212) 980-7400
Facsimile: (212) 980-7499

-and-

Michael A. Collyard (admitted *pro hac vice*)
Richard B. Allyn (admitted *pro hac vice*)
Thomas F. Berndt (admitted *pro hac vice*)
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone: (612) 349-8500
Facsimile: (612) 339-4181

*Co-counsel to the Trustee*

Respectfully submitted,

*/s/ John C. Hoard*
John C. Hoard

John C. Hoard (Atty. No. 8024-49)
**RUBIN & LEVIN, P.C.**
135 N. Pennsylvania Street, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 634-0300
Facsimile: (317) 263-9411

*Co-counsel to the Trustee*

## CERTIFICATE OF SERVICE

I hereby certify that on October 5, 2018, a copy of the foregoing *Trustee's Brief in Opposition to Kevin Modany's Motion to Dismiss* was filed electronically. Notice of this filing will be sent to the following party/parties through the Court's Electronic Filing System. Party/parties may access this filing through the Court's system.

Richard Allyn    rallyn@robinskaplan.com
Thomas Berndt    tberndt@robinskaplan.com, jgerboth@robinskaplan.com
John Cannizzaro    john.cannizzaro@icemiller.com, Deborah.Martin@icemiller.com
Michael Anthony Collyard    mcollyard@robinskaplan.com, rhoule@robinskaplan.com
Elaine Victoria Fenna    elaine.fenna@morganlewis.com
John C Goodchild    john.goodchild@morganlewis.com
Gregory Forrest Hahn    ghahn@boselaw.com, jmcneeley@boselaw.com
John C. Hoard    johnh@rubin-levin.net, jkrichbaum@rubin-levin.net;atty_jch@trustesolutions.com;sturpin@rubin-levin.net
Jeffrey A Hokanson    jeff.hokanson@icemiller.com, Kathy.peed@icemiller.com
Carly Kessler    ckessler@robinskaplan.com
Vilda Samuel Laurin    slaurin@boselaw.com

23

Rachel Jaffe Mauceri     rachel.mauceri@morganlewis.com
James P Moloy     jmoloy@boselaw.com,
dlingenfelter@boselaw.com;mwakefield@boselaw.com
Ronald James Schutz     rschutz@robinskaplan.com
U.S. Trustee     ustpregion10.in.ecf@usdoj.gov
Paul D. Vink     pvink@boselaw.com, clindsey@boselaw.com
Philip A. Whistler     philip.whistler@icemiller.com, carla.persons@icemiller.com

I further certify that on the October 5, 2018, a copy of the foregoing *Trustee's Brief in Opposition to Kevin Modany's Motion to Dismiss* was mailed by first-class United States mail, postage prepaid, and properly addressed to the following:

None.

/s/ John C. Hoard
John C. Hoard